## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

```
KAREN L. BACCHI                 . CIVIL NO. 12-11280-DJC
     Plaintiff                  .
                                .
          V.                    . BOSTON, MASSACHUSETTS
                                . MAY 15, 2015
MASSACHUSETTS MUTUAL LIFE INS. CO. .
     Defendant                  .
                                .
. . . . . . . . . . . . . . . . .
```

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE DONALD L. CABELL
UNITED STATES MAGISTRATE JUDGE

**APPEARANCES:**
ADKINS, KELSTON AND ZAVEZ, P.C.
Jason B. Adkins, Esq.
Brendan Bridgeland, Esq.
90 Canal Street, 5th Floor
Boston, MA 02114
617-367-1040
JADKINS@AKZLAW.com


BONNETT FAIRBOURN FRIEDMAN & BALINT, P.C.
Andrew S. Friedman, Esq.
2325 E. Camelback Road, Suite 300
Phoenix, AZ 85016
602-274-1100
afriedman@bffb.com


SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
Kurt Hemr, Esq.
Alisha Quintana Nanda, Esq.
Emily Jennings, Esq.
James Carroll, Esq.
500 Boylston Street
Boston, MA 02116
617-573-4800
kurt.hemr@skadden.com


Court Reporter:


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

*MARYANN V. YOUNG*
**Certified Court Transcriber**
**Wrentham, MA  02093**
**(508) 384-2003**

2

1                    I N D E X

2   EXHIBITS            DESCRIPTION              PAGE

3     1        Adkins' Declaration Ex. 24        17

4     2        Annotated Statute                 49

5     3        Privilege Log                     65

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1    (Court called into session)

2    (9:31:10 AM)

3          THE CLERK:  The United States District Court for

4    the District of Massachusetts is now in session.  The

5    Honorable Donald L. Cabell presiding.  Please be seated.

6    The case of Bacchi v. The Massachusetts Mutual Life

7    Insurance Company, Civil Action No. 12-11280 will now be

8    held before this Court.

9          Would counsel please identify themselves for the

10   record?

11         MR. FRIEDMAN:  Good morning, Your Honor, I'm

12   Andrew Friedman on behalf of the plaintiff.

13         THE COURT:  Good morning.

14         MR. ADKINS:  Good morning, Your Honor, Jason

15   Adkins on behalf of plaintiff.

16         THE COURT:  Good morning.

17         MR. BRIDGELAND:  Good morning, Brendan

18   Bridgeland on behalf of plaintiffs.

19         THE COURT:  Good morning to you all.

20         MR. HEMR:  Good morning, Your Honor, on behalf

21   of defendant MassMutual, I'm Kurt Hemr of the firm of

22   Skadden Arps.  With me are my colleagues, Alisha Nanda and

23   Emily Jennings.  Back there is Jim Carroll, also of my

24   firm, and also with us today are Scott Lashway and Susana

25   Marques of the legal department at MassMutual.

4

1          THE COURT:  All right, good morning to all of

2   you, and I hope that I won't be penalized if I don't

3   remember everybody's names, but I'll do my best.  So, we

4   are here today just for the record in connection with the

5   two motions that have been filed by the plaintiff.  One is

6   a motion to compel production of non-privileged discovery

7   from MassMutual.  The other is a motion to enforce a

8   defendant's waiver of the attorney-client privilege or in

9   the alternative to preclude MassMutual from introducing

10  evidence implicating advice of counsel.

11         So just make sure, we've looked at everything we

12  should have been looking at.  We've read, both of the

13  memoranda filed by the plaintiff, read the response in

14  opposition filed by the defendant.  I've read the reply

15  brief filed by plaintiff and the sur-reply filed by

16  MassMutual.  I've also looked at the affidavits and

17  declarations that were provided and any accompanying

18  documents such as sample of the redaction logs and the

19  like.

20         Is there anything else that we should have been

21  looking at just to make sure I, we've got everything.

22  Does that seem about right?

23         MR. FRIEDMAN:  No, Your Honor.  I'm sure you've

24  looked at more than you wanted to.

25         THE COURT:  Well there's a lot of paper there.

5

1   In just as a way to frame this, again, just making sure

2   we understand it, writ large, really this is the 40,000

3   foot macro view of these issues, if I understand it

4   correctly, the plaintiff is seeking or arguing that they

5   should be entitled to received information in the form, in

6   the form of papers as well as responses to interrogatories

7   and are challenging the fact that not all of this

8   information has been provided.  Some of it has been

9   provided in redacted form.  Some of it has been withheld

10  on the ground of privilege, and is also challenging the

11  structure of the logs themselves that reflect what

12  information has not been provided or is being provided in

13  redacted form and is challenging whether the logs are

14  complete.  All right.  The plaintiff wants this

15  information and also argues that to the extent there's an

16  attorney-client privilege, it's been waived because of the

17  defense that has been asserted by MassMutual.

18          The defense it seems to me is countering that

19  while we've given you a lot of the information you're

20  looking for we think the logs in general are adequate.  We

21  think they're also relatively complete.  We think that

22  some of the information you're looking for is privileged

23  and we think we have not waived any attorney-client

24  privilege by asserting a good faith defense in part

25  because either that information is not relevant or it's

6

1    not, it hasn't been shown it's relevant or because it's

2    not anything we intend to rely on should the case go to

3    trial.

4           So, you might quibble with some of that but

5    that's how I'm, I've kind of been approaching this.  I'll

6    hear from whoever wants to argue.  There's been a lot of

7    good thorough briefing and I'll commend the parties for

8    this and I don't think we need anymore, but what would be

9    helpful for us I think might be focusing more on the issue

10   of the privilege and whether there's been a waiver.  I

11   think that we can from the papers handle the issue of

12   whether the log is adequate, obviously you can argue it.

13   I would like to hear from the parties about what was the

14   understanding between counsel as to how logs, if there was

15   any discussion, how the logs were going to be structured.

16   How the information was going to be presented.  Also what

17   protocols if any there were for the formatting and

18   production of electronically stored information?  Just for

19   our edification it would be helpful to know that.  But,

20   again on the issue of the waiver of privilege, I had gone

21   through, I'd like some clarification on the positions of

22   the parties, just to make sure we understand correctly

23   because again we've got opening memoranda, we've got

24   replies, we've got sur-reply and sometimes the arguments

25   have evolved a bit and been refined a bit, but it seems to

7

1  me the plaintiff is saying that the defendant is saying

2  that they relied in good faith on a regulatory

3  determination and the plaintiff says MassMutual is going

4  to try to defend what they provided based in part on legal

5  conclusions of in-house counsel and legal guidance by the

6  Division of Insurance, and I just want to understand is

7  that correct, and where that's coming from, and it seems

8  like the defense is saying, well you're missing the boat.

9  What we're saying is we had approval objectively as

10 opposed to relied upon.  We didn't rely upon guidance.  We

11 had approval and our filings were consistent with the

12 guidance that we received from the division of insurance

13 so that no attorney-client privileged communication is

14 implicated and so maybe these are incompatible positions.

15 Maybe they're compatible, but you can reconcile them for

16 me and help me to understand and then based on that as

17 you, I think you've all noted the law on this matter,

18 there is some guidance but it hasn't been crystallized to

19 the point where we can all point to one similar case and

20 say this answers everything so I really am interested in

21 hearing more on that.  I'm not necessarily asking you to

22 repeat exactly what's in your briefs, but to the extent

23 you can help us work through this issue a bit more I'd

24 appreciate that.

25          So with that as a backdrop, I'll hear from the

8

1  plaintiffs on their motion.

2          MR. FRIEDMAN:  Thank you, Your Honor.  Let me

3  start with the discreet questions you asked that really

4  aren't I think part of the motion papers themselves which

5  I think were what discussions occurred about the formal of

6  the logs and there was no agreement or protocol that was

7  negotiated or discussed per se.  The sequence of events

8  was that we served discovery requests for documents and we

9  served interrogatories and over time we received what were

10  called redaction logs in which we had the logs come in and

11  then separately redacted versions of the documents which

12  had to be sort of stitched together in order to

13  understand.  We objected to the format.  There was a very

14  lengthy meet and confer  process, but I think it's fair to

15  say that we never at the outset discussed, negotiated nor

16  agreed to what format any privilege logs would be.

17          THE COURT:  Okay.

18          MR. FRIEDMAN:  With respect, Your Honor, to your

19  question about the protocols for electronic discovery, my

20  recollection is that we did talk about documents to be

21  produced in electronic format, they be produced as .tif

22  images with certain load files, but we didn't have a

23  comprehensive electronic protocol like you might see in

24  some cases where you have a vast amount of electronic

25  information being produced.  The other thing I would

1    simply say before I address some of the arguments, Your

2    Honor, is that there's, you noted at issue today we have

3    document requests and interrogatories.  The other issue is

4    the privilege objections that were lodged at the Rule

5    30(b)(6) depositions and so we've moved to overrule those

6    objections too, but admittedly all of, the outcome of all

7    of those disputes will be resolved by Your Honor's ruling

8    on the core issues.

9              THE COURT:  Well let me ask you as part of that,

10    in MassMutual's briefs, there was a suggestion that some

11    of these matters probably could have been resolved if they

12    had known of them and there wasn't necessarily a

13    principled refusal by Mass Mutual to give you the

14    information you were seeking and, you know, either of you

15    had asked or you've already gotten it, if you look over

16    here and the like.  Has any of this been narrowed?  Have

17    any of these issues been resolved since you guys filed

18    these papers?

19              MR. FRIEDMAN:  Yes, Your Honor.

20              THE COURT:  Okay.

21              MR. FRIEDMAN:  There's one group of documents

22    that we pointed out our opening papers consisted of these

23    spreadsheets.  There were many, many electronic

24    spreadsheets that were produced.  There were redacted

25    copies that were logged.  We pointed out in our papers

1  that this type of information done by accounting or

2  actuarial personnel in the ordinary course of business,

3  it's just number crunching--

4           THE COURT:  Right.

5           MR. FRIEDMAN:  --and calculations is financial

6  advice.  It's not legal advice and couldn't conceivably be

7  privileged.  The testimony was that that was done in the

8  ordinary course of business, not at direction of counsel.

9  After the motion, at some point during the briefing

10 process, MassMutual indicated that many of the redacted

11 versions that appeared on the logs had been produced--

12          THE COURT:  Right.

13          MR. FRIEDMAN:  --we couldn't tell that because

14 they were just blank documents--

15          THE COURT:  All right.

16          MR. FRIEDMAN:  --and that the ones that had been

17 withheld, at least a significant number of them were

18 withheld because there were stray notes that may have been

19 made on them.

20          THE COURT:  Right.

21          MR. FRIEDMAN:  In other instances, however, when

22 that, we would have expected to see the actual documents

23 with the notes blacked out.  So there were and my numbers

24 may be wrong, there were about 77--

25          THE COURT:  Um-hmmm.

11

1          MR. FRIEDMAN:  --spreadsheets that fall within

2  that category in which the defendant has represented to us

3  that we have the spreadsheets but that what is being

4  withheld are spreadsheets that have these notes.

5          THE COURT:  All right.

6          MR. FRIEDMAN:  In addition to that there were 16

7  or 17 spreadsheets that had not been produced in any

8  format that defendant produced asking that we agree that

9  the production would not constitute a waiver of any

10  privilege which we readily agreed to.  We think that's a

11  little bit of a smoke screen because these documents were

12  not privileged.  They're simply spreadsheets.  At least

13  one of those documents we've used and a very important

14  document relating to the way they calculated what the

15  papers call the MVM--

16          THE COURT:  Um-hmmm.

17          MR. FRIEDMAN:  --the market value over book

18  value of securities back in 1997.  So, I think it's fair

19  to say that the spreadsheet issues have largely been

20  resolved--

21          THE COURT:  Okay.

22          MR. FRIEDMAN:  --after we challenged them and I

23  take it as a concession by MassMutual that those should

24  not have been withheld in the first instance.  That is to

25  my recollection is the one issue that's sort of off the

12

1  table at this point.

