# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
(BOSTON)

| | |
|---|---|
| KAREN L. BACCHI, ) | |
|    Individually and on Behalf of all Persons ) | Civil Action No. 12-cv-11280-DJC |
|    Similarly Situated, ) | |
| ) | |
|    Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| MASSACHUSETTS MUTUAL LIFE ) | |
| INSURANCE COMPANY, ) | |
| ) | |
|    Defendant. ) | |

## <u>FIRST AMENDED CLASS ACTION COMPLAINT</u> <u>AND JURY TRIAL DEMAND</u>

Plaintiff Karen L. Bacchi ("Plaintiff"), by and through her counsel, on behalf of

herself and all other persons similarly situated (the "Class"), alleges the following facts

and asserts the following claims against Massachusetts Mutual Life Insurance Company

("MassMutual" or the "Company") based upon personal knowledge as to matters relating

to herself, and upon information and belief as to all other matters based upon the

investigation of counsel, discovery in this action and the analysis and conclusions of

Plaintiff's experts:

## <u>INTRODUCTION</u>

1.      MassMutual is a mutual life insurance company owned by its participating

(or "par") policyholders and members, who are entitled to share in its retained profits

("surplus") through the distribution of policy dividends.  For more than a century, the

Massachusetts insurance statutes have required  mutual life insurance companies like

MassMutual to distribute to their par policyholders as annual dividends the entire amount

of surplus exceeding a statutory maximum cap known as the "contingency reserve" or "safety fund" limit.   The Massachusetts statutes specifically require mutual insurance companies to include in their participating policies provisions entitling the par policyholders to receive the share of the surplus attributable to their policies, including the profits earned on the assets acquired with their premiums.

2.      The safety fund statute, enacted in 1907 and currently codified at M.G.L. c. 175, §141 ("§ 141" or the "Safety Fund Statute"), strictly limits the amount of surplus a Massachusetts-based mutual life insurance company may retain to (a) "an amount not in excess of 12% of its reserve for such [participating] business" and (b) an allowance for "the margin of the market value of its securities over their book value."  A companion statute, M.G.L. c. 175, §140 ("§140"), expressly requires mutual companies to apportion and distribute as annual dividends to par policyholders all surplus in excess of the safety fund limit established by §141.

3.      The Massachusetts legislature enacted the Safety Fund Statute to prevent life insurance companies from hoarding surplus from their participating policyholders. In its report recommending passage of the Safety Fund Statute, the legislative commission appointed by the Governor of Massachusetts emphasized that the anti-hoarding law was necessary because insurance companies had "raised inordinate surpluses at the expense of policy holders, and then used them to provide funds for speculation, and to furnish a pretext for excessive salaries to the officers who accumulated them." [1]

4.      The Massachusetts legislature also recognized that because mutual insurance companies charge premiums higher than their anticipated expenses with the

---

[1] Report of the Commission to Recodify the Insurance Laws, Massachusetts House Document No. 1375 at 38-39 (June 1906).

expectation that they will return the excess as dividends, the surplus created by the premium overpayments rightfully belongs to the policyholders:

> The scheme of mutual life insurance requires that each member pay as premium more than a conservative estimate would require for the insurance and the expenses, so that the company may be on the safe side.  From these overpayments and the income thereon a surplus results which naturally would belong to the policy holders who contributed it, in sums proportioned to the contributions of each policy.[2]

5.      To prevent such hoarding, §§ 140 and 141 require all surplus amounts in excess of the safety fund limit be distributed to the participating policyholders as annual dividends.  The safety fund limit is set at a level allowing insurance companies to retain a modest amount of surplus to serve as a solvency backstop in the unlikely event that the policy reserves they are required to maintain prove insufficient to meet policyholder obligations.

6.      Although the Safety Fund Statute was enacted in 1907, MassMutual did not calculate the safety fund limit applicable to its withheld surplus, or otherwise report on its compliance with §141 in recent times, until in 1997 when it was requested to do so by the Massachusetts Commissioner of Insurance ("Commissioner").  MassMutual thereafter submitted annual safety fund submissions to the Commissioner, based on varying calculation methods over time in which it claimed to be in compliance with the safety fund limit.

7.      In 2002, however, an internal analysis by MassMutual management showed that the Company's surplus had grown so large that it exceeded the statutory safety fund limit based on the methodology MassMutual had employed in prior years.  But rather than paying to its participating policyholders the dividends required by §§ 140

---

[2] Id. at 32.

and 141, MassMutual instead internally manipulated the elements of its safety fund computations, improperly inflating the purported safety fund limit reported to the Commissioner.

8.      Beginning with its safety fund calculation for 2001 (which was made during 2002 when MassMutual discovered its potential safety fund violation), MassMutual adopted a series of increasingly manipulative and aggressive changes to its safety fund calculations that improperly impacted virtually every component of the safety fund formula.  MassMutual deliberately implemented these changes to its internal safety fund calculations in order to circumvent compliance with § 141 and hoard surplus from its par policyholders.

9.      For example, as alleged above the safety fund statute allows MassMutual to retain from its surplus "an amount not in excess of 12% *of its reserve* for such [participating] business." (emphasis added).  Such policy reserves are required by statute and represent contingent amounts set aside to pay *future* unaccrued insurance claims and expenses.  To improperly inflate this component of the safety fund calculation, however, MassMutual began including  as purported "reserve" items non-contingent accrued liabilities that were already due and owing  (such as rent, agent commissions and similar routine operating expenses) and thus are not "reserves" at all.  MassMutual also began including  within its purported reserve for *participating* business massive reserves attributable to its *separate account* business that pose no contingency risk at all to MassMutual's general account surplus.

