UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

KAREN L. BACCHI,

                        :

            Plaintiff,         :      Civil Action

                        :      No. 12-11280-DJC

      v.

                        :      **ORAL ARGUMENT REQUESTED**

MASSACHUSETTS MUTUAL LIFE
INSURANCE COMPANY,           :

            Defendant.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MASSMUTUAL'S MEMORANDUM IN SUPPORT
OF ITS MOTION TO STRIKE INADMISSIBLE STATEMENTS
FROM THE EXPERT REPORTS OF LAW PROFESSOR TOM BAKER,
ATTORNEY JAMES W. LOVELY, AND CONSULTANT R. LARRY JOHNSON**

James R. Carroll
Kurt Wm. Hemr
Alisha Q. Nanda
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
500 Boylston Street
Boston, Massachusetts  02116
(617) 573-4800

Dated: December 28, 2015
        Boston, Massachusetts

Counsel for Defendant
Massachusetts Mutual Life Insurance Company

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .......................................................................... iii

PRELIMINARY STATEMENT ....................................................................1

PERTINENT FACTUAL BACKGROUND .................................................2

    1.    Plaintiff's Proposed Expert Tom Baker, A Law Professor, Intends To Offer His Opinions Regarding The Proper Legal Construction Of Section 141.............................................................................................................3

    2.    Plaintiff's Proposed Expert Attorney James W. Lovely Intends To Offer His Opinions Regarding The Scope Of Federal Derivatives Regulation And The Proper Legal Construction Of Section 141 ..............................................5

    3.    Plaintiff's Proposed Expert R. Larry Johnson Intends To Offer His Opinions Regarding The Proper Legal Construction Of Section 141 ....................7

LEGAL STANDARD....................................................................................8

ARGUMENT ................................................................................................9

I.    PLAINTIFF'S PROFFERED "EXPERT OPINIONS" REGARDING STATUTORY CONSTRUCTION REPRESENT INADMISSIBLE LEGAL CONCLUSIONS AND SHOULD BE STRICKEN ...........................................9

    A.    Professor Baker, Attorney Lovely, and Mr. Johnson Cannot Offer Expert Testimony As To The Proper Legal Interpretation of Section 141 ........................9

    B.    Attorney Lovely Cannot Opine On The Scope Of Derivative Regulation Under Federal and State Law................................................................................13

II.    PLAINTIFF'S PROFFERED "EXPERT OPINIONS" REGARDING LEGISLATIVE INTENT ARE INADMISSIBLE BOTH BECAUSE THEY REPRESENT LEGAL CONCLUSIONS AND BECAUSE THEY SPECULATE CONCERNING THE STATES OF MIND OF LEGISLATORS AND OTHERS...........14

    A.    "Expert Opinions" Regarding Legislative Intent Amount To Inadmissible Legal Conclusions And Thus Are Not A Proper Subject Matter For Expert Testimony ............................................................................................................14

    B.    "Expert Opinions" Regarding Legislative Intent Are Also Impermissible For The Additional And Independent Reason That They Speculate On The States Of Mind Of Legislators And Others............................................................15

C.    In An Effort To Establish The Meaning Of Section 141, Plaintiff's Expert
      Reports Are Replete With Impermissible Legal Opinions Concerning
      Legislative History And Intent..............................................................................16

III.    PLAINTIFF'S PROFFERED "EXPERT OPINIONS" REGARDING
        MASSMUTUAL'S PURPORTED STATE OF MIND SHOULD BE STRICKEN ........19

CONCLUSION..........................................................................................................................20

## TABLE OF AUTHORITIES

**CASES**                                                 **PAGE(S)**

Bartlett v. Mut. Pharm. Co.,
   742 F. Supp. 2d 182 (D.N.H. 2010) .......................................................................11

Beauregard Parish Sch. Bd. v. Honeywell, Inc.,
   No. 2:05 CV 1388, 2008 WL 821053 (W.D. La. Mar. 24, 2008) ...........................16

Damon v. Hukowicz,
   964 F. Supp. 2d 120 (D. Mass. 2013) .....................................................................13

Daubert v. Merrell Dow Pharm., Inc.,
   509 U.S. 579 (1993) ...............................................................................................8, 9

DePaepe v. Gen. Motors Corp.,
   141 F.3d 715 (7th Cir. 1998) ..................................................................................16

G.F. Co. v. Pan Ocean Shipping Co.,
   23 F.3d 1498 (9th Cir. 1994) .......................................................................15, 16, 17

Holmes Grp., Inc. v. RPS Products, Inc.,
   No. 03-40146-FDS, 2010 WL 7867756 (D. Mass. June 25, 2010) .........................15

In re Prograf Antitrust Litig.,
   No. 1:11-MD-02242-RWZ, 2014 WL 7641156 (D. Mass. Dec. 23, 2014) .............16

In re Rezulin Products Liab. Litig.,
   309 F. Supp. 2d 531 (S.D.N.Y. 2004) ...............................................................16, 19

Inner-Tite Corp. v. DeWalch Technologies, Inc.,
   No. 04-40219-FDS, 2007 WL 2507737 (D. Mass. Aug. 31, 2007) ..........................9

Karp v. CIGNA Healthcare, Inc.,
   882 F. Supp. 2d 199 (D. Mass. 2012) ...............................................................13, 14

Marlin v. Moody Nat. Bank, N.A.,
   248 F. App'x 534 (5th Cir. 2007) ..........................................................................16

Nieves-Villanueva v. Soto-Rivera,
   133 F.3d 92 (1st Cir. 1997) ............................................................................. *passim*

Pelletier v. Main St. Textiles, LP,
   470 F.3d 48 (1st Cir. 2006) .....................................................................................13

U.S. ex rel. Dyer v. Raytheon Co.,
   No. 08-10341-DPW, 2013 WL 5348571 (D. Mass. Sept. 23, 2013) .................11, 15