2          THE COURT:  Okay.

3          MR. ADKINS:  Except that they haven't produced

4  part of the 77 like--

5          MR. FRIEDMAN:  With the notes.

6          MR. ADKINS:  We'd like the other--.

7          MR. FRIEDMAN:  Yeah, as I pointed out, the

8  remainder of the 77, to the extent that there are notes

9  that may present issue for in camera review or other

10 resolution as part of the motion.

11         THE COURT:  Yeah, with respect to any requests

12 that we do any sort of in camera review, and I'm not

13 trying to signal what our position would be on that, but

14 if we were going to contemplate it, I think we would want

15 to make sure we're talking about a small, finite number of

16 documents.  So, if as part of this you are going to be

17 asking us to do in camera review, please give us, you can

18 even do it in a supplemental or you can do today, but as

19 long as it's clear, it's the specific documents, here's

20 the number.  If we're talking a large number, you know,

21 then I approach that request differently than if you're

22 talking about a small number.

23         MR. FRIEDMAN:  On that issue, Your Honor, you'll

24 recall, initially we suggested if the number, initially

25 about 500 documents that were at issue.

13

1            THE COURT:  Yeah, that's a large number.

2            MR. FRIEDMAN:  And now 77 or so have been sort

3   of set to the side at least in terms of any significant

4   review if there's a note or something that would be fairly

5   inconsequential probably, as a burden.  I think

6   ultimately, no matter what happens on the legal issues

7   and, you know, if the Court agrees that there's been a

8   waiver of one type or another, it becomes a non-issue

9   obviously.  In anticipation, we suggest a referee might be

10  necessary.  We've reconsidered that and what we've done is

11  to refine the number of documents and we actually will be

12  prepared today, at the appropriate time, Your Honor, to

13  provide MassMutual and the Court with a narrow list of

14  documents specifically listing in a chart the Bates

15  numbers and attached are copies of the redacted versions

16  to make it clear, to make clear exactly what we're talking

17  about and that whittles it down to some number less than

18  200 and it's not a large volume, it fits within, you know,

19  the redacted copies themselves fit within this binder and

20  so presumably if the Court were to look at the unredacted

21  copies, if that's the sort of volume we're talking about.

22            THE COURT:  Okay.

23            MR. FRIEDMAN:  If Your Honor, with your

24  indulgence so I can move on to the issues--

25            THE COURT:  Please.

14

1          MR. FRIEDMAN:  --that I think are important to

2     the Court.  Now I will try not to repeat what we've put in

3     our papers, and I'll try to present things in a way

4     perhaps that hopefully will crystallize some of the issues

5     for the Court.

6          With respect to the waiver issues, there really

7     are two levels of waiver that are implicated.  There's the

8     waiver that Your Honor noted that is results from

9     plaintiffs perspective from the affirmative defenses that

10    MassMutual has raised in this case, the two affirmative

11    defenses but there's a preliminary waiver issue relating

12    to this efficiency of the logs because the law is clear

13    here as elsewhere that if a party desires to assert a

14    privilege then they carry the burden of establishing all

15    the elements of the privilege and the way that has to be

16    done under Rule 26 is through an appropriate privilege

17    log, and that the failure to do that results in either a

18    waiver or failure to establish and carry their burden

19    means that the privilege will be found to be inapplicable.

20    So there is a waiver issue that relates to the sufficiency

21    of the logs themselves.

22          THE COURT:  Two questions on that.  First, isn't

23    the law a little more equivocal than that in that it says,

24    may be, may result in a waiver, or there could be a waiver

25    as opposed to it necessarily follows and if the log is any

15

1  way inadequate, there's a waiver, but more

2  fundamentally, I think their response is that well, if you

3  take the log and you take a document and you put them side

4  by side, you can get all of the information that the rule

5  would contemplate that you could get.  So it's not that

6  onerous in context.

7         MR. FRIEDMAN:  That Your Honor, I'm prepared to

8  show Your Honor why that simply is untrue.  The law is

9  clear that they have the burden to establish on a document

10  by document basis, each and every element of the claimed

11  privilege.  The failure to do that means they've not

12  carried their burden.

13         Now the *Neelon* case in this district as well as

14  the *Decelle* or *Decelle*, I'm not sure how it's pronounced

15  case, made very clear what a privilege log must contain

16  and the purpose for the privilege log, Your Honor, was to

17  actually to avoid the necessity of in camera review and

18  was to assist the parties and the Court ultimately to

19  determine is this, are these documents privileged or not?

20  That's the whole purpose of the log.  So what is the

21  information that the Court's require to be included in the

22  log?  And it's a fairly significant list and I want to go

23  through each of the elements because I think to evaluate

24  fairly whether the logs are adequate, the question is,

25  what's the target?  What is the required showing?  And

16

1   what *Neelon* says and it's consistent with all the other

2   cases is that a privilege log, you know, should contain a

3   brief description of a summary of the contents of the

4   document, the date the document was prepared, the people,

5   person or persons who prepared the document, the person or

6   persons to whom the document was or were directed, the

7   purpose and how each element is met, and the summary has

8   to be specific enough for the Court to evaluate whether

9   the documents in fact are privileged.  So boilerplate

10  description saying, legal analysis of X, that would never

11  be sufficient because if that were the case, all somebody

12  would need to do is write in the privilege log legal

13  analysis and the Court would never be in a position to

14  truly evaluate it, just like categorical designations are

15  insufficient.  So what do we have here?  And this is going

16  to implicate two different related issues, Your Honor,

17  because in the first instance, I'm prepared to show you

18  exactly how and why the privileged log does not contain

19  the required elements in a very significant way.  I did it

20  because of the need to compare two different documents.

21  What I did was to prepare a demonstrative exhibit in which

22  we took Exhibit 24 to the Adkins' declaration.  Exhibit

23  24, Your Honor, was as best we could tell a collection of

24  redacted versions of meetings' notes on critical meetings,

25  and I think redaction is sort of a euphemism here.

1    Normally redaction is a line or two of words.  These

2    redactions are wholesale.

3              May I approach, Your Honor?

4              THE COURT:  Yes, please do.  Okay.  If you're--

5              MR. FRIEDMAN:  May I provide your clerk with a

6    copy as well?

7              THE COURT:  Pardon?

8              MR. FRIEDMAN:  May I provide your clerk with a

9    copy as well?

10             THE COURT:  Sure, and what I was going to

11   suggest is that we mark this as an exhibit for purposes of

12   today's hearing if there's no objection.

13             MR. HEMR:  I'll need to take a look at it, Your

14   Honor.

15             THE COURT:  Okay.

16             MR. HEMR:  That's fine, Your Honor.  Thank you.

17             THE COURT:  One, yeah, plaintiff's.  All right,

18   one.  Just with numbers.  Okay.  Okay, and just so the

19   record reflects it, this is a, it looks like about 29

20   pages, maybe 30 with the cover page attached.  The cover

21   page says Adkins' declaration Exhibit 24 and it's been

22   admitted as Exhibit 1.

23             PLAINTIFF'S EXHIBIT NO. 1, ADMITTED

24             MR. FRIEDMAN:  Thank you, Your Honor, and let me

25   explain what this exhibit is.  These are copies of the

18

1   redacted versions of the underlying documents for

2   Exhibit 24 which again as I said were what we believe to

3   be redacted versions of meeting notes and handwritten

4   notes, and at the bottom of each page what we did was to

5   simply take a snapshot of the privilege log entry, a

6   redaction log entry that related to each of the documents.

7   so I sort of stitched them together so that you can

8   actually see in real time what is and what is not, what

9   information is and is not available, and I don't intend to

10  go through all 29 pages because, Your Honor, it's self-

11  evident, but I think just as a few examples to show Your

12  Honor what we're talking about, if you look at the very

13  first page, this is a document provided to us that is

14  simply a black screen.  There's nothing on the document

15  itself.  So you look at the log entry, the log entry says

16  something like email chain in handwritten notes reflecting

17  a request for legal advice from as well as legal advice

18  rendered by William Fisher, Attorney for MassMutual.

19          THE COURT:  Okay, I can try to multitask so I

20  can.  Okay.  Okay.

21          MR. FRIEDMAN:  So the very first document, there

22  is no date.  There is no indication who requested whatever

23  advice they're claiming is rendered.  There's no

24  indication who the recipients were on the emails, if it is

25  an email.  There's no indication of the purpose for which

19

1   the in, the communication occurred other than this vague

2   notion that it's legal analysis on Section 141 which is

3   what this case is all about.

4          THE COURT:  And I don't mean to interrupt you,

5   but I do have a question.  We were looking at just this.

6   I mean exactly as you've done, and it is apparent that in

7   some cases there is an initial email that refers to or

8   apins to it or is accompanied by or explains emails that

9   follow so that there is one email at the beginning that

10  actually contains some of the information that you're

11  talking about, and I think for example on this one, this

12  wasn't the first email in the chain and that there was an

13  email before it that perhaps gave date, gave to whom and

14  the like, so.

15         MR. FRIEDMAN:  Yeah, on this one in fact, you're

16  absolutely correct, this one if you look at the log entry

17  it starts with 239 and this exhibit did not include 239.

18         THE COURT:  Okay.

19         MR. FRIEDMAN:  That's true for virtually none of

20  the other documents and part of the problem with this, and

21  we'll get to this in a bit, is that the log often would

22  list as separate documents things that later MassMutual

23  said, well that was part of an email or that was part of a

24  fax, but there was no way to tell that because if you see

25  a document that looks just like this, that's completely

20

1  blacked out--

2           THE COURT:  Um-hmmm.

3           MR. FRIEDMAN:  --unless it's produced as a

4  single document, a single image, there's no way to know

5  that, but this same problem exists throughout the

6  documents as well.  There are, the second page for

7  example, again are handwritten notes with the same non-

8  descriptive designation of legal advice concerning Section

9  141 which again doesn't tell us anything because that's

10 what this case is about and again there was no date on the

11 document, no indication as to who requested or who

12 received it, its purpose, no summary of its contents

13 whatsoever, no information showing the subject or why or

14 how it's privileged.  There's simply the same cut and

15 pasted reference over and over again to a request for and

16 provision of legal advice.

17          THE COURT:  Just so I can understand, so let's,

18 if you look at the explanation, in your opinion what would

19 that explanation need to say or what more would need to be

20 there before you would say it's adequate?

21          MR. FRIEDMAN:  Well, it's a little difficult not

22 seeing the document but so, as a hypothetical--

23          THE COURT:  But imagine, imagine a scenario--

24          MR. FRIEDMAN:  --as a hypothetical example--

25          THE COURT:  --where something like this might

21

1    have come up where you're saying, that's the context I

2    would have needed in order to consider this under the rule

3    to be an adequate--

4              MR. FRIEDMAN:  So, in addition to the other

5    identifying information which is critical--

6              THE COURT:  Yeah.

7              MR. FRIEDMAN:  --the dates become very critical

8    and I'll explain to Your Honor why--

9              THE COURT:  Right.

10             MR. FRIEDMAN:  --in this particular set of

11   circumstances and without knowing the recipients and all

12   that information, that's all critical--

13             THE COURT:  Right.

14             MR. FRIEDMAN:  --because the recipients can

15   indicate a waiver, they can indicate the purpose, it can

16   allow us to challenge it, but if you're focusing just on

17   the description, the summary of it, I would think you

18   would need to say there was a legal advice provided on the

19   specific issues that are being addressed.  There's no

20   dispute as to what issues we have raised in the case--

21             THE COURT:  Um-hmmm.

22             MR. FRIEDMAN:  --so, if in fact it was purely

23   legal advice relating to whether a security of a certain

24   type or an asset of a certain type was appropriately

25   contained in the MVM calculation--

1          THE COURT:  Um-hmmm.

2          MR. FRIEDMAN:  --or whether it was excluded from

3    the MVM calculation or whether a given liability was being

4    treated as a reserve, at least that would give us some

5    indication as to the nature of the subject matter.  But

6    simply to say, legal analysis concerning Section 141 is

7    completely uninformative.  How would you know, Your Honor,

8    from looking at this document, how could you evaluate

9    whether that's privileged and whether the privilege

10   properly applies?  Now you could if you saw the document

11   with an in camera review, but the privilege log which was

12   designed to avoid any camera review, there's no way and I

13   could go through page after page because this sort of

14   information is by and large missing.  There are a few

15   notes where the dates and participants were left, at the

16   top.