10.      MassMutual also manipulated the second component of the safety fund formula, which permits it an allowance for "the margin of the market value of its securities over their book value" ("MVM").  To inflate its computation of MVM,

MassMutual included as purported "securities" a variety of assets that are not properly considered securities at all, including (a) unrealized gains attributable to interest rate and currency derivatives used for hedging purposes and (b) its own wholly-owned limited liability companies ("LLC") and other LLCs and limited partnerships it controls.  In addition, MassMutual improperly computed its MVM by including only assets with unrealized *gains*, while excluding corresponding assets with unrealized *losses* -- even though only *net* unrealized gains and losses are used to calculate its surplus.  Indeed, at the time the safety fund statute was enacted in 1907, MassMutual and other companies filed public reports in which the "market value … of bonds and stocks over book value" (i.e. the MVM) was computed on a net basis taking into account both unrealized gains and losses reported for all such assets.

11.     Through these and other manipulative practices (including specifically those described below and in the reports of Plaintiffs' testifying expert witnesses produced to MassMutual on December 15, 2015), MassMutual intentionally perverted the safety fund from its intended purpose as an anti-hoarding policyholder protection into a license to hoard surplus from its policyholder-owners. The following graph -- which compares the astronomical growth in MassMutual's surplus from 2001-2014 with the relatively stagnant level of policyholder dividends during the same period -- starkly illustrates the manner in which MassMutual has manipulated its safety fund to hoard surplus from its par policyholders:



12.     By 2014, MassMutual had through its manipulative practices inflated its claimed safety fund limit to a level nearly 1½ times *its entire reported surplus*, misconstruing the Safety Fund Statute in a way that would allow MassMutual to stop paying *any* dividends to its par policyholders for many years.  As of 2014, MassMutual's retained surplus of $14.2 billion is $2.7 billion *over* the correctly calculated statutory Safety Fund limit.[3]

13.     MassMutual is thus manipulating the Safety Fund Statute to accomplish precisely what the law was enacted to prevent: to hoard enormous amounts of surplus that should be distributed as dividends to its participating policyholders. By retaining excess

---

[3] There is no "protection of solvency" justification for MassMutual's flagrant disregard of the safety fund statute.   If MassMutual is required to distribute policyholder dividends in compliance with §§ 140 and 141 – which would leave it with surplus of approximately $11.5 billion – it will still remain well capitalized, with a risk-based capital ratio more than *four times* the ratio required to avoid any regulatory action.

surplus owed to Plaintiff and the putative Class, MassMutual has breached its par policies, has breached the implied covenant of good faith and fair dealing, and has unjustly enriched itself at the expense of its par policyholders.  Plaintiff accordingly brings this action, for herself and on behalf of a Class of similarly situated MassMutual par policyholders, to recover damages resulting from the Company's failure to pay annual policy dividends as required by §§140 and 141, and as incorporated into their participating policies.

## PARTIES

14.     Plaintiff Karen L. Bacchi (formerly Karen L. Orton) resides in Andover, Massachusetts, and has owned a participating whole-life policy from March 25, 1975 to the present, initially issued to her by Connecticut Mutual Life Ins. Co. ("Connecticut Mutual") and since 1996 by MassMutual when it merged with Connecticut Mutual.

15.     Defendant Massachusetts Mutual Life Insurance Company is a domestic mutual life insurance company of Massachusetts with its headquarters in Springfield, Massachusetts.  MassMutual merged with Connecticut Mutual in 1996 and thereby assumed all of Connecticut Mutual's par policies as its own.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. 1332 because the amount in controversy for the Class exceeds $5 million and there is diversity between some Class members and the Defendant.

17.     Venue is proper here pursuant to 28 U.S.C. § 1391(a) because Defendant is headquartered, and transacted business here and a substantial part of the events or omissions giving rise to the claim occurred here.

## SUBSTANTIVE ALLEGATIONS

### Massachusetts Law Mandates That Domestic Life Insurers' Contracts Provide for the Distribution of All Excess Surplus Annually as Participating Dividends

18.     A "participating" insurance policy is one that entitles the holder to share in the life insurer's retained profits, otherwise known as "surplus," through the receipt of policy dividends.  In contrast, the holder of a "non-participating" insurance policy is not entitled to a share of profits or dividends.

19.     In the early 1900's it became clear to the legislature, the General Court of the Commonwealth, that life insurers were hoarding (and squandering) surplus at levels far in excess of their realistic needs and, thus, underpaying dividends to their par policyholders.  To address the problem Massachusetts in 1907enacted and/or amended M.G.L. c. 175, §§140, 141 and 149, to require that each domestic life insurer issuing par insurance policies pay any and all excess surplus at the end of each year as par dividends.

20.     Specifically, § 149 permits a domestic life insurance company, such as MassMutual, to issue participating policies so long as such policies "by their terms give to the holders thereof full right to participate in the accumulations of said company attributable to such business as provided in section [140]."

21.     Section 140 states that every domestic life insurer shall provide in "every participating policy of life or endowment insurance… that the proportion of the divisible surplus of the company contributed by said policy shall be ascertained and distributed annually . . . beginning not later than the end of the third policy year."  Section 140 provides further, in pertinent part, that:

> Every such company shall on December thirty-first of each year or as soon thereafter as practicable, after providing from the funds attributable to its participating business for the reserve required by [§§ 9 and 11] and all other

> liabilities attributable to such business, including dividends declared upon the capital stock, if any, and such sum as may be held on account of existing deferred dividend policies, and providing also for a contingency reserve not in excess of the [12%] limit prescribed in [§ 141], apportion its remaining funds attributable to such business upon the contribution to surplus plan, as dividends, to all other policies entitled to share therein.