United States v. Caputo,
   517 F.3d 935 (7th Cir. 2008) .............................................................................10, 11

United States v. Mikutowicz,
   365 F.3d 65 (1st Cir. 2004) ................................................................................................10

United States v. Prigmore,
   243 F.3d 1 (1st Cir. 2001) ............................................................................................10, 14

**STATUTE**                                                   **PAGE(S)**

M.G.L. c. 175, § 141 ........................................................................................................ *passim*

**RULE**                                                        **PAGE(S)**

Fed. R. Evid. 702 ............................................................................................................8, 10

## PRELIMINARY STATEMENT

On December 15, 2015, Plaintiff Karen L. Bacchi served three expert reports in this action.  Two of those three expert reports were prepared by lawyers (one by a law professor).  All three of those reports address subject matter that is not a proper subject for expert testimony: specifically, (i) legal analysis of a Massachusetts statute at issue in this litigation, including the legal construction of that statute in light of its legislative history and the decisions of other courts;  (ii) the state of mind and intentions of the persons who drafted and enacted that 1906 statute; and (iii) the state of mind of employees of Defendant Massachusetts Mutual Life Insurance Company ("MassMutual") who performed calculations of MassMutual's compliance with that statute.  The Court should strike those expert reports to the extent that they address that impermissible subject matter.

Plaintiff may make her legal arguments about the meaning of the Massachusetts statute to this Court.  This Court has expertise in considering the construction of Massachusetts and federal statutes, legislative history, the precedents of other courts, and other legal authority.  This Court will determine the proper legal construction of that statute and will (if necessary) instruct the jury on the application of that statute.  But Plaintiff, who has demanded a jury trial, cannot present expert testimony that would usurp the Court's role as the authority on the law applicable to this action.  Nor may Plaintiff present expert testimony that purports to opine as to the state of mind of legislators (much less long dead ones!) or of MassMutual's employees.

MassMutual thus moves this Court to strike the impermissible portions of those reports.  MassMutual seeks that relief now, rather than at some later stage of this litigation, because of the unfair burden and prejudice that it would suffer if it were required to (i) retain experts to prepare reports rebutting Plaintiff's impermissible expert reports, (ii) depose Plaintiff's

experts, and (iii) defend the deposition of its own experts, all before this Court rules on the

propriety of Plaintiff's plainly improper reports.[1]

## PERTINENT FACTUAL BACKGROUND

A Massachusetts statute enacted in 1906 provides that a Massachusetts life insurer

may carry on its books certain surplus (i.e., its retained earnings) as a "safety fund."  M.G.L. c.

175, § 141.  The calculation of an insurer's safety fund limit has two parts, both of which are

expressly set out in § 141:

     i.      a specified percentage (12%) of the insurer's reserves; plus

     ii.     "the margin of the market value of [the insurer's] securities over their book value"
          (i.e., the excess of the market value of the securities held in the insurer's
          investment portfolio over the prices at which those securities were purchased).

MassMutual has complied with this statute at all times.  In each year since 1998, MassMutual

has made annual, publicly-available filings with the Massachusetts Division of Insurance

showing its compliance with § 141 in the prior year.

Plaintiff asserts that MassMutual has exceeded the § 141 limit, and seeks to

compel MassMutual to pay out a portion of its surplus as dividends to certain holders of

MassMutual policies.  To that end, she proffers various criticisms of MassMutual's safety fund

calculation.  (See Compl. ¶ 22.)  As MassMutual will show in its forthcoming motion for

summary judgment (to be filed by May 6, 2016, see Dkt. No. 112), Plaintiff's criticisms fail as a

matter of law for numerous reasons, including because Plaintiff misconstrues § 141.

In an apparent effort to buttress her criticisms of MassMutual's safety fund

calculations, Plaintiff has served three expert reports that address the legal interpretation of

---

[1]      MassMutual expressly reserves its right to challenge the admissibility of Professor
Baker's, Attorney Lovely's, and Mr. Johnson's "expert opinions" on other grounds, including
(for example) on the ground that they purport to opine on matters and events outside the scope of
this action and outside the scope of their expertise.

§ 141, including the legal meanings of the terms "reserves," "surplus," and "securities" in that Massachusetts insurance statute, and the intentions and states of mind of long dead state legislators who first enacted that statute in 1906.

1. **Plaintiff's Proposed Expert Tom Baker, A Law Professor, Intends To Offer His Opinions Regarding The Proper Legal Construction Of Section 141**

Plaintiff has served a 46-page report from Tom Baker, a law professor at the University of Pennsylvania (and not even a Massachusetts lawyer), who purports to opine about the statutory interpretation of Massachusetts' "safety fund" law set forth in M.G.L. c. 175, § 141, including his views of the "legislative intent" of the statute and the proper construction and application of its terms. (In the highlighted copy of the Expert Report Of Professor Tom Baker (the "Baker Report") (attached hereto as Exhibit 1), Professor Baker's conclusions of law are highlighted in yellow, opinions regarding legislative intent are highlighted in blue, and opinions regarding MassMutual's state of mind are highlighted in green.)

The entirety of Professor Baker's Report provides his proposed legal interpretation of § 141 -- under the guise of expert testimony -- and sets forth his legal conclusions regarding the meaning of certain terms in that statute. Ultimately, Professor Baker's Report concludes that MassMutual's method of calculating its compliance with § 141 conflicts with what he contends are the legal requirements of § 141. Indeed, he expressly states at the outset of his Report that his opinions described therein "focus on the history and legislative intent of the Safety Fund Law," so that he may conclude that the "accounting practices of MassMutual conflict with this legislative intent and historical practices in the application of the Safety Fund Law." (Baker Report at ¶ 14.) In particular, Professor Baker -- whose expert report is essentially just a legal brief -- purports to opine, among other things, that:

3

i.     the "historical record indicates a <u>clear legislative intent</u> dating back to 1887 that surplus in a life insurance company belongs to its participating policyholders" (<u>id.</u> at ¶ 2 (emphasis added));

ii.     "<u>Section 140 requires</u> Massachusetts domestic life insurance companies to ascertain and distribute their divisible surplus attributable to participating policyholders on an annual basis" (<u>id.</u> at ¶ 10 (emphasis added));

iii.     "<u>the Legislature intended</u> that the anti-hoarding purpose and provisions of the restored Safety Fund Law would trump industry concerns over its impact on insurers' competitiveness" (<u>id.</u> at ¶ 29 (emphasis added));

iv.     "[t]<u>he annual dividend distribution statute and the safety fund statute were meant to</u> operate in tandem to establish bright-light rules protecting policyholders." (<u>id.</u> at ¶ 39 (emphasis added));

v.     "MassMutual's safety fund calculations conflict with the <u>historical purpose of the safety fund and distribution statutes</u>" (<u>id.</u> at ¶ 40 (emphasis added));

vi.     "MassMutual includes in the 'reserves' it uses . . . liabilities that are not properly classified as legal reserves under governing statutory insurance accounting rules or the <u>operative Massachusetts statutes</u> defining policy reserves, contrary to the legislative history and intent (<u>as recognized by a prior Massachusetts court ruling directly on point</u>)" (<u>id.</u> at ¶ 40 (emphasis added));

vii.     "MassMutual is attempting to reclaim through aggressive accounting techniques the discretion over the timing and amount of its dividends that the <u>Massachusetts Legislature took away with the enactment of §§ 140 and 141.</u>" (<u>id.</u> at ¶ 42 (emphasis added));

viii.     "[a]s Commissioner Tarbox's testimony makes clear, <u>the primary purpose of the safety fund</u> is protecting policyholders from the hoarding of surplus by <u>requiring its distribution</u>" (<u>id.</u> at ¶ 46 (emphasis added));

ix.     "[t]hus, <u>I completely agree with Judge Gants' statutory analysis</u> and the court's description of 'the spirit behind these statutes'" (<u>id.</u> at ¶ 57 (emphasis added));

x.     "[t]he historical record demonstrates that <u>the Massachusetts Legislature included the MVM clause in the safety fund statute to address a specific concern</u>" (<u>id.</u> at ¶ 63 (emphasis added));

xi.     "the <u>language of the Safety Fund Law</u>, which refers to 'the margin of the market value of its [the company's] securities over their book value,' <u>where 'its' is an inclusive not an exclusive term</u>" (<u>id.</u> at ¶ 67 (emphasis added));

xii.     "MassMutual includes derivatives in its safety fund MVM calculations, <u>even though derivatives are not 'securities' under Massachusetts law</u>" (<u>id.</u> at ¶ 68 (emphasis added)); and

xiii.    "[t]his demonstrates that the <u>legislative intent</u> was to include in the safety fund MVM calculation only 'securities,' not all assets that have a potential difference between market and book value" (<u>id.</u> at ¶ 70 (emphasis added)).

As discussed further below, it is black-letter law that the Court should draw its own legal conclusions on these issues:  Professor Baker should not be testifying before the jury on those subjects.

**2.     Plaintiff's Proposed Expert Attorney James W. Lovely Intends To Offer His Opinions Regarding The Scope Of Federal Derivatives Regulation And The Proper Legal Construction Of Section 141**

Attorney Lovely (who is not a lawyer admitted in Massachusetts) has issued a 49-page report which purports to set forth his opinions regarding the scope of derivatives regulation under federal and Massachusetts law, and his view of the proper legal construction and application of § 141 as it relates to MassMutual's derivative holdings.  (In the highlighted copy of the Expert Report Of James W. Lovely (the "Lovely Report") (attached hereto as Exhibit 2), Attorney Lovely's conclusions of law are highlighted in yellow, opinions regarding legislative intent are highlighted in blue, and opinions regarding MassMutual's state of mind are highlighted in green.)

In particular, Attorney Lovely's Report/Brief makes arguments based upon his analysis of the legal landscape of derivatives regulation under both federal and state laws, in order to draw his further legal conclusions as to the meaning of the term "securities" under § 141.  Ultimately, Attorney Lovely's Report concludes that MassMutual's inclusion of derivatives in its safety fund calculation conflicts with <u>his</u> own understanding of current federal and state securities laws and the statutory requirements of § 141.  Indeed, he expressly states in the "Summary Conclusion[s]" at the outset of his Report that (i) certain of MassMutual's

derivative instruments "were not (and are not) considered or defined to be securities . . . in light of applicable Federal securities law, Massachusetts securities law or the Massachusetts Uniform Commercial Code" and (ii) that MassMutual "improperly includes [these derivatives] in its calculation of MVM as if they are 'securities' for purposes of the Safety Fund Statute." (Lovely Report at ¶ 8.)  Specifically, Attorney Lovely purports to opine, among other things, that:

i.     "[t]he prevailing understanding that Interest Rate and Currency Derivatives are not 'securities' under Federal law was validated in 1996 through litigation involving [P&G]" (id. at ¶ 45 (emphasis added));

ii.    "[t]he court in *P & G* analyzed whether the particular transactions were, for purposes of the Federal definition of 'security,' (a) an 'investment contract' or (b) a 'note' or 'evidence of indebtedness'" (id. a t ¶ 47 (emphasis added));

iii.   "[t]he *Howey* test states that an agreement or transaction is an 'investment contract', and therefore a security if it involves . . ." (id. at ¶ 48 (emphasis added));

iv.    "MassMutual's Interest Rate and Currency Derivatives do not have the attributes required to be a security under the *Howey* test for the same reasons articulated in the *P & G* case and other authorities cited herein" (id. at ¶ 49 (emphasis added));

v.     "MassMutual's Interest Rate and Currency Derivatives do not have the attributes required to be a security under the *Reeves* test for the same reasons articulated in the *P & G* case and other authorities cited herein" (id. at ¶ 52 (emphasis added));