17         THE COURT:  Um-hmmm.  Right.

18         MR. FRIEDMAN:  But by and large what we have is

19   page after page of blank documents with no adequate

20   corresponding description.

21         THE COURT:  And numbers wise, how many documents

22   would you say, you attach this as kind of a sample for the

23   Court, but roughly how many documents would you say are

24   deficient in this way?

25         MR. FRIEDMAN:  Um--

23

1          THE COURT:  When I say documents I mean

2    entries or on the log.

3          MR. FRIEDMAN:  I would say the 197 or so that we

4    designated, some of them I will readily admit, Your Honor,

5    contain some portions of the information.

6          THE COURT:  Okay.

7          MR. FRIEDMAN:  But I think that's the universe

8    of what we think are inadequate descriptions and redacted

9    documents that are significant.  Let me say there were

10   more but what we tried to do was to say let's whittle this

11   down to eliminate things that either seem to be

12   unimportant, even though it's difficult not having seen

13   the document, or things that on their face at least we

14   could, so for example if someone said, if an entry said it

15   was a copy of a statute--

16         THE COURT:  Um-hmmm.

17         MR. FRIEDMAN:  --we're not going to quibble over

18   that.  We're not going to quibble over that.  We're not

19   going to whether that may or not be privileged because

20   it's kind of beside the point.  The things we've focused

21   on for in camera review are things which we believe are

22   very material, many of which are these critical meeting

23   notes.

24         THE COURT:  Why wouldn't it be most appropriate

25   to just say, from the Court's perspective, to just order

24

1   MassMutual to produce a revised log that comports with

2   what the rule contemplates, the rule in the case log

3   contemplate you should be given as opposed to saying

4   there's a waiver--

5           MR. FRIEDMAN:  The Court--

6           THE COURT:  --which seems pretty draconian in

7   part given that this issue was not raised until later in

8   the game is my understanding.  That this is not something

9   that was flagged from MassMutual when the logs were first

10  produced to you unless I can tell by the look on your

11  face, you're saying that's not correct?

12          MR. FRIEDMAN:  No, I think this issue arose in

13  July of last year.

14          THE COURT:  Okay.

15          MR. FRIEDMAN:  We brought to their attention the

16  logs were deficient in July of last year.  There is a

17  controversy over whether we should have come to the Court

18  sooner rather than continuing to meet and confer, but we

19  didn't wait until the end to raise the privilege log--

20          THE COURT:  Okay.

21          MR. FRIEDMAN:  --or redaction log issue.  We

22  raised it in July of last year, but I'd like to explain,

23  Your Honor, because sometimes, you know, there's a

24  corollary to these issues which I think is extremely

25  important.  You'll remember that we challenged the

25

1    assertion of privilege saying that most if not all this

2    information is likely business or financial advice--

3              THE COURT:  All right.

4              MR. FRIEDMAN:  --that is not protected.  If you

5    understand what was happening at a point in time, as

6    example, I think it will illustrate the critical nature of

7    these particular meeting notes.  MassMutual every year in

8    about May or June puts together a report on their safety

9    fund calculations which is submitted to the Division of

10   Insurance, and it's for the prior year.  As the papers

11   reflect, in year 2002 which relates to the 2001--

12             THE COURT:  Um-hmmm, right.

13             MR. FRIEDMAN:  --safety fund calculation, there

14   was a Sea change in the way that MassMutual calculated the

15   safety fund, and we deposed an actuary named, Meg Gresham,

16   to find out what was the process and what was happening

17   and what Meg Gresham said was that every year a small

18   committee would meet and decide what would be done with

19   the safety fund.

20             THE COURT:  Right.

21             MR. FRIEDMAN:  And the committee members

22   typically changed from year to year but typically it was

23   Ms. Gresham, another actuary named Carol Dube and a

24   lawyer.  Now the bonafides of this is a little suspect

25   because when I asked her about that she said whatever

26

1   lawyer we get our hands on which suggested to me that

2   perhaps lawyers were sitting in for a particular purpose

3   to cloak with the privilege, but setting that aside, I, we

4   focused on a 2002 events and I asked her about this Sea

5   change--

6           THE COURT:  Um-hmmm.

7           MR. FRIEDMAN:  --and I said tell me what the

8   business reasons were.  You know, what was the business

9   consideration for this and she readily admitted that they

10  were concerned that they were bumping up against the

11  limit--

12          THE COURT:  Right.

13          MR. FRIEDMAN:  --and that they had to do

14  something to increase the amount they were seeking to

15  withhold based upon the safety fund so there was a

16  business discussion that occurred.  Now these things don't

17  happen in a vacuum.  It's incredible to think that you

18  would have business discussions and not a single document

19  has been produced or a portion of a single document has

20  been produced showing, reflecting a narrative way, any of

21  those discussions.  We have spreadsheets which are

22  numbers, not a single email, not a single memo, not a

23  single handwritten note.  There's absolutely not a single

24  document that we have been able to see that reflects these

25  admittedly ongoing business discussions.  I would submit

27

1   that those discussions occurred in some of these

2   meetings that we have blank documents for.

3           THE COURT:  Right, and I'm not sure, maybe I

4   asked my question the wrong way, what I was asking is so

5   why shouldn't I just say to MassMutual, okay, revise these

6   logs.  Give them something that allows them to assess in a

7   meaningful way what it relates to so that they can make

8   the claim or argue whether the privilege, whether we

9   should consider it privileged or not, so all I'm trying to

10  get at is why don't I just say fine, go back and fix

11  what's wrong with this.  Give them something that they can

12  use.

13          MR. FRIEDMAN:  You undoubtedly have discretion

14  to do that, Your Honor, and the court in *Neelon*

15  confronted exactly that situation because the objecting

16  party in *Neelon* said, let us go back and do it over--

17          THE COURT:  Um-hmmm.

18          MR. FRIEDMAN:  --and the court in *Neelon*

19  considered that and in that case rejected it for the

20  reason that I think this Court should do the same.  What

21  the court said was look, discovery is largely closed.  Not

22  entirely closed in  *Neelon* but largely closed and the

23  court said there simply is not time to have a new

24  privilege log prepared and then have the subsequent

25  litigation over the adequacy of that log and the validity

28

1    of the assertions that take place.  Here, as Your Honor

2    knows, discovery was extended for a brief period after

3    Your Honor's ruling on these motions and so we're in

4    exactly the same situation.  MassMutual, despite being on

5    notice since July of last year that we claim their

6    redaction logs were inadequate, insufficient and

7    inappropriate to preserve the privilege, has elected to

8    stand on them.  Even now they're vigorously arguing in

9    their papers as late as their sur-reply that there's

10   nothing wrong with our privilege log.  They've elected to

11   stand on it.  So I'm not going to dispute that Your Honor

12   has ample discretion to allow them to redo the logs.  That

13   would I believe would require an adjustment in the

14   schedule which is always something that can be done but

15   that's where we are.  We're at the end of discovery right

16   now and ultimately I think the law is fairly clear that

17   within reason and in a non-burdensome way, I think the

18   Court's ultimately going to have to view these documents

19   in camera anyway because again, even in a more fulsome

20   description, it's just impossible where you have a meeting

21   notes to know is this a privileged discussion or not?

22          THE COURT:  Right.

23          MR. FRIEDMAN:  Is there non-privileged

24   information with the privileged information?  When they're

25   having meetings and we have notes from meetings at the

1  critical time, not the contents but the dates and the

2  participants making clear it's the committee who's making

3  business decisions, but none of the contents ultimately, I

4  don't know, I'm just afraid we would be 60 days from now

5  in the same place and inevitably if the Court doesn't find

6  a waiver or inadequate showing of meeting their burden,

7  based upon the logs that you have, we're going to wind up

8  in the same place--

9          THE COURT:  All right.

10          MR. FRIEDMAN:  --but I'm not going to dispute

11 that Your Honor has ample discretion to follow that course

12 if that's what the Court deems most appropriate under the

13 circumstances.

14          THE COURT:  All right.  So let me hear you on

15 the other ground--

16          MR. FRIEDMAN:  Yes, sir.

17          THE COURT:  --the two affirmative defenses and--

18          MR. FRIEDMAN:  The affirm, on the affirmative

19 defenses you're right that we can't, nobody can point to a

20 crystal clear first circuit test.  The closest we have is

21 the *Greater Newburyport Clamshell Alliance* case which is I

22 think the last, it may perhaps be one of the only times

23 that the First Circuit has addressed these sorts of

24 issues, and there are some district court cases that are

25 not that helpful because they sort of take different

1   positions but at least First Circuit law as we distill

2   it based upon the *Clamshell Alliance* case is that the

3   court did a couple of things.  It was considered in that

4   case, this was a case where a claim was being made rather

5   than an affirmative defense being injected or raised, but

6   the court said there are a couple of different ways you

7   can approach this.  One is an absolute rule that says if

8   you inject a claim you're automatically deemed to have

9   waived it.  The other competing approach was the balancing

10  or nuance balancing approach that is the majority view,

11  the *Hearn v. Rhay* case, which throughout the country is

12  the majority standard for this issue, and the court cited

13  ultimately adopted a balancing test citing I think with

14  approval of *Hearn v. Rhay* approach and articulated in a

15  slightly different way than the *Hearn v. Rhay* case, but

16  with deference to *Hearn v. Rhay* and the majority view--

17           THE COURT:  Um-hmmm.

18           MR. FRIEDMAN:  --the court ultimately concluded

19  look, where privileged information isn't meshed,

20  intertwined with a claim or a defense the court will find

21  a waiver.  There are cases that find and rightfully so

22  that where you raise a defense of good faith as MassMutual

23  has done here, that that is enmeshed with the privilege

24  because  particularly so where--

25           THE COURT:  Do you need any water?  I don't know

31

1    if we have any water.

2            MR. FRIEDMAN:  Let me just take some of his.

3    I'm sorry.  I have a scratchy throat, Your Honor.

4            THE COURT:  All right, can we have some water?

5            MR. FRIEDMAN:  I'm fine.

6            THE COURT:  Oh, okay.  You okay?  All right.

7            MR. FRIEDMAN:  I just took some of my co-

8    counsels.

9            THE COURT:  Okay.

10           MR. FRIEDMAN:  Particularly where the claim of

11   good faith as here is based upon a claim that we in good

12   faith relied upon the action or inaction of a regulatory

13   body such as the division and the *McLaughlin* case which we

14   cite and discuss at length in our papers was a paradigm

15   example of that.  The -- *Banco do Brazil* case in this

16   district considered the McLaughlin case and didn't repute

17   it but distinguished it--

18           THE COURT:  Um-hmmm.

19           MR. FRIEDMAN:  --but that case is very close on

20   the facts.  There it was an employer who was relying upon

21   exemptions under the wage statutes and the Department of

22   Labor  had begun an investigation and the employer had

23   counsel submit a declaration or affidavit saying that we,

24   they investigated us, they didn't find a violation so we

25   acted in good faith essentially, and the court found that

1  by necessity once you say we're relying in good faith on

2  the action or inaction of a regulator, that throws open in

3  fairness the need for us in this case to be able to say,

4  is that really true?  Were you really relying in good

5  faith on what the regulator did or didn't do or were you

6  told totally conflicting things by your counsel?  Here,

7  the interrogatory answer providing the supposed facts for

8  that affirmative defense was signed or verified by Mr.

9  Fisher, the in-house counsel who's the same person who had

10  the communications with the division, that they're saying

11  constituting good faith.  I would submit that here there's

12  a stronger case for a waiver because in the McLaughlin

13  case it wasn't as if the employer was saying that I relied

14  upon the legal advice in deciding whether these exemptions

15  applied.  They said only that I relied upon the regulator.

16         THE COURT:  Right.

17         MR. FRIEDMAN:   Here, what MassMutual is saying

18  is that every decision that was made about the safety fund

19  was legal advice, so they have their lawyers involved in

20  making the decisions.  In their sur-reply, MassMutual says

21  well, we're only quoting the objective fact that we

22  submitted these things and that the division didn't come

23  back and disagree with us.