The required reserves referenced in § 140 are defined in M.G.L. c. 175, § 9 (which provides for the computation of reserves), and § 11 (which provides for the computation of assets and liabilities, and requires reserves, as calculated under § 9, as well as all unpaid losses and claims for losses, and all other debts and liabilities, to be designated as liabilities).

22.     Section 141 provides, in relevant part, that:

> Any domestic life company may from its surplus funds or profits attributable to its participating business accumulate and hold, or hold if already accumulated, as a safety fund, an amount not in excess of twelve per cent of its reserve for such business, and, in addition thereto, any surplus that may have been contributed by the holders of the guaranty stock of the company, or which has been accumulated for the retirement of said guaranty stock and the margin of the market value of its securities over their book value ... provided that for cause shown, the commissioner may ... permit  any company to accumulate and maintain a safety fund in excess of the limit above mentioned… This safety fund shall be in addition to any safety fund accumulated from a mutual domestic life company's surplus funds attributable to its nonparticipating business, which funds may be appointed equitably, in the discretion of the company, as part of any annual dividend on participating business.

23.     Thus, under Sections 140 and 141, MassMutual is permitted to retain from its participating surplus funds, a contingency reserve or safety fund, equal in amount to: (1) no more than twelve percent (12%) of its reserve funds attributable to its par business, plus (2) the margin of the market value of its securities over their book value (hereinafter the "Market Value Margin" or "MVM") (combined, the "Safety Fund Limit").  Anything over the Safety Fund Limit must be distributed to MassMutual's par policyholders as an annual policy dividend, unless the Commissioner, for cause shown, has permitted an

accumulation in excess of the Safety Fund Limit and published such permission in the

Commissioner's Annual Report.

24.     According to the legislative history of these two statutes, Sections 140 and

141 were adopted to operate in tandem to prevent insurance companies from deferring

dividends rather than paying them annually – a practice that was rampant in life insurance

at the turn of the 19th Century and had led to the buildup of enormous surpluses and

abuses by life insurers well-documented by the notorious Armstrong Committee hearings

and investigations in New York in 1905-1906.  As the report of the Joint Special

Committee of the Massachusetts Legislature made clear, the 1907 Safety Fund Statute

was adopted in reaction to the Armstrong Committee's findings:

> The wisdom of those who framed the insurance laws of this
> Commonwealth, requiring from mutual companies regular and frequent
> accounting and distribution of surplus to policy holders, has been justified
> by recent disclosure of corruption elsewhere which the vast accumulation
> of unapportioned dividends made possible; and not only has corruption
> followed, but this immense sum, aggregating many millions, for which no
> security is exacted and no accounting required before the expiration of the
> long terms of the contract, has been so drawn upon and reduced to meet the
> grossly excessive expenses incident to exploiting this form of insurance
> that the persistent survivors have been defrauded of a large part of the
> accumulations due and promised them.[4]

25.     The legislative history of § 141 resoundingly confirms that the overriding

purpose of the Safety Fund Statute was (and remains) to prevent the hoarding of surplus

by insurance companies:

> [The Safety Fund Statute] will not injuriously affect the Massachusetts
> companies; it will, however, prevent them from following the example of some
> foreign companies which have raised inordinate surpluses at the expense of policy
> holders, and then used them to provide funds for speculation, and to furnish a

---

[4] Report of the Joint Special Committee on Insurance Appointed to Revise and Amend
the Insurance Laws of the Commonwealth of Massachusetts at 36-37, January 1907
(House Document No. 1085).

pretext for excessive salaries to the officers who accumulated them.[5]
Addressing the statutory predecessor to § 141 adopted in 1887, Massachusetts Insurance
Commissioner John Tarbox implored the legislature to prevent precisely the sort of
hoarding that MassMutual has now accomplished more than 100 years later: "Do not
leave these corporations with unlimited power to hoard from the public."[6]

26.     While the primary overriding purpose of the Safety Fund Statute is to
prevent life insurance companies like MassMutual from hoarding surplus at the expense
of their par policyholders, the statute also allows companies to retain a modest safety
fund in an amount sufficient to avoid insolvency should required policy reserves prove
inadequate to satisfy the companies' contractual obligations to their par policyholders
(i.e., 12% of policy reserves plus the MVM).  The legislative history of § 141 and its
predecessor reflect the Legislature's belief that statutory policy reserves provide the
primary protection of insurer solvency, and that the safety fund is intended solely as a
backstop "to be used, if needed to repair the reserve."[7]  In the view of Insurance
Commissioner Tarbox, "a life company, well established and with sound investments and
a safe basis of reserve, needs no surplus for its safety, and that for it to accumulate such a
surplus from dividends to which its policy holders are in equity entitled is an

---

[5] Report of the Commission to Recodify the Insurance Laws, Massachusetts House
Document No. 1375 at 34 (June 1906).

[6] Report of Hearing on the Commissioner's Report before the Joint Committee on
Insurance (1887), at 72-73.