vi.    "[t]he [Commodities Futures Modernization Act] amended both the 1933 Act and the 1934 Act to provide that the Federal law definition of 'security' did not include any 'security-based swap agreement'" (id. at ¶ 57 (emphasis added));

vii.   "[t]he [Dodd-Frank Act] also amended each of the 1933 Act and the 1934 Act to provide that the definition of 'security' used therein included a CEA-defined 'swap' only if that swap was a 'security-based swap'" (id. at ¶ 60 (emphasis added));

viii.  "[the] Massachusetts' Uniform Securities Act currently defines a 'security' as follows . . ." (id. at ¶ 64 (emphasis added));

ix.    "Massachusetts courts look to Federal case law to evaluate whether the state definition of security should apply to new instruments or in new circumstances" (id. at ¶ 65 (emphasis added));

    x.      "[t]he language, legislative history and statutory purpose of the Safety Fund Statute all make clear that the reference to 'securities' within the Safety Fund Statute was not intended to include [certain of MassMutual's derivatives]" (id. at ¶ 74 (emphasis added));

    xi.      "the legislative history of the Safety Fund Statute reflects that Massachusetts Legislature intended for the term 'securities' to mean . . ." (id. at ¶ 82 (emphasis added)); and

    xii.      "[t]his further confirms that the term 'security' in the Safety Fund Statute was intended to encompass traditional investments like bonds and stocks" (id. (emphasis added)).

Again, as discussed further below, the Court should draw its own legal conclusions on these issues, and Attorney Lovely should not be testifying before the jury on these subjects.

**3.      Plaintiff's Proposed Expert R. Larry Johnson Intends To Offer His Opinions Regarding The Proper Legal Construction Of Section 141**

Mr. Johnson has issued a 81-page report which purports to set forth his views on the legal interpretation of Massachusetts' "safety fund" law set forth in M.G.L. c. 175, § 141, including his views of the "legislative intent" of the statute and the proper construction and application of its terms.  (In the highlighted copy of the Expert Report Of R. Larry Johnson (the "Johnson Report") (attached hereto as Exhibit 3), Mr. Johnson's conclusions of law are highlighted in yellow, opinions regarding legislative intent are highlighted in blue, and opinions regarding MassMutual's state of mind are highlighted in green.)  The Johnson Report thus provides his legal interpretation of § 141 -- under the guise of expert testimony -- and draws legal conclusions as to the meaning of certain terms in that statute.  For example, Mr. Johnson purports to opine, among other things, that:

    i.      "[i]n the case of Richard Goldstein vs. Savings Bank Life Insurance Company of Massachusetts . . . involving a similarly situated life insurance company . . . the Court, in 2006, stated that the safety fund law . . ." (Johnson Report at ¶ 48 (emphasis added));

ii.     "[b]ased on this statutory definition of reserves, MassMutual should have, at all times, only included in its calculation of reserves for purposes of the safety fund . . ." (id. at ¶ 79 (emphasis added));

iii.    "[i]n Goldstein vs. SBLIC, the Court concluded . . ." (id. at ¶ 92 (emphasis added));

iv.     "in 1907 when the safety fund law was enacted, the aggregate 'book value' was reported in the annual statement . . . [a]ccordingly, the safety fund adjustment was intended to remove the aggregate net unrealized value . . ." (id. at ¶ 129 (emphasis added));

v.      "[i]n Goldstein v. SBLIC, the Court determined . . ."  (id. at ¶ 184 (emphasis added)); and

vi.     "there is no provision in the safety fund law for removing the admitted DTA from surplus or for increasing the safety fund by the amount of the DTA" (id. at ¶ 187 (emphasis added)).

As discussed below, the law is clear that such opinions are not an appropriate subject matter of expert testimony.

## LEGAL STANDARD

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which codified the standard set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).  Under Rule 702, the district court judge must act as a "gatekeeper" to ensure that expert testimony has a proper foundation.  Daubert, 509 U.S. at 597.  This gatekeeping function requires that the court consider three issues: (1) whether the proposed expert is "qualified by 'knowledge, skill, experience, training, or education'"; (2) whether "the proposed subject matter of the expert opinion properly concerns 'scientific, technical, or other specialized knowledge'"; and (3) "whether the testimony [will be] helpful to the trier of fact, i.e., whether it rests on a reliable foundation and is relevant to the facts of the case."  Bogosian v. Mercedes– Benz of N. Am., Inc., 104 F.3d 472, 476 (1st Cir. 1997) (quoting Fed. R. Evid. 702).  It is appropriate to move to strike an expert report when challenging the admissibility of evidence that

will be offered at summary judgment (including, for example, expert testimony that lacks

foundation).  See Inner-Tite Corpo. v. DeWalch Technologies, Inc., No. 04-40219-FDS, 2007

WL 2507737, at *3 (D. Mass. Aug. 31, 2007) (considering and granting in part motions to strike

expert reports offered at summary judgment) (citing Casas Office Machs., Inc. v. Mita Copystar

Am., Inc., 42 F.3d 668, 682 (1st Cir. 1994)).  The party introducing the expert testimony bears

the burden of proving its admissibility.  Daubert, 509 U.S. at 596.  Here, Plaintiff cannot meet

that burden.

## ARGUMENT

Professor Baker, Attorney Lovely, and Mr. Johnson, who are not attorneys for the

parties, cannot advocate a particular legal interpretation of a statute from the witness stand under

the guise of expert testimony.  Their opinions as to the appropriate legal construction of § 141

have no place before a jury.  Plaintiff's counsel of record will have ample opportunity to

advocate for her favored legal construction of § 141 before this Court in the usual course in her

summary judgment papers and (if necessary) in her proposed jury instructions.  Accordingly,

Professor Baker's, Attorney Lovely's, and Mr. Johnson's "expert opinions" on those topics are

impermissible, and must be stricken.