24         THE COURT:  Right.

25         MR. FRIEDMAN:  Well first of all, by its very

33

1  nature, a good faith affirmative defense depends upon

2  your subjective good faith.  By its very nature it is

3  subjective good faith but the court in *McLaughlin* rejected

4  the same sort of attempt.  In *McLaughlin*, the employer

5  said they were simply offering evidence of the objective

6  actions by the regulator and the court would have none of

7  that.

8          THE COURT:  Right.

9          MR. FRIEDMAN:  Here, if the ultimate question,

10  Your Honor is whether there's enmeshing, if you will,--

11          THE COURT:  Right.

12          MR. FRIEDMAN:  --I would submit it's not here,

13  it's not just enmeshed.  It's engulfed.  We have been able

14  to, unable to get any information concerning the critical

15  issues of the rationale for how they calculated their

16  safety fund, the justification for how they calculated

17  their safety fund.  They can't tell us without claiming

18  privilege whether certain assets were included or

19  excluded, why they were included or excluded, what

20  definition they employed.  There's virtually every issue

21  allowing us to understand why they did what they did and

22  how they treated it is being claimed to be privileged.

23  Now it may be that the lawyers were calling all the

24  shots--

25          THE COURT:  Um-hmmm.

34

1          MR. FRIEDMAN:  It may be.  That all may be

2    true but what it shows is that it's not simply enmeshed,

3    but the issues in this case once they take the position

4    that all of these critical decisions are protected and

5    made by lawyers, it's engulfed by the legal advice, not

6    simply enmeshed.  So we think under the First Circuit

7    standard as articulated in the *Clam shell Alliance* case,

8    you have to conclude that they're enmeshed because they're

9    basically are saying we can't provide you with any of this

10   information because we're claiming it's all driven by the

11   lawyers.  In fact when I asked Meg Gresham in her

12   deposition about these issues, she said these were all

13   inextricably intertwined.  I can't answer any of these

14   questions without violating or disclosing privileges cause

15   they're all inextricably intertwined with the legal advice

16   that they're withholding from us.

17          So we think under that test they made a decision

18   to raise the good faith defense, the regulatory approval

19   defense.  We think under the *McLaughlin* case and the *Clam*

20   *shell Alliance* that works a waiver.  They point to their

21   own *Rhone-Poulenc* case which is a Third Circuit case.

22   There's only been district court's in this circuit have

23   applied, the *Hearn v. Rhay* formulation which we think

24   clearly results in a waiver.  One court has applied their

25   own *Rhone-Poulenc* formulation.  That case is

35

1    distinguishable because in that case the issue never as

2    injected.  The court was sort of indicative saying,

3    adopting that case but the First Circuit test is the

4    *Clamshell Alliance test*, and I don't think, Your Honor,

5    you can escape finding that there's this enmeshing given

6    the breath, the breathtaking scope of the privilege as

7    they are asserting it.

8              THE COURT:  All right, and I'm just, I'm, cause

9    this is kind of gets to the nub of what we've also been

10   trying to consider and I'm just making sure I understand

11   and if you can indulge us, the way we tried to understand

12   this whole concept was we came up with a kind of absurdly

13   simply scenario where, which we used when we were

14   discussing this.  So let me put it to you and then you

15   know cause this is helpful to me.  So we say imagine a

16   parking lot and the issue is where you're allowed to park.

17   There's 10 spots and you have a car.  In nine of the spots

18   it's unlawful to park.  You can get a ticket.  One of the

19   spots is legit and in determining where you want to park

20   you get advice from a lawyer who says those first nine

21   spots are no good.  You should be parking in spot number

22   10.  So that's where you park your car.  The meter person

23   comes by and they look and they say, yup, this is the one

24   spot you can park.  You're okay so you don't get a ticket,

25   and then later there's some dispute over whether in fact

36

1   you, it was proper for you to park exactly where you

2   parked.  Clearly you have a lawyer who gave you some

3   advice who said, yeah, I think you can park there, but

4   independent of that or notwithstanding that or despite

5   that, you have objectively approval by somebody connected

6   to an institution, regulator that that says, yup you can

7   park there.  Now maybe later it might turn out that the

8   person who said you could park there was wrong and you

9   couldn't park there.  I suppose in that case if the

10  defense is going to be, well I shouldn't get a ticket

11  because I was relying on the advice of my lawyer who said

12  I could park there, I think we could all agree well you're

13  clearing relying on the advice of counsel good faith and

14  it necessarily follows that you should probably be able to

15  explore.  But if what you're saying is, if it turns out

16  you could park there and your defense is well, I don't

17  know what you're complaining about we had approval and we

18  parked there and we've consistently parked there and it

19  seems like there's no problem with us parking there.  We

20  understand you're saying that I shouldn't have parked

21  there, but if I got approval then none of this other stuff

22  matters.

23          MR. FRIEDMAN:  Okay.

24          THE COURT:  But you're telling me it does.

25          MR. FRIEDMAN:  I'm telling you something a

37

1   little different.

2           THE COURT:  All right.

3           MR. FRIEDMAN:  Let's now take your hypothetical.

4           THE COURT:  Yup.

5           MR. FRIEDMAN:  And assume that there are 10

6   parking spaces and they're all illegal.

7           THE COURT:  All of them, all right.

8           MR. FRIEDMAN:  All of them and your lawyer tells

9   you you can't park there.  That's illegal and I'm telling

10  you A, B, C and D why.

11          THE COURT:  All right.

12          MR. FRIEDMAN:  But you go there and the parking

13  meter person that day says you can park there.

14          THE COURT:  All right.

15          MR. FRIEDMAN:  And then you get a ticket or you

16  get sued by some plaintiff's lawyers--

17          THE COURT:  Right.

18          MR. FRIEDMAN:  --because somebody gets hurt

19  there and you say, I relied upon the parking meter.  She's

20  an authority and she didn't tell me what I did was wrong,

21  but you were told by your lawyer you couldn't park there.

22  How would a jury ever reach a fair determination that

23  you're relying in good faith upon the parking meter when

24  you'd been told by your lawyer what you're doing is

25  illegal?  And that's what we have here, Your Honor.  What

38

1    we're saying--

2            THE COURT:  Um-hmmm.

3            MR. FRIEDMAN:  --is that we're entitled to know

4    and develop evidence whether when MassMutual says, the

5    division told us or we assumed--

6            THE COURT:  Right.

7            MR. FRIEDMAN:  --in good faith and we relied

8    upon a determination that these safety fund reports were

9    legit--

10           THE COURT:  Um-hmmm.

11           MR. FRIEDMAN:  --because we submitted them to

12   division, they didn't yank our chain on them.

13           THE COURT:  Right.

14           MR. FRIEDMAN:  And those reports by the way are

15   drafted by the lawyer and the positions articulated are

16   prepared by the lawyer, we're entitled to know is that

17   true?  We're entitled to test that and if they receive

18   legal advice saying, you're on shaky ground here my

19   friend--

20           THE COURT:  Um-hmmm.

21           MR. FRIEDMAN:  --you shouldn't be taking this

22   position.  You shouldn't withhold a billion dollars of

23   surplus from the policy holders under the market value

24   adjustment because you're wrong but the department let you

25   get away with it, that's the waiver doctrine that we're

1  talking about.

2          THE COURT:  All right.

3          MR. FRIEDMAN:  It wouldn't apply, it could turn

4  out, it could very well turn out that the parking meter

5  lady, man was right and the lawyer told you that was the

6  right place to be, but without an inquiry into what real

7  advice was given we never will know whether MassMutual was

8  told what you're doing raising serious questions or

9  perhaps is illegal or in violation of the statute.  For

10  MassMutual then to come to court and say, give us a free

11  pass because the division didn't hold us accountable,

12  that's at least from our thinking, the apt analogy Your

13  Honor.

14          THE COURT:  Okay, and what's the limitation on

15  this?  Where, I mean it seems like you go along a

16  continuum and you get to a point where the moment a lawyer

17  was in the room, there's an argument that if, well, that

18  if the lawyer was in the room at any point that somewhere,

19  somehow you were entitled to get, I'm just trying to

20  figure out how we balance that.  There are, I mean there

21  still are times when the privilege should entitle the

22  defendant to withhold production of that information.  So

23  in your analogy, just to complete the last thought, where

24  does it end?  Where would you say, okay but here's where

25  they, in this scenario, here's where they would be fined.

40

1    Here's where they could legitimately say, we don't have

2    to give you any information.  We can uphold this.

3         MR. FRIEDMAN:  The tipping point, Your Honor,

4    comes when they decide to assert an affirmative defense.

5         THE COURT:  All right.  So it's at that point.

6         MR. FRIEDMAN:  If they had, that raises, that

7    puts at issue their good faith subjective reliance upon

8    the regulator's action.  That was the point in time at

9    which an election was made to put that issue into the case

10   as an affirmative defense and that is when we're entitled

11   to see the balance.  Now does that apply in every case?  I

12   would say no but here you have the other plus factors for

13   the *Hearn v. Rhay* balancing test--

14        THE COURT:  Right.

15        MR. FREIDMAN:  --which are, that these decisions

16   according to MassMutual were all made by the lawyers.

17   It's not a situation like *McLaughlin* even where

18   MassMutual's business people made a decision and got a few

19   straight strands of legal advice--

20        THE COURT:  Um-hmmm.

21        MR. FRIEDMAN:  They're saying we're not entitled

22   to know anything about the rationale for what they did

23   because they routed it all through the lawyers.  So you

24   have the enmeshing and you have the unfairness prong.

25   That information is vital for us to understand what

41

1  happened and present it to the court or the jury to

2  trial as to the rationale and justification for what the

3  heck MassMutual was doing.

4          THE COURT:  Okay.  No, that's helpful.  Thank

5  you.

6          MR. FRIEDMAN:  Thank you, Your Honor.  Unless

7  you have further questions, I think I've taken enough of

8  your time.

9          THE COURT:  Okay, no, thank you.

10          MR. FRIEDMAN:  Okay.

11          MR. HEMR:  Good morning, Your Honor.  I would

12  like to and I will address everything that Mr. Friedman

13  addressed.  I think I would like to start with this

14  document here.

15          THE COURT:  Which is Exhibit 1.

16          MR. HEMR:  This is Exhibit 1, yes.  Thank you,

17  Your Honor.

18          THE COURT:  Um-hmmm.

19          MR. HEMR:  And I want to give you the chronology

20  if I may, Your Honor.  We started with this in October

21  2013.  That's when all of these documents were produced

22  and on the same day that I produced these documents to the

23  plaintiff and I produced them all in electronic form,

24  according to a protocol that we had worked out, and I

25  think it's a fairly elaborate protocol and it's consistent

42

1  with what you see in more complex cases or at least

2  cases involving more complex electronic information, and

3  provide for production in electronic form--

4          THE COURT:  Um-hmmm.

5          MR. HEMR:  --documents which were attached to

6  one another.  There was a protocol and I wish I understood

7  it better but they're connected up in the metadata that's

8  provided, their load files, things like that so you see

9  for instance the first page here.  It says there's an

10 email chain and handwritten notes and this is described as

11 page 239 to 240 and we see page 240 here.  Yeah, I don't

12 know where page 239 is.  I didn't bring it with me to

13 court, and so we produced this.  We produced our redaction

14 log which we thought was complete and which is consistent

15 with what we've done in other cases.  I did the production

16 in November.  I did another redaction log.  I did

17 productions in December, January, February, March.  In May

18 of 2014, I got a letter from Mr. Adkins saying, I'm not

19 really sure I like your redaction log so much.  We were

20 working on a couple different discovery issues at that

21 time.  I sent him a letter on July 1 of that year and

22 that's Exhibit 9 to my transmittal declaration which is

23 Docket No. 78, and I explained the methodology that we had

24 used and literally that's the last time I heard of it

25 until these motions were submitted to the court.  With

43

1   respect to these particular documents, I think they're a

2   little bit unusual.  You can see what they all are, are

3   their handwritten notes.  I'd explained to Mr. Adkins in

4   my letter of July 2014, and this is on page 4, note 2.