[7] Report of the Insurance Commissioner on the Resolve to Revise and Codify the
Insurance Laws of the Commonwealth, House Document No. 20 at pp. *xvii-xxi*
(M010060-M010062) (1887).

injustice.…"[8]

27.     Unfortunately, having amassed a participating policy surplus many times in excess of that needed to maintain its solvency and pay current policyholder claims, MassMutual chose to evade the required distribution of dividends by manipulating the elements of its reported Safety Fund Limit in numerous ways, all of which serve to grossly inflate the purported "contingency reserve" of surplus beyond even the total amount of surplus itself. As shown below, this violates the letter and spirit of the Safety Fund Statute.

**Plaintiff and the Putative Class Own Par MassMutual Policies
Entitled to All the Protections Incorporated Therein from
M.G.L. c. 175, §§ 140, 141 and 149**

28.     MassMutual has issued participating policies to Plaintiff and, upon information and belief, to more than 2 million other par policyholders comprising the putative Class.  The par policies must, and do, contain the dividend distribution language required by Sections 140 and 149.  Plaintiff Bacchi's standard whole-life policy states:

> Upon payment of the premium for the full second policy year, and thereafter at the end of the second and each later policy year, this Policy, while in force other than as Extended Insurance, will be credited with such share of the divisible surplus, if any, as may be apportioned to it by the Company as a dividend.

29.     When Connecticut Mutual merged into MassMutual in 1996, Plaintiff and other former Connecticut Mutual par policyholders became par policyholders of MassMutual and their policies thereafter became MassMutual policies.

30.     The MassMutual policies do not make specific reference to §§ 140, 141 or 149, but do contain the requisite language that annually "…this Policy .... ***will*** be credited

---

[8] Report of Hearing on the Commissioner's Report before the Joint Committee on Insurance (1887), at 69, 72-73 (MO10098-100).

with such share of the ***divisible surplus***, if any, as we may apportion to it by the

Company as a dividend." (Emphasis added.) Thus, the policies incorporate the

requirement for the payment of annual dividends out of the divisible surplus mandated by

§ 140 subject only to the contingency reserve that MassMutual is permitted to retain

under the Safety Fund Statute, § 141. As such, MassMutual's policies contain the

language required by § 149 providing for the "full right to participate in the

accumulations of said company attributable to such business as provided in section

[140]."

<u>**MassMutual's Safety Fund Calculation Methods**</u>

31.     Starting with the year 1997, MassMutual has calculated its safety fund

each year and submitted it to the Commissioner ("Safety Fund Calculations"). These

computations represent MassMutual's annual assessment of the applicable Safety Fund

Limit and, thus, of its obligation to pay the remaining, excess surplus to its par

policyholders.

32.     In 2002, while performing its preliminary internal safety fund

computations for the prior year, MassMutual realized that its reported surplus for 2001

exceeded the Safety Fund Limit.   But rather than distributing this excess surplus as

required by §§ 140 and 141, MassMutual instead explored changes in the methodology

used for its Safety Fund Calculations that would allow it to evade the Safety Fund Limit

and hoard additional surplus from its par policyholders.

33.     In the weeks leading up to the submission of its safety fund report for

2001, which it ultimately filed with the Commissioner on May14, 2002, MassMutual ran

a series of internal scenarios encompassing increasingly aggressive methodological

changes to its Safety Fund Calculations, all designed to keep more surplus and pay lower annual policy dividends than the Safety Fund Statute allows.

34.     For example, to inflate its claimed Safety Fund Limit, MassMutual for the first time invoked the MVM provisions of § 141 and sought to include as "securities" in the MVM various assets that are not properly characterized as "securities," such as derivative contracts used to hedge interest rate risk, investments in joint ventures and limited partnerships that it controls, and its interest in a wholly owned limited liability company. MassMutual at first considered including within the MVM component both the unrealized gains and losses attributable to these assets (the same approach used to determine the surplus attributable to those assets), but that proved insufficient when MassMutual ran the numbers. Because the required net approach did not produce a high enough Safety Fund Limit to create the appearance of compliance with § 141, MassMutual decided to further inflate the MVM component by including **only** the unrealized gains associated with the assets, but not the unrealized losses associated with the corresponding assets of the same type. By cherry picking the gains associated with these assets, while disregarding the corresponding losses, MassMutual inflated the MVM component of its Safety Fund Limit to astronomical levels. Of note, MassMutual's Safety Fund Calculations submitted to the Commissioner were opaque as they did not disclose how the MVM was calculated and they relied on non-public information.

35.     MassMutual also made other modifications in its Safety Fund Calculations in the weeks leading up to the submission of its 2001 safety fund report, including changes designed to improperly inflate the "reserves" component of the 12% safety fund formula. Thus, for 2001, MassMutual sought to sweep within the "reserve" component: (1) certain accrued non-contingent liabilities that are not properly characterized as policy

reserves, and (2) liabilities associated with its Separate Accounts which do not pose any solvency or other contingency risk to the Company or its par policyholders.[9]

36.    In addition, for 2001, MassMutual for the first time included in its Safety Fund Calculations deductions designed to reduce the "surplus" component of the calculation, by amounts attributable to its claimed net admitted Deferred Tax Asset ("DTA")[10] and certain prepaid pension expenses. Like the others described above, MassMutual made these changes to its Safety Fund Calculations to inflate the amount of its claimed Safety Fund Limit to create the false appearance of compliance with § 141.

37.    In the following years, MassMutual implemented yet more improper changes to its Safety Fund Calculations – all of which were intended to further inflate its claimed Safety Fund Limit so as to hoard additional surplus amounts otherwise due to its par policyholders in accordance with §§ 140 and 141. For 2004, MassMutual swept within its purported definition of "reserves" all of the remaining accrued non-contingent liabilities from its annual statement (including accrued liabilities for rent and similar routine operating expenses) even though these liabilities are not properly characterized as policy reserves.