**I.    PLAINTIFF'S PROFFERED "EXPERT OPINIONS"
       REGARDING STATUTORY CONSTRUCTION REPRESENT
       INADMISSIBLE LEGAL CONCLUSIONS AND SHOULD BE STRICKEN**

   **A.    Professor Baker, Attorney Lovely, and Mr. Johnson Cannot Offer
          Expert Testimony As To The Proper Legal Interpretation of Section 141**

Professor Baker's, Attorney Lovely's, and Mr. Johnson's proposed testimony

regarding the legal interpretation of M.G.L. c. 175, § 141, is plainly improper.  As the First

Circuit held in Nieves-Villanueva v. Soto-Rivera, 133 F.3d 92 (1st Cir. 1997), "[i]t is black-letter

law that it is not for witnesses to instruct the jury as to applicable principles of law, but for the

judge." Id. at 99 (collecting cases) (internal quotations omitted).  In Nieves-Villanueva, a group

of municipal workers complained that they were fired in violation of their First Amendment

rights, and the district court allowed the defendants' expert witness to "testif[y] as to what the

law [in Puerto Rico] required and that her examination of plaintiffs' personnel records led to the

conclusion that plaintiffs had been improperly hired or renewed in the first place."  Id. at 93.  The

First Circuit held that the district court erred, finding the expert's testimony concerning "the

holdings of various opinions of the Supreme Court of Puerto Rico and by reference, of this

court" and "the legal conclusion that these appointments were in violation of law" to be "very

troubling" and "egregious."  Id. at 99, 101.  The First Circuit explained that testimony regarding

questions of law "is not helpful to the jury," id. at 100, and thus impermissible:  Rule 702 allows

expert testimony only "[i]f the expert's scientific, technical, or other specialized knowledge will

help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid.

702.  "[P]urely legal questions and instructions to the jury on the law to be applied to the

resolution of the dispute before them is exclusively the domain of the judge."  Nieves-

Villanueva, 133 F.3d at 99.

    Indeed, numerous federal courts in this Circuit and beyond have consistently held

that it is the judge -- not a witness -- who should opine, decide, and instruct the jury as to the

legal issues in any given case, including regarding (a) issues of statutory construction or

interpretation, (b) the veracity and weight to attach to legislative history, and (c) the laws

applicable to the current case.[2]  For example, in United States v. Caputo, 517 F.3d 935 (7th Cir.

---

[2] See, e.g., United States v. Mikutowicz, 365 F.3d 65, 73 (1st Cir. 2004) ("The government
attempted to elicit from [the expert] neither an opinion on the precise meaning of terms used in
the Internal Revenue Code nor a discussion of legal sources that could bear on such an
interpretation, as well it should not have." (citing United States v. Prigmore, 243 F.3d 1, 18 (1st
Cir. 2001))); Prigmore, 243 F.3d at 19 n.3 ("expert testimony proffered solely to establish the

2008), the Second Circuit affirmed the district court's exclusion of expert testimony regarding

"the meaning of the statute and regulations," noting that "[t]hat's a subject for the court, not for

testimonial experts.  The only legal expert in a federal courtroom is the judge."  Id. at 942

(emphasis added) (internal citation omitted).  Similarly, in Bartlett v. Mutual Pharmaceutical Co.,

Inc., 742 F. Supp. 2d 182 (D.N.H. 2010), the parties disputed the permissible scope of the

defendant's expert's testimony.  The defendant ultimately conceded that "its experts cannot and

will not 'provide testimony that interprets any statutes or regulations.'"  Id. at 188 (citation

omitted).  Judge Laplante concurred that such testimony regarding legal interpretation would be

inadmissible:

> This concession is well taken.  Again, such testimony would be presumptively
> improper.  It would also be unfairly prejudicial to [the adverse party] and confusing to
> the jury, because it would conflict with this court's legal rulings and, presumably, its
> jury instructions.

Id. (citation omitted).

Here, the reports of all three of Plaintiff's proposed experts impermissibly opine

as to the proper interpretation of § 141:

Professor Baker's Report is substantially similar to the expert testimony held to be

inadmissible in Caputo and Bartlett.  To give just one example (and there are many more),

Professor Baker analyzes the "historical record" and "language of the Safety Fund Law" to

determine whether the "the margin of the market value of its securities over their book value"

should be computed on a gross or net basis.  (Baker Report at ¶¶ 66-67.)  In that legal analysis,

Professor Baker opines that the word "its" as used in the statute "is an inclusive not exclusive

---

meaning of a law is presumptively improper" (citing Nieves-Villanueva, 133 F.3d at 99-101));
U.S. ex rel. Dyer v. Raytheon Co., No. 08-10341-DPW, 2013 WL 5348571, at *13 (D. Mass.
Sept. 23, 2013) (excluding expert's description and interpretation of government contracting
regulations: "Opinions regarding the state of the law, interpretation of statutes or regulations, or
the ultimate application of the facts to the law fall far outside the purview of expert testimony.").

term" and thereby concludes that MassMutual's inclusion of only gross unrealized gains in its calculation conflicts with the language and meaning of the statute.  (Id. at ¶ 67.)  The meaning of a particular word in a statute -- here, the word "its" -- is squarely an issue of statutory interpretation.  All such testimony is plainly inadmissible and should be stricken.

Attorney Lovely's efforts to express impermissible opinions regarding statutory interpretation are just as egregious.  Nearly the entirety of Attorney Lovely's Report endeavors to argue that the word "securities" -- as used in § 141's provision for "the margin of the market value of [the insurer's] securities over their book value" -- should be construed not to include derivative instruments.  Indeed, Attorney Lovely dedicates an entire section of his Report to his legal conclusion that "the term 'securities' in the Safety Fund statute does not include interest rate and currency derivatives."  (Lovely Report at ¶¶ 75-86).  This testimony serves no purpose but to usurp the judge's role as the "only legal expert in a federal courtroom," and if allowed would prove confusing to the jury where it conflicted with this Court's legal rulings and ultimate jury instructions on this legal issue of statutory construction.