5   That these are all handwritten notes that came from the

6   file of Bill Fisher.  Bill Fisher is an attorney at

7   MassMutual and he is chiefly the fellow who advised people

8   at MassMutual regarding the meaning of this statute

9   because among other things he has responsibility for

10  dealing with the state regulator.  That's his job.  He's

11  sort of a regulatory attorney in government relations.

12  And that's the last I heard of it.  It is literally the

13  last I heard of it as of July 2014 and I submit that to

14  say that we waived things because we didn't do something

15  else over the following nine months is really absurd.  If

16  there had been a genuine concern prior to that point they

17  could have moved, there would have been plenty of time

18  left in discovery.  Secondly, I don't accept at all that

19  there is any serious issue with these privilege logs.  Can

20  we flyspeck something here and there?  They're, you know,

21  they're lengthy documents.  I'm sure you could flyspeck

22  something, but it says that they are handwritten notes of

23  Mr. Fisher that relate to the issues that are under

24  consideration here.

25            THE COURT:  Well, well, it doesn't say relates

44

1   to issues that under consideration here.

2           MR. HEMR:  What--

3           THE COURT:  I understand in context they may be

4   under consideration here but it refers say to a statute.

5           MR. HEMR:  This is true, Your Honor, and I don't

6   think I'm required to go farther and here's why.

7           THE COURT:  And that, yeah.  Okay, that's, I

8   want to hear about cause I do want you to comment on

9   whether in your view these are adequate under the rule or

10  at least what the Rule 26 contemplates.

11          MR. HEMR:  You know, I think different people

12  might take different approaches, but if I were to say well

13  Mr. Fisher was considering this legal issue that had been

14  presented--

15          THE COURT:  Um-hmmm.

16          MR. HEMR:  And you know maybe there are legal

17  issues that Mr. Fisher considered that the plaintiffs

18  haven't considered and he's not entitled to the benefit of

19  his thinking on that.  That's the work that Mr. Fisher

20  did.  It's his legal advice to the company.  All right, so

21  well gee Mr. Fisher considered this issue and he

22  considered these authorities and this is the conclusion he

23  came to.  At some point I'm waiving the privilege by

24  describing the legal advice rendered, and I think, you

25  know, this is a description at a high level, that is true,

1   but I think that's the balance that's struck under the

2   rules.  You provide a description that's sufficient to

3   evaluate whether the privilege applies, and I've made a

4   representation to plaintiff's counsel that this is his

5   handwritten notes.  You know, some of them are meeting

6   notes.  Some of them are just sort of you know an

7   attorney's sort of notations to himself on paper.  They're

8   all on his file.  I would say in many cases he wouldn't

9   even review an attorney's file for production because you

10  would say well, you know, it's all likely to be

11  privileged.  It's burdensome to do it.  In this case we

12  did.  We actually produced these before we even got a

13  document request from plaintiff.  We produced them on the,

14  they did automatic disclosures.

15       THE COURT:  Let me ask for my edification.

16  Normally when somebody responds to a request for documents

17  or interrogatories, a lot of times counsel will say, well

18  we object generally to your request.  We think it's unduly

19  burdensome, onerous.  We think some of the stuff you seek

20  is not relevant.  That being said, here's the following.

21       MR. HEMR:  Yeah.

22       THE COURT:  To the extent there was any of that,

23  was there any sort of signal by MassMutual whether these

24  documents that are referenced here, these handwritten

25  notes for example, were relevant or not.  So for example

46

1  if you felt, hey this is not relevant but out of an

2  abundance of caution or because we're good guys, we're

3  putting it on our log.  We're producing it to you, or

4  alternatively, should we assume that if you produced it,

5  especially if you produced it before getting a request,

6  that you already made a decision these are relevant but

7  there's a privilege here that allows us not to turn it

8  over.

9           MR. HEMR:  I would say it's more in the former

10  category, Your Honor, in this following sense.  We started

11  very early in this case.  We knew, Mr. Friedman made

12  reference to the fact that we do these filings with the

13  Division of Insurance in each and every year.  We knew

14  that we were going to need to produce those filings.

15  We're going to need to produce MassMutual's publicly filed

16  annual statements which are these beasts.  I won't burden

17  the Court with them--

18           THE COURT:  Thank you.

19           MR. HEMR:  --although you're welcome to see

20  them.

21           THE COURT:  That's all right.

22           MR. HEMR:  We knew that we would need to produce

23  all of the underlying accounting for those annual filings

24  to the extent that we could find it and we were going back

25  all the way to 1997 which is 15 years before the case was

47

1  filed.  We knew that there were allocations that are

2  done.  They're also reflected in the filing with the

3  Division of Insurance on Section 141.  They're done for

4  other state regulators.  We knew we were going to provide

5  those.  We would need to provide all the underlying stuff.

6  We just started going.  We started producing.  We first

7  got our document request from plaintiff, or their first

8  document request just before Thanksgiving of 2013, so in

9  late November.  These had all been produced a month

10 before.  We knew, you know, Mr. Fisher is the fellow at

11 MassMutual who is responsible for doing the Section 141

12 overlook.  He does the back and forth with the division to

13 the extent that there was any and it's really quite

14 minimal.  So we're going to need to take his Section 141

15 file and review it, and you know what we did?  We produced

16 the whole thing.  Some of it we produced with redaction.

17 In fact quite a bit of his file we produced with redaction

18 and it's probably where most of the redactions on the

19 redact privilege log come from, and, you know, if Mr.

20 Fisher said, you know well, gee, you know, maybe the

21 safety fund statute works this way--

22          THE COURT:  Um-hmmm.

23          MR. HEMR:  --and made a little note to himself

24 in the  file, we produced it.  We called it a handwritten

25 note which was accurate and that's how we proceeded, and

48

1    we clarified in my July 2014 letter, you know, all these

2    came from Bill Fisher's file, and that's the last I heard

3    of it.

4              THE COURT:  Okay.

5              MR. HEMR:  And so I guess if the Court were

6    inclined to request that we provide an amended log--

7              THE COURT:  Um-hmmm.

8              MR. HEMR:  --I would like guidance from the

9    Court about how to do that because I'm not sure how far,

10   further I can go with what I've done here without actually

11   saying, well here is the issue that was raised.  Here's

12   the rationale.  All of that invades the privilege and

13   we're trying to strike the right balance and say well, you

14   know this is Bill Fisher's notes.  He was analyzing the

15   statute.

16             THE COURT:  Okay.

17             MR. HEMR:  With respect to that and sort of

18   going back a little bit more broadly, to the extent that

19   there's a claim that there's been a lack of transparency

20   here, it's very important to draw the distinction between

21   the legal analysis and the legal advice provided which

22   MassMutual has asserted a privilege to as to which we've,

23   you know, instructed witnesses not to answer, raised

24   objections to interrogatories and so forth and what we've

25   told them about the calculation which is everything,

49

1   everything that we had availability of.  So for instance

2   there's a question and, you know, maybe perhaps what I

3   would do, is I would hand up a copy of the statute that

4   I've annotated if that were convenient?

5              THE COURT:  That's fine.

6              MR. HEMR:  May I hand it to your clerk?

7              THE COURT:  Please.  Thank you.  And unless

8   there's any objection, I'm going to mark this as Exhibit

9   2.

10             MR. FRIEDMAN:  No objection, Your Honor.

11             THE COURT:  Okay.

12               DEFENDANT'S EXHIBIT NO. 2, ADMITTED

13             MR. HEMR:  So in the box is the statute at issue

14  here and everything else around it is my annotation and

15  the statute is Section 141 and it says that a domestic

16  life company here appear, that's MassMutual, may from its

17  surplus funds, attributable to its participating business

18  hold as a safety fund an amount not in excess of the

19  following and then there are three pieces to the formula.

20  The first piece is 12% of reserve.  The second has to do

21  with guarantee stock that a company might have which is no

22  longer an issue for MassMutual, and the third thing is

23  this margin of market value computation.  Now I think what

24  plaintiff is getting at when they're saying that there was

25  a Sea change in 2001, what had happened in 1997 through

1  2000 and you can see this in I believe it's Docket No.

2  69, Exhibit 1, where plaintiff has actually put these

3  filings before the Court and the filings are about one or

4  two page cover letter and there's a calculation that

5  follows, in the first years they said, well you know our

6  surplus on participating business is this--

7          THE COURT:  Um-hmmm.

8          MR. HEMR:  --12% of our reserves is this.  We're

9  below 12% of our reserves.  We're done.  We're complied

10 with the statute.  There's no need to do anything further,

11 and then in 2001 and subsequent years MassMutual included

12 both of these parts, and so I don't think there's anything

13 so dramatic, there's certainly nothing that wasn't sort of

14 on the face of these filings in terms of the change that

15 MassMutual made in its approach to the calculation.  At

16 one point it said, you know, if you only use part of the

17 formula, we're under it.  We reserve our rights, and then

18 after 2001 they said, you know, here's both parts of the

19 calculations and we're under it by a considerable amount,

20 and in terms of what they need in order to evaluate that

21 calculation, well there's no doubt, or no dispute that

22 before 2001 we didn't include the second part of this

23 calculation--

24         THE COURT:  Um-hmmm.

25         MR. HEMR:  --and afterwards we did.  You know,

51

1    the parties can take legal positions as to whether

2    plaintiff has taken the position that there have been

3    subsequent developments that basically write this part out

4    of the statute.  We can have that legal argument here in

5    court.  I don't think there's anything to be gained by

6    having a MassMutual attorney sit down and say well here's

7    what my thinking was on that piece or yeah, here's the

8    arguments that I considered at that time.  Certainly

9    there's nothing to be gained by having MassMutual

10   personnel, you know, cross examine then what they think

11   the statute ought to be.

12           THE COURT:  Have you given them, or what, I

13   understand when you say, if Bill Fisher had some thoughts

14   about this, whether thoughts about the statute, thoughts

15   about what we should do and the like, that's protected.

16   If a business person inside MassMutual had some thoughts

17   about this and played a role in any role that culminated

18   in whatever the final amount that MassMutual determined to

19   be, is, when you talk about the great transparency, are

20   you giving them stuff that the non-lawyers who were part

21   of that contributed to, their thoughts, if any of them had

22   the business or mathematical acumen that was necessary to

23   come up with the figures as well as then crunch the

24   numbers to get the amount?  Is that, are you saying, no,

25   no, no, that's--

52

1          MR. HEMR:  Yeah.

2          THE COURT:  --part of a whole legal process too

3  or are you, are you giving that?

4          MR. HEMR:  Well I guess I would say two things

5  about that.  Number one, I think plaintiff is sort of

6  hypothesizing that there are, that there were written

7  narratives and somebody prepared a business case or other

8  things and actually this is a relatively small

9  calculation.  It's done pretty mechanically.  They're a

10  small group of people who do it each year.  The company

11  had never been challenged on it.  The company had believed

12  as is reflected in the calculations that they're

13  substantially below and so, you know, if there were a

14  PowerPoint doc or a memo or something like that, from a

15  business person saying, you know, we really ought to do

16  both of these, you know, there isn't such a document that

17  I know of.

18          THE COURT:  Okay.  Let me just ask you.  This is

19  helping me to understand--

20          MR. HEMR:  Yeah.

21          THE COURT:  --now and you all have the benefit

22  of having been involved with this for a long time, but

23  when I listen to you speak and when I approach this it

24  seems like what you're saying is completely reasonable

25  which is hey, this sets out just a very simple calculus so

53

1    in the entity that is required under the statute to

2    comply with this, can go and, with a small group of people

3    figure this out, and I'm balancing that with, I think

4    there was a reference to a deposition of Meg Gresham--

5            MR. HEMR:  Yeah.

6            THE COURT:  --where at some point, and I'm

7    paraphrasing, she says words to the effect, yeah, well, we

8    were concerned that one year because we realized we were

9    actually about to bump up to that 12% limit and that

10   concerned us to we had to change the way we calculate

11   which suggested to me that oh, well maybe it's not just

12   kind of a simple, you always take this and you always take

13   this, but rather the calculation of each one of those

14   things itself turns on numbers or factors that can be

15   manipulated or calculated in-house.