---

[9] MassMutual sells a variety of life and disability insurance products. The vast majority of the policyholder reserves are related to individual and group traditional whole-life, term life, universal life, variable life and various types of annuities. The annuity products include substantial amounts of variable annuities invested primarily in mutual funds and other investments that are legally segregated from the rest of the funds administered and invested by the Company, and owned by the policyholders. These segregated funds are required by law to be maintained in a separate reporting structure referred to as "separate accounts" and are reported in a separately filed annual statement.

[10] Generally, net admitted DTAs represent the expected future tax recoveries (within 12 months) for, e.g., dividends paid and expensed in the prior year, and are reported as surplus under the governing statutory accounting principles.

**Calculating the Safety Fund Correctly Demonstrates that MassMutual
Retained Excess Surplus That Should Have Been Paid as Par Policy Dividends**

38.     Based upon the analysis of Plaintiff's experts and the information available to Plaintiff following extensive discovery in this matter, when calculated properly using the financial items and amounts required by Section 141 for each year on a stand-alone basis, MassMutual's claimed safety fund exceeds the statutory Safety Fund Limit for every year from 2001 to the present, except 2005.  Consequently, MassMutual has underpaid dividends to its participating policyholders over these years.  Based on the improper methods employed in its Safety Fund Calculations, MassMutual will continue to violate the Safety Fund Statute and the terms of its participating policies unless it is ordered to comply with §§ 140 and 141.

39.     Paragraphs 40 - 50 below set forth ways in which MassMutual has improperly computed its safety fund by systemically overstating its MVM and par reserves, while understating its par surplus, in order to impermissibly inflate its claimed Safety Fund Limit.

**MassMutual's Overstated MVM**

40.     MassMutual has overstated the MVM component of its Safety Fund Calculations in at least the following ways:

41.     **Inclusion of Non-Securities:** Although the MVM component of the Safety Fund Limit under § 141 applies only to "the margin of the ***market value*** of its ***securities*** over their book value" MassMutual calculates its MVM by including assets that are not securities and/or are not carried at market value in its surplus (such that there is no difference between market and book value).

A.   The items that are not securities, but that MassMutual has included

in its MVM calculation are: (a) interest rate and currency derivative contracts used for hedging transactions (which comprise 97% of all its derivatives); (b) MassMutual's wholly-owned subsidiaries and limited liability companies ("LLCs") (included on Schedule D-Part 2 of its annual statements) and limited partnerships and joint ventures that it controls (included on Schedule BA of its annual statements) ("BA Assets"); and (c) foreign currency exchange rate gains.

B.   The items that are not carried at market value in its surplus, but that MassMutual nevertheless includes in its MVM calculation are (i) its wholly owned LLCs; and (ii) the BA Assets.

42.   **Gross Rather Than Net Approach.**  In addition, although the MVM applies to all of "its securities," MassMutual only includes those assets for which it reports unrealized gains and fails to offset those gains with the unrealized losses (although only the aggregate net unrealized amounts are included in surplus).  For derivative contracts, for example, MassMutual includes only the total of all contracts with carrying values greater than zero rather than the aggregate net position of all derivative contracts (although only the aggregate net amounts are included in surplus).

43.   **Failure to Adjust for Taxes.** MassMutual's surplus includes only unrealized gains on assets net of taxes (that is, its surplus is reduced for the amount of tax that would be due on the gains if they were realized).  By doing so, MassMutual improperly fails to adjust its claimed MVM for such taxes and, therefore, its MVM is inflated by the amount of the corporate tax rate (estimated at 35%).

44.    **Failure to Account for AVR.** Long after § 141 was enacted, the governing statutory accounting principles ("SAP") introduced the use of an Asset Valuation Reserve ("AVR") which adjusted (*i.e.,* lowered) surplus to account for fluctuations in an insurer's market value of securities and other assets.  However, MassMutual's MVM component improperly fails to take into account the duplication or double-counting of unrealized gains already removed from surplus through the AVR.

### MassMutual's Overstated Reserves

45.    MassMutual has overstated its par policy reserves in at least the following ways: (1) improperly treating accrued non-contingent liabilities as if they are reserves; and (2) improperly including as reserves separate accounts that are legally separate from its par business.

46.    **Non-Reserve Liabilities**.  MassMutual has overstated its actual "reserves" in its Safety Fund Calculations by including accrued non-contingent liabilities that are not policy reserves under M.G.L. c. 175, § 9 (which governs the detailed computation of life insurance company reserves, and their certification annually by the Commissioner), or the statutory accounting rules.  Examples of these non-reserve items include the following ordinary liabilities such as rent, agent commissions due and *declared* policyholder dividends (due and unpaid, and set aside for the following year).

47.    **Separate Account Liabilities**.  MassMutual also has overstated the "reserve" used in its Safety Fund Calculations by improperly including the liabilities that it records in connection with Separate Account products.  Those liabilities are legally separate and distinct from the General Account relating to its par business and, therefore, cannot be comingled for any purpose (including in calculating MassMutual's divisible surplus and the safety fund).  Moreover, the "contingency reserve" allowed by § 141 is

18

inapplicable to the Separate Account liabilities because those liabilities present no solvency risk for MassMutual and the Separate Account holders derive no benefit from the safety fund.  The Separate Account contract owners bear their own investment performance risk and are not eligible for dividends from MassMutual's surplus.  Hence there is no basis to withhold dividends from par policyholders, as MassMutual seeks to do, by including Separate Account liabilities in the safety fund calculation.