Mr. Johnson also expresses legal conclusions.  For example, Mr. Johnson opines as to the meaning of the term "reserves" as used in the safety fund statute.  (Johnson Report at ¶ 79 (citing M.G.L. c. 175, § 9).)  In doing so, Mr. Johnson cites and analyzes other provisions of the Insurance Code, and concludes that "[b]ased on [M.G.L. c. 175, § 9], MassMutual should have, at all times, only included in its calculation of reserves for purposes of the safety fund, the amounts [listed at Lines 1 through 3 in MassMutual's Annual Statement]."  (Id.)  That legal argument (which MassMutual disputes) may be addressed by Plaintiff in her briefing to this Court, but it has no place in an expert's report.

**B.**     **Attorney Lovely Cannot Opine On The Scope Of**
**Derivative Regulation Under Federal and State Law**

In addition to his impermissible opinions as to the statutory construction of § 141,

Attorney Lovely's Report purports to opine on the current and historical regulation of derivatives

under both federal and state law.  Expert testimony citing, quoting, and explaining case law

constitutes impermissible legal conclusions, and must be stricken.  See Nieves-Villanueva, 133

F.3d at 99.  For example, in Karp v. CIGNA Healthcare, Inc., 882 F.Supp.2d 199 (D. Mass.

2012), the court struck portions of an attorney-expert's that described the history and key case

law regarding Title VII of the Civil Rights Act of 1964.  Id. at 205 n.4 (citing Affidavit and

Report of Michael D. Lieder, Karp v. CIGNA Healthcare, Inc., No. 11-cv-10361-TSH (D. Mass.

2012), ECF No. 20) (striking the expert's discussion of the history and case law of Title VII,

including such legal conclusions that "the leading case explicating 'pattern or practice'

claims . . . ," "[t]he Supreme Court fleshed out the meaning of a pattern-or-practice claim . . . ,"

"[s]everal courts have held . . .").[3]

So too here.  Attorney Lovely dedicates fifteen pages of his Report to describe his

views of the manner in which federal securities laws, Massachusetts securities laws, and the

UCC regulate derivatives, both in the modern time and historically.  (Lovely Report at ¶¶ 42-73.)

Throughout the report, Attorney Lovely purports to cite, quote, and apply the holdings of various

courts to the circumstances of this action.  See, e.g., Lovely Report at ¶ 48 ("The *P & G Court*

evaluated . . ."); id. at ¶ 49 ("MassMutual's Interest Rate and Currency Derivatives do not have

---

[3]     See also Pelletier v. Main St. Textiles, LP, 470 F.3d 48, 54-55 (1st Cir. 2006) (affirming
district court's exclusion of expert testimony about the "applicability of OSHA regulations to
[the defendant's] conduct," as the "general rule is that it is the judge's role, not a witness's, to
instruct the jury on the law" (citing Nieves-Villanueva, 133 F.3d at 99)); Damon v. Hukowicz,
964 F. Supp. 2d 120, 131 (D. Mass. 2013) (excluding expert testimony where it included
"improper legal conclusions regarding the state of the traffic laws in Massachusetts, an issue for
the court not an expert to decide" (citing Nieves-Villanueva, 133 F.3d at 99)).

the attributes required to be a security under the *Howey* test . . ."); <u>id.</u> at ¶ 60 ("The [Dodd-Frank

Act] amended each of the 1933 Act and the 1934 Act to provide . . ."); <u>id.</u> at ¶ 65

("Massachusetts courts look to Federal case law to evaluate whether the state definition of

security . . ."). These are precisely the type of legal conclusions and analysis that the court held

to be inadmissible in both <u>Karp</u> and <u>Nieves-Villanueva</u>.

        To be clear, MassMutual does not suggest that Plaintiff is barred from making

arguments about the proper legal construction of § 141. But expert testimony is not a proper

vehicle for advancing such arguments. Plaintiff can raise her arguments in summary judgment

papers, which will be received and resolved by this Court. If necessary, Plaintiff can propose

jury instructions and supporting briefing regarding her view of meaning of terms in § 141. To

allow Plaintiff's experts to testify before the jury regarding their legal conclusions as to the

purpose, meaning, and applicability of § 141, however, is wholly improper, including because

such testimony may be inconsistent with this Court's legal rulings.

**II.     PLAINTIFF'S PROFFERED "EXPERT OPINIONS" REGARDING**
**LEGISLATIVE INTENT ARE INADMISSIBLE BOTH BECAUSE THEY**
**REPRESENT LEGAL CONCLUSIONS AND BECAUSE THEY SPECULATE**
<u>**CONCERNING THE STATES OF MIND OF LEGISLATORS AND OTHERS**</u>

    **A.     "Expert Opinions" Regarding Legislative Intent**
           **Amount To Inadmissible Legal Conclusions And Thus**
           <u>**Are Not A Proper Subject Matter For Expert Testimony**</u>

        All three of Plaintiff's proposed experts purport to opine as to the legislative

history of § 141 and their opinions as to what import that history should have for the legal

interpretation of that statute. This is "presumptively improper" because their analysis of the

legislative history is "proffered solely to establish the meaning of a law." <u>See</u> <u>Prigmore</u>, 243

F.3d at 19 n.3. Courts have excluded expert reports opining as to the legislative history of a

statute, as it is a court's responsibility, not a jury's, to interpret statutes, and the court will

determine when to consult legislative history and whether to rely on it.  For example, in <u>G.F. Co.</u>

<u>v. Pan Ocean Shipping Co.</u>, 23 F.3d 1498 (9th Cir. 1994), the Ninth Circuit struck two expert

affidavits from the record <u>in their entirety</u> that explained "the legislative history of [a statute] and

state[d] that [a case] [wa]s inconsistent with that history," noting that each affidavit was "written

in the form of a legal document, complete with subdivisions for discussion of the issues, the law,

and the conclusions."  The court found that "[b]ecause the interpretation of legislative history

and the application of a statute to a particular case are uniquely questions for the court, we strike

the affidavits from the record."  <u>Id.</u> at 1507 n.6.  Plaintiff's efforts to supply expert testimony on

legislative history here are likewise improper.