16           MR. HEMR:  I think it's a little easier than

17   that, Your Honor.  This calculation is, both calculations

18   have some detail associated with them.  They're non-

19   trivial calculations.   It takes somebody a couple of days

20   to sit down to do them and you wouldn't do them both if

21   you didn't have to--

22           THE COURT:  Okay.

23           MR. HEMR:  --or at least if you didn't see

24   prudent to do both, and at one point they just did this

25   and reserved their rights and at some point they started

54

1   doing the second part, and with regard to the second

2   part, it's not that they were doing this letter part in a

3   different way before, they simply weren't doing it at all,

4   and then subsequently they did it, and to the extent that

5   there is any accounting detail and in many years, I guess,

6   I think from about 2002 to the present we have some

7   detail.  From 2005 about to the present we have an

8   enormous amount of detail.  Thousands and thousands of

9   pages that explain, you know, very clearly how MassMutual

10  did the calculation.  That's all been provided, and so if

11  the question's like well what securities or at least what

12  assets did you treat as securities for purposes of that

13  calculation, they know that.  We gave an interrogatory

14  response.  They have the spreadsheets.  They could look at

15  them.  If they say, well, you know, I think it's okay that

16  you use common stocks but you shouldn't include you know

17  limited partnership interests.

18          THE COURT:  Right.

19          MR. HEMR:  Those I don't think are securities so

20  I'm going to perform this alternative calculation.

21  Plaintiffs are free to perform their calculation.  They

22  have all the tools that we have available to us to do

23  that, and that, well we've been completely forthcoming on

24  that I think.

25          THE COURT:  Okay.

55

1          MR. HEMR:  So I'm going to move off of this

2   for a moment if I may and whoop, I keep hitting this mike.

3   I'm going to talk about waiver.

4          THE COURT:  Yes, please.

5          MR. HEMR:  In particular the question of have we

6   waived things by asserting affirmative defenses?  Now with

7   regard to these defenses of good faith and regulatory

8   approval--

9          THE COURT:  Um-hmmm.

10          MR. HEMR:  --we think those have merit.  We

11   don't have guidance from the statute itself or from case

12   law as to how those defenses might exactly work here.  You

13   know, there have been only, there's been one prior

14   litigation on this statute that I know of in which I was

15   adverse to Mr. Adkins for a time being, but essentially

16   our good faith defense as you say is, you know, we made

17   the annual calculations, we received certain guidance from

18   the division and the guidance we received from the

19   division as distinguished from the case in which they

20   rely.  I think in this case it's not a question of Mr.

21   Fisher subjectively saying well, you know, this was the

22   kind of vibe I was getting from people at the division. It

23   was saying no actually I got a fax from the division and

24   they, well they left me a voicemail and here's the

25   transcript of the voicemail because I had my secretary

1    make a transcript, and I think, you know, there's no

2    dispute that that was the guidance.  I think plaintiff

3    disagrees that it's meritorious guidance.  They think that

4    the division got it wrong which is fine.  That's their

5    position.  I disagree.  I think it's clear.  It's

6    undisputed really that MassMutual behaved consistently

7    with that guidance.  Again, they think MassMutual was

8    wrong to do so because they believe the guidance itself

9    was wrong, but I don't think there's any dispute as to

10   that, and that we've never been asked by the division and

11   other companies have been called in I think, you know, at

12   least on one occasion by the division to say, you know,

13   here's something that came to our attention about your

14   calculation. It's never happened with MassMutual, and

15   that's the set of facts.  It's undisputed.

16           THE COURT:  Um-hmmm.

17           MR. HEMR:  You don't need Mr. Fisher's

18   subjective impressions.  You don't need his legal analysis

19   to know what happened there.

20           THE COURT:  What if it's an email, I'm sorry.

21   What if it's a handwritten note from Mr. Fisher that says,

22   as you just said, I got a fax from the Division of

23   Insurance?  He's a lawyer but that doesn't really

24   implicate any deep thoughts.  Would you say that's

25   privileged or would you say that's, or it's just not

57

1   relevant and we're not going to turn it over?

2         MR. HEMR:  We actually have, I produced a

3   document along those lines which I believe is a memo, I

4   can't put my fingers on it this moment, but it's actually

5   a memo from Mr. Fisher to a group of people at the company

6   saying we received a fax from the division, I believe

7   it's, it may be in the, I'll have Ms. Nanda look for it,

8   but it actually says, you know, we received this fax from

9   the division.  Here it is.  Here are my thoughts about it

10  and that's, and the part following that is what we

11  redacted.

12        THE COURT:  It's what you redacted.  Okay.

13        MR. HEMR:  Okay.

14        THE COURT:  Okay.  Okay.

15        MR. HEMR:  And there are two tests sort of at

16  issue here and one of them is the *Rhone-Poulenc and County*

17  *of Erie* test and that Mr. Friedman adverted to.  That was

18  the one that Magistrate Judge Boal used just a few months

19  ago in the Trustees of BU case.  I would say that that's

20  the leading case at this point, and it may be at some

21  point, you know, Mr. Freidman and Mr. Adkins tell me and

22  they moved saying, you know, this is a legally

23  insufficient defense and we can have that debate at that

24  time but if you apply that test that says you know if

25  MassMutual doesn't put its foot over the line and say yes

58

1   we relied on advice of counsel, that's the end of it.

2   That's a very clear test.  The other case that they refer

3   to which I is I believe *Hearn v. Rhay* which is from

4   Eastern District of Washington in 1975 which is referred

5   to in the *Greater Newburyport* case, and the *Greater*

6   *Newburyport* case is about, it's a very interesting case

7   but it's about the least informative case you could

8   possibly find on any subject.  It has to do with

9   apparently there was some fight among clam fishermen on

10  the north shore and there was an undercover informant in

11  one of the clam fishermen's groups or something like that

12  and there was a question of whether there was a waiver

13  given that the undercover informant had heard some things

14  at meetings of the clam fishermen's group.  I guess

15  they're called clammers, not a clam fisherman, but they,

16  in the, the way the First Circuit came down is okay well

17  to the extent the information heard things we'll call that

18  open.  Not particularly helpful here I don't think, but if

19  you were to apply that case in a more typical context,

20  what that case says is if something is vital or necessary

21  to address again defense then perhaps it's producible,

22  notwithstanding in the assertion of privilege but not

23  otherwise, and in the *Frontier* case from the Tenth

24  Circuit, the Tenth Circuit said, you know, just finding

25  that something is relevant, you know, and that you might

59

1  want to use it to test the proposition is not enough,

2  and in the *Frontier* case they actually, they vacated a

3  trial court verdict after a jury trial and sent it back

4  for a new trial.

5        The, in this case, I refer several times in our

6  briefing to the timing of these motions.  These are

7  brought, you know, not at the stroke of midnight but

8  certainly at the 11th hour.  We provided these

9  interrogatory responses.  We answered this in September of

10 2013.  We provided our interrogatory responses and

11 substantially the form now in December of 2013.  If this,

12 and the fact that MassMutual made this change from using

13 one part of the formula to both parts of the formula from

14 2000 to 2001, that plaintiff was aware of that before he

15 filed, before her counsel filed the case because that's

16 right on the face of our filings.  In terms of timeliness,

17 you know, I think the Court would be within its rights to

18 say, you know, I'm not going to consider these at all

19 because they're untimely, but to the extent that timing is

20 informative on the question of whether this is really

21 vital or necessary, you know, that MassMutual's position

22 on these issues and the underlying facts were very clear

23 in the fall of 2013 and yet here we are in you know almost

24 the summer of 2015 and, you know, the fact that well

25 perhaps MassMutual's counsel said well this part of the

60

1  statute shouldn't be taken into account, I don't think,

2  there's no evidence of that.  It's speculation.  There's

3  nothing in MassMutual's prior filings or in other

4  documents that would suggest that something like that was

5  going on.  And I guess, just one final point on that, the

6  underlying, to the extent that there's a business analysis

7  here which just the, it's got the last; it's like the last

8  page.

9  PAUSE

10         MR. HEMR: One moment.  Perhaps it will come to

11  me but the, briefly, there's a document that they advert

12  to that says, here was their filing they did with the

13  division and attached is a business analysis of whether,

14  how the calculation would look, whether or not you use

15  different parts of the formula, and number one, we

16  produced that to them.  We advertently produced it to them

17  and we didn't claim privilege on it.  It's been produced,

18  and what that document actually says is well you know

19  you're under the cap either way, but you're farther under

20  the cap if you use both parts of the formula.

21         THE COURT:  Right.

22         MR. HEMR:  So I don't think there's anything

23  particularly unusual about that.  Yes, this is Exhibit 6

24  to Mr. Adkins' declaration.  It's the last page.  It says,

25  you know, look, here's the number.  You're under the

61

1  safety fund in any event.  So I, it doesn't strike me as

2  unusual.  It doesn't strike me as, that there's something

3  that warrants invading the privilege there.

4         THE COURT:  Okay.

5         MR. HEMR:  I've spoken enough.  I will stop now

6  unless Your Honor has further questions.

7         THE COURT:  I just have one question for you.  I

8  just want to make sure we understand, that I understand

9  and I suppose this is not legally binding you but just

10 make sure I understand for purposes of this argument,

11 MassMutual's good faith defense is based upon the

12 objective, upon the assertion that it turns out that the

13 calculations were objectively correct.  That the Division

14 of Insurance says yes.  This is correct.  That it's not

15 based on a subjective conclusion based on guidance that

16 you got from other people.  Is that a distinction that--

17        MR. HEMR:  I think that's a fair

18 characterization, Your Honor.

19        THE COURT:  Okay.

20        MR. HEMR:  Just saying that this is the kind of

21 things that a company would do if they were behaving in

22 good faith.  They'd made an annual filing.

23        THE COURT:  Okay.

24        MR. HEMR:  They'd have credible people doing the

25 calculation.  They would get guidance.  They would act in

62

1  compliance with the guidance.

2          THE COURT:  Okay.

3          MR. HEMR:  There was one occasion which is

4  described in the interrogatory responses where there was

5  an error in the calculation and then a new version was

6  submitted, what year it was discovered, that kind of

7  thing.  There's no suggestion of well and we relied on Mr.

8  Fisher or that we relied on anything other than, similar

9  with the objective facts of what we did, you know what

10 guidance was provided by the division.

11         THE COURT:  What assurance?

12         MR. HEMR:  What did the division do or not do

13 as--

14         THE COURT:  Okay.

15         MR. HEMR:  --regards what we did.

16         THE COURT:  And then lastly, and I'll also hear

17 from Mr. Friedman on this if you want to, there was just

18 this last little sub issue about the relationship with the

19 Life Insurance Association and the amicus brief and

20 whether the fact that you were dealing with them somehow

21 constitutes a waiver with respect to any communications

22 that were shared back and forth?

23         MR. HEMR:  The Life Insurance Association in

24 Massachusetts is a trade association of basically the life

25 insurance companies here in Massachusetts.  There was a

63

1  prior litigation as I referred to earlier.  It involved

2  the company Savings Bank Life Insurance up in Woburn and

3  that went up, that was in the state court system.  It went

4  up to the SJC.  Liam was, put in an amicus brief.

5  MassMutual was represented on the executive committee and

6  they received a draft of the amicus brief.  The amicus

7  brief was thereafter filed.  I don't think the issues in

8  SBLI.  I think the issues at that point in the litigation

9  were quite different than the issues that are present

10 here, and we reached out to Liam and said would you agree

11 to a limited waiver and privilege here?  And they said no,

12 I think you're members of this organization.  We want you

13 to assert the privilege and so we said okay we'll assert

14 the privilege.  I don't see what the, I think we're

15 entitled to do it.  I think it's appropriate to withhold a

16 draft brief.  If you are under, it was provided to you

17 under an obligation of confidentiality as it was.

18          THE COURT:  Okay, which is fine.  I guess I was,

19 it was a little curious to me, I expected the first

20 response to be that's absolutely irrelevant to anything

21 that's going on here.  I didn't see that so I wondered if

22 I was missing something and maybe it's actually relevant

23 but there's another reason for it.