## **MassMutual's Understated Surplus**

48.     MassMutual understated the amount of "surplus" used in its Safety Fund Calculations in at least the following ways: by excluding its net admitted Deferred Tax Asset ("DTA") and its prepaid pension expense.

49.     **Net Admitted DTA.**  MassMutual also improperly reduces the "surplus" component of its Safety Fund Calculations by excluding its net admitted DTA from surplus even though the net admitted DTA by definition constitutes surplus under the governing SAP.[11]

50.     **Pre Paid Pension Expense.** MassMutual improperly deducted its pre-paid pension expenses from surplus for several years even though this treatment is not provided for under SAP.

---

[11] The Commissioner granted waivers allowing MassMutual to exceed the Safety Fund Limit in the amount of its admitted DTA for 2001-2005.  However, these waivers are invalid because they are based on inaccurate information presented by MassMutual and are contrary to SAP.  A virtually identical purported waiver was held to be "arbitrary and capricious" by a Massachusetts Superior Court in the Business Litigation Session in a case involving a different Massachusetts-domiciled life insurance company.  The court held that the Commissioner's waivers were improper because those waivers were issued on grounds that the admitted DTAs were not liquid and/or otherwise immediately available for the payment of policyholder claims, dividends, etc., even though admitted DTAs are *by definition* under SAP available to pay claims and dividends.  No waivers were granted to MassMutual after 2005 (after the "arbitrary and capricious" decision referenced above was issued).

### The Correct Calculation of MassMutual's Safety Fund

51.     As a result of MassMutual's systematic understatement of surplus and overstatement of its reserve in its Safety Fund Calculations, as alleged above, MassMutual has hoarded surplus in violation of the Safety Fund Statute and the terms of its par policies from 2001 to the present, except in 2005.

52.     The following table shows the amount of par surplus retained by MassMutual each year from 2001 through 2014, on a stand-alone basis, and the corresponding amount of excess surplus retained by MassMutual in violation of the Safety Fund Statute[12]:

| Revised Calculation of MassMutual's Safety Fund ($ in millions) | | | |
|---|---|---|---|
| | **Par Surplus Retained by Mass Mutual** | **Safety Fund Limit** | **Retained Surplus in Excess of Safety Fund Limit** |
| 2001 | 4,205.2 | 3,804.6 | 400.6 |
| 2002 | 4,751.2 | 3,944.6 | 806.6 |
| 2003 | 4,724.8 | 4,259.6 | 465.2 |
| 2004 | 4,632.2 | 4,516.1 | 116.0 |
| 2005 | 4,555.5 | 4,686.0 | (130.5) |
| 2006 | 5,196.3 | 4,913.8 | 282.6 |
| 2007 | 5,722.6 | 5,095.2 | 627.5 |
| 2008 | 6,965.0 | 5,302.4 | 1,662.7 |
| 2009 | 6,809.6 | 5,561.3 | 1,248.3 |
| 2010 | 7,551.5 | 5,891.3 | 1,660.2 |
| 2011 | 8,601.4 | 6,175.7 | 2,425.7 |
| 2012 | 8,795.6 | 6,424.4 | 2,371.2 |
| 2013 | 8,675.3 | 6,806.2 | 1,869.2 |
| 2014 | 9,986.6 | 7,256.5 | 2,730.1 |

53.     **As** the foregoing table demonstrates, by 2014 MassMutual had hoarded more than $2.7 Billion in excess surplus from its own par policyholders in violation of

---

[12] The calculation for each year reflected in the table does not make any adjustments for unpaid dividends from prior periods.

the Safety Fund Statute.  In fact, by 2014, MassMutual had inflated its claimed Safety

Fund Limit through its manipulative practices to a level nearly 1½ times its entire

reported surplus, misconstruing the Safety Fund Statute in a way that would allow

MassMutual to stop paying ***any*** dividends to its par policyholders for years.

54.     If anything, Plaintiff's corrected Safety Fund Calculations are

conservative because of at least the following: (1) Plaintiff retains in the MVM

component some derivative contracts (3%) even though at least some of those derivative

contracts likewise do not constitute securities within the meaning of § 141; (2) Plaintiff

has made no adjustment for the double-counting resulting from SAP's introduction of the

AVR (*supra*, ¶ 44); and (3) Plaintiff included all of line 3 items from the liabilities and

surplus page in the annual statement despite the fact that some of those items may not be

reserves.   Plaintiff has not computed the amounts attributable to these items due to

limitations in the information produced by MassMutual during discovery.

55.    The following graph shows the disparity between MassMutual's ever-increasing par surplus during the Class Period (2001 – 2014) and the relatively meager growth in policyholder dividends over the same period:



56.     Indeed, the dividends paid to the MassMutual par policyholders actually

*decreased* as a percentage of the Company's par surplus during the Class Period:



57.     In sum, MassMutual has intentionally inflated the amount of surplus it is

permitted to withhold from its participating policyholders like Plaintiff by systematically

inflating its Safety Fund Calculations to skew the Safety Fund Limit far, far in excess of

that actually allowed under the Safety Fund Statute.  MassMutual is hoarding this excess

surplus even though compliance with the Safety Fund Statute would still leave it

statutorily solvent many times over, by billions of dollars.