**B.**    **"Expert Opinions" Regarding Legislative Intent Are Also
Impermissible For The Additional And Independent Reason That
They Speculate On The States Of Mind Of Legislators And Others**

Plaintiff's proffered expert opinions regarding the intent of Massachusetts

legislators and other individuals are impermissible for the further and independent reason that

courts routinely exclude expert testimony which purports to opine as to another person's

subjective intent or state of mind.  For example, in <u>U.S. ex rel. Dyer v. Raytheon Co.</u>, No. Civ. A.

08-10341-DPW, 2013 WL 5348571 (D. Mass. Sept. 23, 2013), a plaintiff proffered an expert

who opined that a defendant "knowingly misrepresented the results of the [company's

compensation plan]."  The court held that the expert's opinions on the defendant's "knowledge or

intent" were inadmissible where "it is well settled that an expert cannot bring any scientific,

technical, or specialized knowledge to bear on another person's knowledge."  <u>Id.</u> at *13; <u>see also</u>

<u>Holmes Grp, Inc. v. RPS Prods., Inc.</u>, No. 03-40416-FDS, 2010 WL 7867756 at *5 (D. Mass.

June 25, 2010) ("An expert witness may not testify as to another person's intent.  No level of

experience or expertise will make an expert witness a mind-reader.").

Similarly, in <u>In re Rezulin Products Liability Litigation</u>, 309 F. Supp. 2d 531 (S.D.N.Y. 2004), the court excluded expert testimony "concerning the motive, intent and state of mind of [the defendant pharmaceutical company] and others," noting that "the opinions of these witnesses on the intent, motives or states of mind of corporations, regulatory agencies and others have no basis in any relevant body of knowledge or expertise," and that "[i]nferences about the intent or motive of parties or others lie outside the bounds of expert testimony." <u>Id.</u> at 545-47; <u>accord</u> <u>In re Prograf Antitrust Litigation</u>, No. 11- 02242-RWZ, 2014 WL 7641156, at *1 (D. Mass. Dec. 23, 2014) (excluding an expert's testimony on the FDA's "intent, its state of mind, or the 'real' reasons for its actions or statements" where such an opinion has no "basis in any relevant body of knowledge or expertise" (citing <u>Rezulin</u>, 309 F. Supp. 2d at 546)).[4]

**C.    In An Effort To Establish The Meaning Of Section 141, Plaintiff's Expert Reports Are Replete With Impermissible Legal Opinions Concerning Legislative History And Intent**

Just like the affidavits that the Ninth Circuit struck in <u>G.F. Co.</u>, Professor Baker's Report sets forth improper and inadmissible expert opinions and should be struck.  Professor Baker's Report sets forth his own view of § 141's legislative history -- relying on committee reports, testimony, and prior statutory drafts -- and concludes that MassMutual's safety fund calculation is inconsistent with that history.  <u>See</u> <u>G.F. Co.</u>, 23 F.3d at 1507.  (In the highlighted copy of the Baker Report attached hereto, statements of Professor Baker's opinions regarding

---

[4]     <u>See also</u> <u>Marlin v. Moody Nat. Bank, N.A.</u>, 248 F. App'x 534, 541 (5th Cir. 2007) (affirming district court's exclusion of expert testimony about whether the defendant had an "intent to defraud" because "an expert's credentials do not place him in a better position than the jury to draw conclusions about a defendant's state of mind"); <u>DePaepe v. General Motors Corp.</u>, 141 F.3d 715, 720 (7th Cir. 1998) (holding that the district court erred in permitting an expert to testify that the defendant had a particular motive); <u>Beauregard Parish School Bd. v. Honeywell Inc.</u>, No. 2:05 CV 1388, 2008 WL 821053, at *5 (W.D. La. Mar. 24, 2008) (holding that expert's opinions on the defendant's "subjective intentions" were inadmissible, as "[c]ourts do not permit experts to testify on the parties' state of mind or subjective intentions").

legislative intent are highlighted in blue.)  As in <u>G.F. Co.</u>, this type of legal analysis is squarely in the Court's purview.

In addition, Professor Baker's Report is replete with inadmissible speculation as to the state of mind of legislators and others involved in the passage of § 141 and other statutes over 100 years ago.  Indeed, he expressly states at the outset of his Report that his purpose is to opine regarding the "legislative <u>judgment</u>" of those who enacted § 141 and the "legislative <u>intent</u>" of lawmakers "dating back to 1887."  (Baker Report at ¶ 2 (emphasis added).)  In the course of his Report, Professor Baker purports to opine, among other things, that:

i.    the Massachusetts' legislature's "<u>concerns</u> [about the failure to annually distribute excess premiums] <u>resulted in</u> the enactment of the Safety Fund Law in Massachusetts in 1887 and its restoration in 1907" (<u>id.</u> at ¶ 20 (emphasis added));

ii.   that Massachusetts insurance commissioner John Tarbox "<u>convinced</u> the Massachusetts legislature in 1887 to enact anti-hoarding legislation" (<u>id.</u> at ¶ 22 (emphasis added));

iii.  the Massachusetts' legislature's "<u>primary purpose</u>" in enacting a "safety fund was to protect policyholders from hoarding" (<u>id.</u> at ¶ 23 (emphasis added));

iv.   the "Massachusetts Legislature – <u>to its later regret</u> – eliminated the mandatory distribution requirement and repealed the safety fund limit" (<u>id.</u> at ¶ 24 (emphasis added));

v.    "the Legislature <u>intended</u> that the anti-hoarding purpose and provisions of the restored Safety Fund Law would trump industry concerns over its impact on insurers' competitiveness" (<u>id.</u> at ¶ 29 (emphasis added));