24          MR. HEMR:  Well let me put it this way.  I think

25 the subject matter, I mean it's overlapping because it's,

64

1    that was a case involving this section and--

2           THE COURT:  All right.

3           MR. HEMR:  --this case involves this section so

4    I'm not going to, and so certainly we said okay well this

5    is in Bill Fisher's file.  We can identify it.  It doesn't

6    relate to something else in the world.  Whether it has any

7    relevance here, I--

8           THE COURT:  Okay.

9           MR. HEMR:  --I tend to think it doesn't, but

10   certainly if plaintiff wanted to, you know, plaintiff's

11   counsel was the counsel in that litigation.  They were

12   served with a copy of the as filed amicus brief.

13          THE COURT:  Okay.

14          MR. HEMR:  Then if there were an issue there

15   maybe they could present that.

16          THE COURT:  Okay.  All right.  Thank you.  All

17   right, without going over anything that you already the

18   first time, is there anything that was said that prompts

19   you to respond to anything?  Not that you're obligated to,

20   I'm just giving you the chance.

21          MR. FRIEDMAN:  Yes, Your Honor.

22          THE COURT:  Okay.

23          MR. FRIEDMAN:  As I think it's clear, the

24   ultimate task for the privilege log is whether the

25   information is sufficient for us to challenge and for Your

65

1   Honor to evaluate the privilege.  There are two points

2   that counsel raised that I think are critically important.

3   May I approach one more time Your Honor--

4          THE COURT:  Yes.

5          MR. FRIEDMAN:  --with different demonstrative?

6          THE COURT:  Okay, we're going to mark this as

7   Exhibit 3 if there's no objection to it being admitted.

8          MR. FRIEDMAN:  These address the privilege log

9   entries that relate to the spreadsheets.

10          MR. HEMR:  We disagree with the characterization

11   but it's his characterization--

12          THE COURT:  Okay.

13          MR. HEMR:  --so we, subject to that we don't

14   object.

15          THE COURT:  Okay.  Okay, so I'm going to mark

16   this as Exhibit 3 and note the objection.

17            PLAINTIFF'S EXHIBIT NO. 3, ADMITTED

18          MR. FRIEDMAN:  So Your Honor, what we did here

19   was to, you recall there were 16 spreadsheets that when we

20   challenged them, MassMutual then produced them basically

21   conceding that there's no privilege and these are the

22   privilege log entries that related to those and what this

23   exposes is exactly how deficient and why their log is

24   deficient.  If you look at for example the descriptions,

25   draft, the first one.  I'm sorry, Your Honor.  Draft

1   analysis reflecting a request for legal advice from as

2   well as legal advice rendered by William B. Fisher,

3   attorney for MassMutual regarding calculation required by

4   Section 141.  Now what does that look like?  That's the

5   same description they've used for meeting notes and for

6   everything else.  Now how would Your Honor be able to

7   determine looking at that description that these

8   spreadsheets were not privileged?  It's the exact same

9   description.  You simply cannot determine from that vague

10  description whether any given document is privileged or

11  not and the proof is here where that same description was

12  used for non-privileged documents.

13          The other point that he made was we're not sure

14  how far we can go because it would violate the privilege

15  and to use counsel's words to say "Here is the issue

16  raised", that doesn't violate the attorney client

17  privilege.  Disclosing the subject matter of a

18  communication is not within the scope of the privilege nor

19  does it invade the privilege.  If we were talking about

20  work product and the fact that a given issue occurred to

21  counsel might be relevant, but with respect to attorney-

22  client privilege the law is well settled that subject

23  matter, the general description of the subject matter is

24  not privileged at all.

25          THE COURT:  Well I think the concern was that

67

1  and the argument was that there, again there's a

2  continuum and that if this is not sufficient and if what

3  is required is something that provides a little more flesh

4  so you can really assess it before you know it, you might

5  inadvertently end up saying, you know, Jim Smith called me

6  regarding that law suit and I told him I didn't think we

7  should do this.  And then somebody might say well, boy,

8  you just talked.  You just divulged the whole

9  communication.  You now have waived the privilege, and I

10  think the point was not categorically, we should never

11  have to do more than this but that, there's a balancing

12  act whenever you go to do something like this.  You just

13  don't want to be too careful of that.  You just don't want

14  to be sloppy and say something that will come back to bite

15  you.

16          MR. FRIEDMAN:  Agreed, Your Honor, but there

17  were actually two points made.  The first was we can't,

18  we're concerned about disclosing that the issue was

19  discussed and then they went on to say and we're concerned

20  about disclosing what Bill Fisher or anybody's reaction or

21  comments were.  The second, I agree it would

22  inappropriate, but the first not.

23          THE COURT:  Okay, and so before you go any

24  further and I hate to do this cause I know you have a few

25  points, but I think I want to hear a response to this

1   because one response is well, if we didn't have these 16

2   spreadsheets that were produced that you're arguing are

3   effectively a concession that those were not privileged

4   documents and ergo where the same language was used there,

5   it means that some of these may not be privileged, if we

6   didn't have that I think  somewhere you'd still be arguing

7   this language is not adequate, but let me just hear about

8   this point, about this same language arguably was used on,

9   to withhold documents that you subsequently produced.  I

10  know they're arguing that, they're characterizing it as a

11  concession.  Those were not privileged.  I know those

12  weren't the words that came out of your mouth, but what do

13  you say to that particular point before I let Mr. Friedman

14  continue?

15          MR. HEMR:  Well in the interest of resolving

16  discovery disputes, we said, you know, we're prepared to

17  produce these provided that you don't contend its

18  concession and here we have the argument that it's a

19  concession.

20          THE COURT:  All right.

21          MR. HEMR:  I think that was precisely what we

22  were trying to avoid.

23          THE COURT:  Okay.  Understood, but what I'm

24  getting at is that language, that prophylactic phrase, if

25  you did produce them, and I know you said we're doing it

69

1   subject to you not making this argument, but I'm

2   assuming that  somewhere MassMutual made a decision that,

3   you know what, we can give these.  Maybe they're not

4   privileged and so we'll turn them over.  We won't concede

5   they're not privileged but we're turning them over, and

6   it's the same language.  So from our vantage point where

7   we're being asked to potentially either find there's a

8   waiver or do an in camera review, I'm just trying to

9   figure out how much integrity I should give to this phrase

10  that appears over and over.

11          MR. HEMR:  I would say with respect to that, you

12  should look, you would look both at the document itself,

13  and I don't know if we can pull that doc, you know, this

14  document itself right now.  For instance, M009889, this

15  is, this appears as Exhibit 23 of Mr. Adkins' declaration.

16  And it says, draft for discussion purposes only,

17  confidential request for legal advice and I don't recall

18  the date on when that was produced.  I think it was

19  produced--

20          UNIDENTIFIED:  Probably October.

21          MR. HEMR:  Oh, no, when it was created.

22          UNIDENTIFIED:  Oh, created.

23          MR. HEMR:  Yeah, I think this document was

24  created in let's say 2000, 2001--

25          THE COURT:  Um-hmmm.

70

1          MR.HEMR:  --maybe a little bit earlier than

2   that, and so we have this document.  We find it in Mr.

3   Fisher's attorney file.

4          THE COURT:  Um-hmmm.

5          MR. HEMR:  It says you know attorney-client

6   privilege.  We go back we get Mr. Fisher's recollection.

7   We say well, you know, documents were prepared from these

8   for purposes of my analysis.  We looked at them.  I, you

9   know, this was I think a good faith assertion of privilege

10  in this instance.

11         THE COURT:  Okay.

12         MR. HEMR:  You know we can't fight every one of

13  these to the bitter end and I think--

14         THE COURT:  Okay.

15         MR. HEMR:  --to the point of expediting and

16  nailing the issues for the Court's consideration, we're

17  saying, okay, we could look at this.  It is, you know, the

18  information provides you know, perhaps and I don't think

19  provides, I mean really, I don't think it's, you know,

20  perhaps even relevant here.  It's not so vital that we

21  can't try to make some concessions, narrow discovery

22  issues.

23         THE COURT:  All right.

24         MR. HEMR:  But I don't think it's a concession

25  as to whether the privilege was valid.  I think it's an

71

1   attempt to narrow the focus of discussion.

2           THE COURT:  All right, Mr. Friedman, so I'm

3   sorry to have interrupted you, please--

4           MR. FRIEDMAN:  No, absolutely, Your Honor.  But

5   I want to clear if only for the record, when these were

6   produced, there was no agreement that we would not say

7   this was a concession about the privilege nature.

8           THE COURT:  Right.

9           MR. FRIEDMAN:  They said agree that you won't

10  claim the subject matter waiver which is a very different

11  thing.

12          THE COURT:  All right.

13          MR. FRIEDMAN:  For purposes of your analysis I

14  know that's probably not relevant, but I simply want to

15  make that clear for the record.

16          THE COURT:  Okay.

17          MR. FRIEDMAN:  Second point that counsel made

18  that I think bears a response is that he basically said

19  that the Exhibit 24 documents, they had all these meeting

20  notes,, we found them in Mr. Fisher's file.  The law is

21  absolutely clear that a document because it's contained in

22  an attorney's file doesn't make it privileged and remember

23  it's not as if Mr. Fisher is just some lawyer who's

24  providing legal advice.  He's a member of the committee

25  making the decisions including the business decisions, and

72

1   Your Honor asked a pressing question following up on my

2   point which was, gee, it's clear that these discussions

3   where I'm going on these business considerations, we need

4   more surplus, we need new changes, not a single document.

5   Now counsel says well we haven't located any, but when we

6   have blacked out notes from the committee meetings where

7   these very issues are being discussed, it just highlights

8   how it's not credible to say there's not a single

9   commentary anytime, anywhere on the business

10  considerations that Ms. Gresham said that they were

11  making, and I suspect that they are, there are such

12  conversations that had and that are reflected documents.

13          THE COURT:  Well let me ask you, during

14  depositions, was anybody asked whether there were

15  documents of the sort that you're wondering where they

16  are, you know, for example of Meg Gresham?

17          MR. FRIEDMAN:  Funny you should ask, Your Honor,

18  she doesn't remember anything, and when we asked her, we

19  took notes from the committee meeting that were redacted

20  and we said okay we understand this is redacted but this

21  is a meeting that occurred on this date.  You were there.

22  Can you tell us what occurred?  No, because she and every

23  witness didn't review the un-redacted documents.  Now

24  there's a dispute over whether that was required or not

25  but that's hamstringing us when we can't even ask the non-

73

1   privileged foundational questions because the witness

2   who's a 30(b)(6) witness, one of the topics of which was

3   decisions about assertion of privilege and the witness

4   hasn't looked at the privileged documents, can't even give

5   us the non-privileged information so we're, our hands were

6   tied on that, effectively, Your Honor.

7          And again, the only other thing I would say is

8   that the notion that this is some simple calculation that

9   you just do in two hours is a stretch to say the least.

10         THE COURT:  Well I think he said a couple of

11  days.

12         MR. FRIEDMAN:  Okay, couple, whatever.  There

13  are extremely--

14         THE COURT:  With a committee.

15         MR. FRIEDMAN:  --complicated decisions that are

16  being made that become a black box for us.  There are, and

17  as an example, there are derivatives which are not, in the

18  time the statute was  enacted there were no such doc,

19  those instruments didn't exist.  These are assets which

20  were held by the company like stock.  They're hedging doc,

21  they're hedging against interest rate changes or currency

22  swaps.  We asked what was excluded.  Did you excuse any of

23  these?  Won't tell us.  We ask, how did you decide that a

24  derivative, this sort of asset is a sort of security that

25  would be appropriately, no answer, a privilege.  So there

74

1   are a lot of nuances that are critical to our

2   understanding of what decisions were made, how they were

3   made and why they were made that we're simply not seeing,

4   Your Honor.

5           THE COURT:  So you got the data.  What you don't

6   have is information that explains why some data is

7   included and other data was not included.

8           MR. FRIEDMAN:  Among many other things.

9           THE COURT:  Among many other things but in, for

10  purposes of this imagery of, that MassMutual paints of,

11  thousands of pages being produced and a complete

12  transparency and of all of the numbers that one would need

13  in order to test how the figures were arrived at, you got

14  all that but what you're saying is yeah, but what we don't

15  have is maybe arguably, what's equally important is the

16  decision making on what to include and what to exclude.