### The Discovery Rule/Fraudulent Concealment

58.     Plaintiff was unable to discover earlier than the filing of her first

complaint on July 11, 2012 that Defendant was retaining excess surplus because: (1)

MassMutual's annual Safety Fund Calculations since 1999 as submitted to the

Commissioner show (falsely) that its withheld surplus is under the Safety Fund Limit (in most years it uses dollar amounts rather than percentages to make the claim); and (2) MassMutual's Annual Statements filed with the Commissioner lack sufficient detail to allow Plaintiff to calculate its safety fund independently.  For example, MassMutual's Safety Fund Calculations did not disclose the true character and value of the various assets it treated as "securities" for the MVM component under § 141, nor that it failed to net the reported value of its derivative contracts and other MVM items even though it did so for purposes of calculating surplus in the first place.  Most importantly, neither MassMutual's Annual Statements nor its Safety Fund Calculations separately detail the amount of surplus and reserves attributable to its par business (versus its non-par business) with sufficient detail to verify their (in)accuracy.  It is not until the correct amounts of par surplus and par reserves were discovered that Plaintiff could determine that MassMutual's surplus exceeded the Safety Fund Limit.

59.     Because MassMutual misrepresented its Safety Fund Limit, and covered up the true amount of its dividend obligations, in disclosures sent to the Commissioner (*e.g.,* by claiming it was both complying with the relevant contractual/statutory limit regarding its par surplus and reserves and reporting it correctly), Plaintiff and the Class could not reasonably have discovered, and were prevented from discovering, the Company's failure to comply with its insurance policies and the statutes incorporated therein.

60.     Similarly, MassMutual communicated directly with its par policyholders through annual policy statements, annual reports and otherwise, yet failed to disclose to them that the Company's surplus exceeded the Safety Fund Limit in those years, that it was underpaying and underreporting annual dividends due to the par policyholders,

and/or any other information that would have allowed the Plaintiff and the Class to independently and correctly calculate the safety fund.

61.     Additionally, once MassMutual submitted its Safety Fund Calculations, it had a duty to use true and accurate calculations, which it failed to do in breach of its contractual duties to the Class.

62.     Plaintiff Bacchi only learned shortly before filing her initial complaint that MassMutual may in some ways to be violating its contracts and the Safety Fund Law incorporated therein, so as to underpay its annual dividends. Plaintiff for the first time learned of the true nature and scope of MassMutual's Safety Fund machinations through subsequent discovery conduct by her legal counsel in this action.

63.     Therefore, any otherwise applicable statutes of limitation are tolled from at least the filing of the first materially false Safety Fund Calculation in 2001 under the Discovery Rule and/or the doctrine of fraudulent concealment.

## **CLASS ACTION ALLEGATIONS**

64.     Plaintiff brings this action as a class action pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure seeking to represent a class of all persons who own or have owned MassMutual participating policies from 2001 to the present (the "Class"). Excluded from the Class are MassMutual's directors and senior management, and any entity related to or affiliated with MassMutual and the legal representatives, heirs, successors-in-interests or assigns of any such excluded entity, and this Court and its personnel.

65.     The members of the Class are so numerous that joinder of all members is impracticable. MassMutual has issued participating policies to Plaintiff and, upon information and belief, over 2 million other putative Class members. Class members can

be identified from the records maintained by MassMutual and notified of the pendency of this action by mail using a form of notice similar to that customarily used in other class actions.

66.     Plaintiff will fairly and adequately represent and protect the interests of all members of the Class.  Plaintiff has retained competent counsel experienced in policyholder class action litigation in both state and federal courts nationwide – including an action based on the same causes of action alleged herein – and intends to prosecute this action vigorously.

67.     Plaintiff's claims are typical of those of the other members of the Class because (a) each has a par policy imbued with identical rights to annual dividends and/or with substantially identical language supporting his/her claim, and (b) the harm sustained by Plaintiff and all of the members of the Class arises from and was caused by the same course of conduct in which MassMutual engaged.  The Plaintiff does not have interests that are antagonistic to or in conflict with the Class.

68.     Common questions of law and fact exist as to all members of the Class and predominate over questions solely affecting individual members of the Class. Common questions include:

(a)     What is the correct method for calculating MassMutual's Safety Fund Limit;

(b)     Whether and by how much MassMutual's safety fund exceeded the statutory limit during the Class period;

(c)     Whether MassMutual retained excess surplus, in breach of its contracts and other duties, that should have been distributed as policy dividends to its participating policyholders comprising the Class;

(d)     Whether the waivers for net admitted DTAs obtained by MassMutual from

the Division of Insurance for 2001 - 2005 are valid;

(e)     Whether the Class is entitled to an accounting;

(f)     Whether the applicable statutes of limitations have been tolled by the

Company's false safety fund disclosures and other deceptive acts;

(g)     Whether the Class has sustained damages and the proper measure of such

damages; and

(h)     Whether equitable relief is appropriate to prevent the continuation of the

alleged wrongdoing.

69.     In retaining excess surplus and failing to pay the annual dividends it was

contractually obligated to pay under its policies that incorporate the governing statutes,

MassMutual has acted or refused to act on grounds that apply generally to the Class so

that final injunctive relief or corresponding declaratory relief is appropriate respecting the

Class as a whole.

70.     Common questions of law or fact predominate over individual questions

because policyholders are all adversely affected by the Company's failure to honor its

contracts.

71.     A class action is superior to other available methods for the fair and

efficient adjudication of this controversy.  Since the harm suffered by individual Class

members may be relatively small, the expense and burden of individual litigation make it

virtually impossible for the Class members individually to seek redress for the wrongful

conduct alleged.  Moreover, absent class treatment, there is a high risk of inconsistent

judgments by different courts hearing the identical claims of over 2 million

policyholders.  Plaintiffs know of no difficulty that will be encountered in the

management of this litigation to preclude its maintenance as a class action.