vi.   "[a]s Elizur Wright, John Tarbox, Charles Evan Hughes, and Louis Brandeis <u>would surely have predicted</u>, the annual distribution requirement and the safety fund's limit on retained surplus have checked but not eliminated the natural inclination of large mutual life insurance companies to hoard surplus" (<u>id.</u> at ¶ 33 (emphasis added));

vii.  the Massachusetts legislature "<u>intended</u> to prevent hoarding and require distribution of all surplus to policyholders except for the modest margin

over reserves necessary to prevent the risk of insurer insolvency" (id. at ¶ 40 (emphasis added));

viii. "[a]s Commissioner Tarbox and the Legislature would certainly have understood, the size of that safety fund would in many cases be much smaller than the management of a financially strong mutual life insurance companies would choose if left to their discretion" (id. at ¶ 46 (emphasis added));

ix. the Massachusetts legislature's "intent to distinguish reserves from all other liabilities can also be seen in the restored and strengthened dividend distribution provision" (id. at ¶ 56 (emphasis added));

x. "[t]o the names of those who would 'roar in protest' in response to MassMutual's 'corruption of the statute,' I would add Commissioner John Tarbox and the members of the 1887 and 1907 Joint Insurance Committees of the Massachusetts legislature" (id. at ¶ 57 (emphasis added)); and

xi. "Commissioner Tarbox and, by extension the legislature that enacted the safety fund, intended that the MVM component of the safety fund would include only certain specified assets, not all assets that could have a market value that exceeded the book value." (id. at ¶ 69 (emphasis added)).

Similarly, Attorney Lovely's Report sets forth his view of the legislative history behind § 141's enactment -- in large part by relying on Professor Baker's Report -- to conclude that including certain derivatives as "securities" in the safety fund calculation would, in his opinion, "be entirely contrary to the primary anti-hoarding purpose" of § 141.  (Lovely Report at ¶ 89.)  Attorney Lovely also impermissibly purports to opine, among other things, that:

i. "[T]he legislative history of the Safety Fund Statute reflects that the Massachusetts Legislature intended for the term 'securities' to mean . . ." (id. at ¶ 82 (emphasis added)); and

ii. "[T]he Massachusetts Legislature is fully aware of the innovations in the financial markets . . . [i]f the Massachusetts Legislature had wanted to expand the coverage of . . . the Safety Fund Statute to modern financial products not currently securities, it could easily have done so." (id. at ¶ 66 (emphasis added)).

(In the highlighted copy of the Lovely Report attached hereto, statements of Attorney Lovely's opinions regarding legislative intent are highlighted in blue.)

Comparable portions of Mr. Johnson's Report are likewise improper.  Mr. Johnson relies on certain statutes that pre-dated § 141's enactment to provide his view of the meaning of § 141 in light of that legislative history.  (Johnson Report at ¶ 102.)  This, too, is an improper use of expert testimony.  (In the highlighted copy of the Johnson Report attached hereto, statements of Mr. Johnson's opinions regarding legislative intent are highlighted in blue.)

## III.   PLAINTIFF'S PROFFERED "EXPERT OPINIONS" REGARDING MASSMUTUAL'S PURPORTED STATE OF MIND SHOULD BE STRICKEN

Professor Baker's Report improperly speculates as to the state of mind of MassMutual.  Indeed, he expressly states at the outset of his Report that his purpose is to opine regarding MassMutual's purported intention to use "certain methods to improperly manipulate and inflate its safety fund calculation."  (Baker Report at ¶ 2 (emphasis added).)  In the course of his Report, Professor Baker also opines, for example, that MassMutual used "manipulative and aggressive accounting practices" and "is attempting to use the Safety Fund Law to accomplish precisely what the law was enacted to prevent." (Id. at ¶¶ 41, 42 (emphasis added)).  Similarly, Attorney Lovely opines in his Report that MassMutual "is ignoring the amply demonstrated and beneficial effect that its Interest Rate and Currency Derivatives play" and that MassMutual has "confirmed its understanding" or "acknowledged" certain principles.  (Lovely Report at ¶¶ 32, 99 (emphasis added).)  So, too, Mr. Johnson pronounces that MassMutual "sought to exclude" surplus from its dividends to participating policyholders. (Johnson Report at ¶ 50 (emphasis added).)  This "expert" speculation into the state of mind of MassMutual (highlighted in green in Exhibits 1, 2, and 3) is wholly inadmissible and must be struck.  (See, e.g., Rezulin, 309 F. Supp. 2d at 545-47 (excluding expert testimony where "the opinions of these witnesses on the intent,

motives or states of mind of corporations, regulatory agencies and others have no basis in any

relevant body of knowledge or expertise").)

## CONCLUSION

For all of the foregoing reasons, MassMutual respectfully requests that the Court

grant MassMutual's Motion To Strike Inadmissible Statements From The Expert Reports Of

Professor Of Law Tom Baker, Attorney James W. Lovely, and Mr. R. Larry Johnson.  A proposed

order is attached to MassMutual's Motion as Exhibit 1.


Dated: December 28, 2015                              Respectfully submitted,
       Boston, Massachusetts
                                            */s/ Kurt Wm. Hemr*
                                            James R. Carroll (BBO #554426)
                                            Kurt Wm. Hemr (BBO #638742)
                                            Alisha Q. Nanda (BBO #657266)
                                            SKADDEN, ARPS, SLATE,
                                                MEAGHER & FLOM LLP
                                            500 Boylston Street
                                            Boston, Massachusetts  02116
                                            (617) 573-4800
                                            james.carroll@skadden.com
                                            kurt.hemr@skadden.com
                                            alisha.nanda@skadden.com

                                            Counsel for Defendant
                                            Massachusetts Mutual Life Insurance Company


## CERTIFICATE OF SERVICE

I, Kurt Wm. Hemr, hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on December 28, 2015.

Dated: December 28, 2015                              */s/ Kurt Wm. Hemr*
                                            Kurt Wm. Hemr