17          MR. FRIEDMAN:  Precisely, Your Honor.

18          THE COURT:  And you're saying that, you're

19  saying that,  well, you're saying that what they're doing

20  is they're hiding generally behind this blanket assertion

21  of privilege with respect to any of that information.

22          MR. FRIEDMAN:  Correct.  The reasons why, the

23  rationale, the justification for any of this and in some

24  instances we don't even have the underlying information,

25  data, as just as an example, two examples, Your Honor.

75

1  One is the derivatives I mentioned.  We have a list that

2  shows in a very lengthy way derivatives are included, but

3  when we ask for information well what did you exclude,

4  cause we want to know if you excluded these things, that

5  rationale may say you shouldn't have included any of them.

6  Nothing.  The issue of par versus non-par which you saw

7  cropping up in the papers, we say that they intentionally

8  underwent this exercise to characterize as non-

9  participating policies that occurred in 1997 and 1998.  We

10 don't know.  We can't tell how they made the distinction.

11 The only thing we had was a vague reference that we looked

12 at the policy language and made sort of a ministerial,

13 made a decision about whether the language of the policies

14 said that people had a theoretical right to participate in

15 the surplus.  We asked for the policy forms.  The

16 underlying, what would drive this decision?  We don't have

17 the policy forms.  They've claimed it's too burdensome.

18 Well they had their lawyers go look through the policy

19 forms to make determinations.  We couldn't even get

20 exemplars for them, so in many instances, I don't want

21 Your Honor to think that we even have all of the data--

22         THE COURT:  Okay.

23         MR. FRIEDMAN:  --because the critical data on

24 par --- versus and non-par, the policy for themselves, we

25 haven't received any of those.

1        THE COURT:  Okay, but just in terms of what

2   you just said so some of that though you have not because

3   of an attorney-client or an attorney, you know privilege

4   issue that's being  invoked but rather maybe they're

5   saying it's not relevant or it's unduly burdensome or we

6   don't have it.

7        MR. FRIEDMAN:  On the par versus non-par that's

8   absolutely correct, Your Honor.

9        THE COURT:  Okay, but on some of this other

10  stuff you're saying it's being--

11       MR. FRIEDMAN:  It's the wall, the shield that

12  we're, we can't penetrate.

13       THE COURT:  --a shield of privilege.  All right

14  so before you go any further, I don't know if you're done

15  because this is how I, insight me more, how do you respond

16  to that?  That, that it's not just the numbers.  It's not

17  just the data.  It's not just the figures.  We're entitled

18  if Bill from accounting and Jim from finance and others

19  got together in a committee and altogether agreed as to

20  how they should be proceeding and there are notes that

21  reflect or emails that reflect or reports that reflect

22  that, is your position that they get that if it exists or

23  no, they don't get that for the same reasons we've been

24  arguing about.

25       MR. HEMR:  I think that's right, Your Honor.  I

77

1   mean we've turned it over to the extent that it exists.

2          THE COURT:  Okay.

3          MR. HEMR:  There's question about whether we've

4   excluded some number of derivatives from the calculation.

5   I think they are entitled to use all the mechanisms of

6   fact discovery.  They're entitled to propound document

7   requests which they have.  We've responded, and if there

8   were some lists saying let's exclude these derivatives

9   from the calculation, they would have gotten it.  I'm not

10  aware such a document exists, but if there had been they

11  would have gotten it.  They're entitled to propound

12  interrogatories.  They propounded a number of

13  interrogatories.  They used up in our view all 25.

14  They've, they didn't ask that.  They could have put that

15  on you know particularize your 30(b)(6) deposition notice,

16  you know, tell us what derivatives have been excluded.

17         THE COURT:  Um-hmmm.

18         MR. HEMR:  They didn't do that.  You know, I

19  don't, is there an issue as to whether derivatives have

20  been excluded from this calculation?  Some subcategory?  I

21  don't think there is a, you know, we said that we'd

22  consider derivatives in the calculation.  I don't think

23  there's anything that can suggest we don't.  But

24  separating that from the issue of whether derivatives

25  should be counted as securities for purpose of this

1  statute--

2          THE COURT:  Um-hmmm.

3          MR. HEMR:  --which I think is a legal question.

4  I think we're perfectly entitled to assert privilege and

5  in fact we have a certain privilege.  With the par versus

6  non-par, it's exactly as Your Honor said, you know, number

7  one it's not in their complaint whether we've

8  miscategorized things as par or non-par.  There's no

9  analysis suggesting that you know that that actually would

10  make a difference to the calculation and, you know, we

11  said, we've been asked provide exemplar forms.  Well you

12  know we've produced, we have many, many lines of business.

13  Some of them are closed blocks, that is to say we offered

14  business many, many years ago but the policies are still

15  in existence.  Some of these blocks of business have been

16  around for literally decades.  There are different forms

17  in different states.  Sometimes the par, non-par analysis

18  has been different state by state.  If they said, you

19  know, we think variable annuities are really participating

20  products and you've been excluded them all along--

21          THE COURT:  Um-hmmm.

22          MR. HEMR:  --and I choose that because I think

23  it's all very well accepted that variable annuities are

24  not participating, but if that was their theory--

25          THE COURT:  Um-hmmm.

79

1          MR. HEMR:  --they could say, you know, we

2   would want this variable annuity policy.  We would want

3   that one and we could have a discussion about that.

4          THE COURT:  Um-hmmm.

5          MR. HEMR:  To say give us every policy form that

6   forms the basis of your current block of business, I don't

7   think it's workable and I don't think it's merited because

8   it's not in their complaint and there's no one else that

9   suggests it's necessary.

10         THE COURT:  Okay.

11         MR. FRIEDMAN:  Two final things and I'll wrap

12  up, Your Honor.

13         THE COURT:  Okay.

14         MR. FRIEDMAN:  One, I would like to hand up, I

15  offered it at the beginning which was when you raised the

16  issue of the burden of doing in camera review because I

17  really think the law is clear that, you know, you have

18  many options.  You could require a new privilege, you

19  could do nothing and deny my motions entirely.  You could

20  require a new privilege log and then we can argue about

21  that.  You can do an in camera which I think cuts to the

22  case.  I did offer to provide the Court with a list which

23  is simply the base numbers of the 197 or so.

24         MR. BRIDGELAND:  175.

25         MR. FRIEDMAN:  175?

80

1          MR. BRIDGELAND:  Yup.

2          MR. FRIEDMAN:  Set of documents--

3          THE COURT:  Um-hmmm.

4          MR. FRIEDMAN:  --with the actual copies attached

5  by counsel within simply.  Yeah, there you go.  It's an

6  extra one right--

7          MR. BRIDGELAND:  Yeah.

8          MR. FRIEDMAN:  --simply a list of the base

9  numbers.  So it's basically a list of numbers--

10          THE COURT:  Right.

11          MR. FRIEDMAN:  --with the actual redacted copies

12  attachment.  May I hand that up?

13          THE COURT:  Yes, please.  Okay.

14          THE COURT:  Yeah, I think we should mark it.

15  I'm going to mark this as an exhibit.

16          MR. FRIEDMAN:  That would be four I believe,

17  Your Honor.

18          THE COURT:  Exhibit 4.

19          MR. FRIEDMAN:  And the--

20          MR. HEMR:  Your Honor, before you mark it as an

21  exhibit, there's a bunch of confidential documents marked

22  in here.  We haven't had time to review them all, and I'm

23  not suggesting that this can't be in front of Your Honor

24  in some way, but I don't know if it needs to be part of

25  the record  of the proceeding.

81

1          THE COURT:  All right.  All right, you know

2     what?  That's a good point. That's a good point.  Since

3     this is being actually submitted to us and it's

4     essentially asking us to consider doing an in camera

5     review, I won't mark it as an exhibit but we'll accept it

6     and we will look at it.

7          MR. FRIEDMAN:  That's fine, Your Honor, if

8     counsel wants the stipulation that that can remain under

9     seal, that's fine.

10          MR. HEMR:  Maybe there's an easier way to do it,

11     but otherwise having it under seal would be fine.

12          THE COURT:  Okay.

13          MR. FRIEDMAN:  Just consider it lodged.

14          THE COURT:  Okay.

15          MR. FRIEDMAN:  The only, the last thing I'll

16     just really say Your Honor, we would ask that the current

17     schedule has us cutting off fact depositions 45 days after

18     Your Honor's ruling.

19          THE COURT:  Um-hmmm.

20          MR. FRIEDMAN:  I understand that there are a

21     range of things that could happen.  I would simply ask

22     that the Court set a different schedule depending upon

23     your ruling.  Even if Your Honor denies their motions in

24     their entirety, I think it would be difficult to schedule

25     or complete the depositions within 45 days.  There are

82

1   many schedules are involved and whatnot, but depending

2   how much Your Honor does, I simply didn't want to slip

3   through the cracks that I think some adjustment schedule

4   would probably be appropriate.

5             THE COURT:  What I'll do is when we rule, we

6   will also schedule a status conference for very soon after

7   we rule, probably within the week.

8             MR. FRIEDMAN:  Thank you.

9             THE COURT:  And then we can address it that way,

10  but just for the record so just tell me exactly what it is

11  you want me to do with what you just submitted.

12  Understanding I'll consider it.  I'm not agreeing to it

13  but what exactly do you want me to do?

14            MR. FRIEDMAN:  Understood.  At the inception of

15  the hearing, Your Honor, I asked is there a way to make

16  more manageable the group of documents for which we were

17  requesting in camera review.  This is a list of 175 rather

18  than 500 documents which if Your Honor grants our request

19  for in camera review, we would propose in the first

20  instant be reviewed by the Court.  It was our effort to

21  whittle down--

22            THE COURT:  And review them for what purpose?

23            MR. FRIEDMAN:  For purposes of determining

24  whether they're appropriately withheld on privilege, for

25  an in camera review--

83

1          THE COURT:  Okay, and is there anything that's

2    notable about these 175?  Are these reflective of the

3    group as a whole or are, is there something special about

4    these that cause you to select these and not others?

5          MR. FRIEDMAN:  Some of them for example are

6    critical based on time and in context are critical meeting

7    notes.  We've eliminated from the 500 the spreadsheets

8    that were taken off the table and we've eliminated certain

9    categories of documents that we could live without based

10   upon the descriptions.  It was our effort to try to make

11   the in camera review very manageable for the Court.

12         THE COURT:  Okay.

13         MR. FRIEDMAN:  It was our best effort given the

14   lack of information we have.

15         THE COURT:  Okay.  Thank you.

16         MR. FRIEDMAN:  Thank you, Your Honor.

17         THE COURT:  All right.  Anything further?

18         MR. HEMR:  I would just say with regard to in

19   camera review I think this is a very substantial piece of

20   everything that we've marked as privileged in this case.

21         THE COURT:  Um-hmmm.

22         MR. HEMR:  It's not simply, you know, a tenth of

23   it it's more like a third of it or perhaps more.

24         THE COURT:  All right.

25         MR. HEMR:  I don't know if there has been any

84

1  showing that merits in camera review--

2          THE COURT:  All right, I'm not saying we're

3  going to do it.

4          MR. HEMR:  But, yeah, I appreciate Your Honor is

5  not saying either way.  That having been said you know

6  obviously we'll do whatever the Court prefers in that

7  regard, and with regard to the scheduling issue that Mr.

8  Friedman raised, we would look forward to addressing that

9  at the status conference as well.

10          THE COURT:  All right.  Thank you, thank you

11  everybody.  This has been very helpful.  I know that

12  you're essentially at the tail end of fact discovery so

13  you need some sort of ruling from us as quickly as

14  possible so we're going to attempt to do that, and then as

15  I noted we'll get you in here for a status conference so

16  you can complete everything and move on.  All right.

17          MR. FRIEDMAN:  Thank you very much, Your Honor.

18          MR. HEMR:  Thank you, Your Honor.

19          THE COURT:  We'll be in recess.

20  (Court adjourned)

21  (11:21:33 AM)

22

23

24

25

85

CERTIFICATION

1

2        I, Maryann V. Young, court approved transcriber,

3    certify that the foregoing is a correct transcript from

4    the official digital sound recording of the proceedings in

5    the above-entitled matter.

6

7    /s/ Maryann V. Young              May 27, 2015

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25