## COUNT I –
## BREACH OF CONTRACT

72.     Plaintiffs incorporate herein the allegations contained in the preceding

paragraphs.

73.     Plaintiff Bacchi's whole-life policy states that annually it "will be credited

with such share of the divisible surplus, if any, as may be apportioned to it by the

Company as a dividend."

74.     Consistent with the requirements of M.G.L. c. 175, §§ 140, 141 and 149,

each Class member's policy contains substantially similar language entitling them to full

participation rights in MassMutual's divisible surplus, and payment of the excess surplus

therein annually as par policy dividends.

75.     Plaintiff and the Class have fully performed their part of their insurance

contracts.

76.     MassMutual has breached its contracts by failing to pay out the full

amount of its excess surplus due to Plaintiff and the Class as policy dividends.

77.     The Company's breaches of contract have damaged Plaintiff and the Class

in an amount to be proven at trial.

## COUNT II –
## BREACH OF THE IMPLIED COVENANT OF
## GOOD FAITH AND FAIR DEALING

78.     Plaintiff incorporates herein the allegations contained in the preceding

paragraphs.

79.     Plaintiff entered into a participating insurance policy/contract with MassMutual all of which policies must "by their terms give to the holders thereof *full* right to participate in the accumulations of said company attributable to such business as provided in section [140]."  M.G.L. c. 175, § 149 (emphasis added).  Plaintiff's standard policy included such language.

80.     Plaintiff and the Class have fully performed their part of their insurance contracts.

81.     MassMutual has failed to pay out the full amount of its excess surplus due to Plaintiff and the Class as annual policy dividends.

82.     MassMutual acted in bad faith by, *inter alia:* (a) submitting Safety Fund Calculations in Massachusetts each year using incorrect financial information; (b) reducing its surplus (or, said differently, increasing its Safety Fund Limit) by the excess of its market value of its securities over their book value (MVM) by including (i) non-securities, (ii) assets that are not carried at market value in its surplus, (iii) the claimed unrealized gains without netting them against the unrealized losses even though its surplus nets the unrealized gains and losses, (iv) failed to adjust the MVM for taxes even though its surplus is tax adjusted, and (v) fails to make an adjustment for the double count of its MVM and the AVR that is already removed from surplus, and/or otherwise uses grossly overstated numbers for the excess of the market over book value of its securities; (c) includes Separate Accounts that are legally separate and distinct and thus inapplicable; and (d) otherwise understates surplus and overstates reserves in at least the ways alleged in this complaint and as set forth in the expert reports produced to MassMutual on December 15, 2015.

83.     MassMutual has violated its participating policies, which incorporate the

governing statutes, Sections 140, 141 and149, and consequently breached the implied

covenant of good faith and fair dealing by retaining excess surplus due to Plaintiff and

the Class as dividends.

84.     The Company's breaches of the implied covenant of good faith and fair

dealing have damaged Plaintiff and the Class in an amount to be proven at trial.

## COUNT III –
## UNJUST ENRICHMENT

85.     Plaintiff incorporates herein the allegations contained in the preceding

paragraphs.

86.     Because the Company will be unjustly enriched if it is allowed to retain

such funds, all excess surplus (i.e, that exceeding the Safety Fund Limit) should be

disgorged to Plaintiff and the Class.

87.     This relief is appropriate to the extent Plaintiff and the Class may have no

adequate remedy at law.

## COUNT IV –
## MONEY HAD AND RECEIVED

88.     Plaintiff incorporates herein the allegations contained in the preceding

paragraphs.

89.     MassMutual owes Plaintiff and the Class their distribution of excess

surplus for money had and received from par policyholders when they (over) paid their

policy premiums, which surplus is attributable to the par policyholders, and which funds

must be paid to the Class as dictated by contract and the statutes incorporated therein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the Court to:

A.    Certify this case as a class action;

B.    Grant judgment against MassMutual on all Counts and for damages in such

amount as the Company was required by its contracts, incorporating per M.G.L. c.

175, §§ 140, 141 and 149, to distribute as policy dividends to Plaintiff and the

Class, including statutory interest thereon;

C.    Grant all appropriate equitable and/or injunctive relief against MassMutual

(including for an accounting as necessary) to the extent the Court determines that

an adequate remedy at law does not exist;

D.    Award Plaintiff her costs and disbursements incurred in maintaining this action,

including reasonable attorneys' and experts' fees and other expenses, and pre-and

post-judgment interest; and

E.    Grant such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all counts so triable.

Dated:  December __, 2015                     Respectfully submitted,

By Plaintiff,
By their attorneys,

**ADKINS, KELSTON & ZAVEZ, P.C.**

_____
Jason B. Adkins, BBO #558560
John Peter Zavez, BBO #555721
90 Canal Street, 5th Floor
Boston, MA  02114
Phone (617) 367-1040
Fax (617) 742-8280

_____

Andrew Friedman
**BONNETT, FAIRBOURN, FRIEDMAN & BALINT, P.C**.
2901 N. Central Avenue, Suite 1000
Phoenix, AZ  85012
(602) 776-5902

and

_____

Mark A. Chavez
**CHAVEZ & GERTLER LLP**
42 Miller Avenue
Mill Valley, CA  94941
(415) 381-5599

**Attorneys for Plaintiffs**