# Exhibit 1

## *Expert Report Of Professor Tom Baker (marked copy)*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

KAREN L. BACCHI,
　　　Individually and on Behalf of All
　　　Persons Similarly Situated,

　　　　　　　　　　Plaintiff,

　　　v.

MASSACHUSETTS MUTUAL LIFE
INSURANCE COMPANY,

　　　　　　　　　Defendant.

CIVIL ACTION NO. 12-11280-DJC

**EXPERT REPORT OF PROFESSOR TOM BAKER**

**Dated December 15, 2015**

**KEY TO COLOR-CODING:**

Yellow = Conclusions of law
Blue = Opinions about legislative history and legislators' states of mind
Green = Opinions about MassMutual's state of mind

# TABLE OF CONTENTS

I.    Summary ................................................................................................................ 3

II.   Qualifications ...................................................................................................... 3

III. The Historical Record on the Anti-Hoarding Laws ........................................... 6

    A.   Deferred Dividends and the Growth of Life Insurance ............................................. 9

    B.   Hoarded Surplus and the Armstrong Investigation.................................................. 14

    C.   The Revived Massachusetts Anti-Hoarding Legislation of 1907............................. 16

IV. The Structural Reason for the Safety Fund Law – Insurers' Lack of
     Accountability to their Par Policyholders – Persists and is Evident in
     MassMutual ...................................................................................................... 20

V.   Inconsistencies Between MassMutual's Safety Fund Computations and
     Historical Practice ............................................................................................ 25

    A.   The Anti-Hoarding and Solvency-Protection Purposes of the Safety Fund ................ 27

    B.   Including Liabilities that are not Reserves in the Safety Fund Calculation is Contrary to
       the Historical Record ............................................................................................ 34

    C.   Including Separate Accounts in the Safety Fund Calculation Conflicts with Historical
       Practice and Purpose ............................................................................................ 38

    D.   MassMutual's Treatment of the MVM Component of the Safety Fund Conflicts with
       Historical Purpose and Practice............................................................................. 39

        1.   The historical record shows that MVM is supposed to be calculated on a net basis............. 42

        2.   The historical record shows that the MVM component of the safety  fund is limited to
           securities.................................................................................................... 43

        3.   The historical record and purpose of the safety fund statute shows that the MVM
           component of the safety fund does not include assets not carried in surplus at market
           value.....................................................................................................45

VI. Conclusion..................................................................................................... 45

## I. Summary

1.    I have been asked by counsel for Plaintiff Karen L. Bacchi et al for my opinions as an expert on the history and economics of insurance regulation, related to the claim that Massachusetts Mutual Life Insurance Company ("MassMutual") has failed to properly ascertain and pay annual dividends due out of divisible surplus to Ms. Bacchi and MassMutual's other participating policyholders, which divisible surplus necessarily includes all surplus (i.e. retained profits) in excess of the maximum amount MassMutual can retain as defined by the Massachusetts safety fund law, M.G.L. Chapter 175 §141 (the "Safety Fund Law").

2.    In summary, my opinions are as follows:

- The Massachusetts Safety Fund Law embodies a historically well-founded legislative judgment about the perils of allowing life insurers to hoard surplus;

- The historical record indicates a clear legislative intent dating back to 1887 that surplus in a life insurance company belongs to its participating policyholders and must be determined and returned to them as annual dividends; and

- MassMutual has used certain methods to improperly manipulate and inflate its safety fund calculation, to the point that it now claims the discretion to withhold from participating policyholders an amount that is twice its enormous participating surplus, a result that conflicts with the historical purpose of and practices regarding safety funds in Massachusetts.

## II. Qualifications

3.    I am a member of the faculty of the University of Pennsylvania Law School (primary appointment) and the Wharton School of Business (secondary appointment).  In addition to insurance-related law school courses, I have taught the basic insurance and risk management course offered to Wharton business students. Among other recent outside activities, I serve on the editorial board of the Journal of Financial Perspectives, I served as a member of the Working Group on Behavioral Economics and

the Regulation of Retail Financial Markets sponsored by the Sloan and Sage Foundations from 2008 to 2014, I served on the Scientific Committee of the International Association for the Study of Insurance Economics from 2003 to 2013, and I am the Reporter for the American Law Institute's Restatement of the Law Liability Insurance.

4.      I have taught insurance law and policy courses at Columbia University, Yale University, the University of Connecticut, Vanderbilt University, the University of Miami, and the Hebrew University of Jerusalem, where I was a Fulbright Visiting Professor, in addition to Penn Law School. I have also been invited to teach at Harvard Law School and other highly regarded law schools. Through the end of the 2007-08 academic year, I was the Connecticut Mutual Professor and the Director of the Insurance Law Center at the University of Connecticut School of Law ("ILC"), where I established and directed the only advanced degree program (LL.M.) in insurance in a U.S. law school and built the reputation of the University of Connecticut Law School as an internationally recognized leader in insurance education and research. In 2008 I was recruited by the University of Pennsylvania to build an insurance research and teaching capacity at Penn Law School to complement the highly regarded insurance research and teaching capacity of the Wharton School.

5.      My law school insurance courses regularly cover insurance regulation, and my casebook, *Insurance Law and Policy*, contains a chapter on insurance regulation. While at the University of Connecticut I developed and taught a new course on insurance regulation that became a core course in the Insurance LL.M. curriculum. As the financial crisis unfolded in the fall of 2008, I organized a workshop on the crisis for Penn Law students. I then developed and taught a new Insurance Insolvency course during the spring semester of 2009 that related the current developments to major life insurance insolvencies in the past.

6.      I regularly use historical methods and materials in my research, writing, and teaching.[1]  From 1997 through 2009 I organized and facilitated the New England Insurance and Society Study Group, an interdisciplinary group of researchers studying

---

[1] See, e.g., Tom Baker, On the Genealogy of Moral Hazard, 75 *Texas Law Review* 237 (1996); Containing the Promise of Insurance: Adverse Selection and Risk Classification, in 9 *Conn. Ins. L. J.* 371 (2003).

insurance using historical and other research methods.  In the course of my research I have studied the Armstrong Investigation, which is the most significant government investigation in the history of U.S. life insurance and a signal event in the U.S. financial markets more broadly.[2]  My insurance expertise also includes insurance economics. I have written many articles and three books that apply economic analysis to insurance topics.  With the exception of articles in general interest law reviews, that work was peer reviewed.  The risk management class I have taught at Wharton is an applied insurance economics class, and my law school insurance courses include substantial economic analysis.

7.     My work on insurance has been recognized in a variety of ways.  In 2003, I gave the Annual Lecture of the Geneva Association (also known as the International Association for the Study of Insurance Economics), one of the most significant invited lectures in the field of insurance. In 2013, I received the Robert B. McKay award from the Tort Trial & Insurance Practice Section of the American Bar Association, to honor my "commitment to the advancement of justice, scholarship and the legal profession, demonstrated by outstanding contributions to the fields of tort and insurance law."  In addition, I regularly serve as a peer reviewer for journals, university presses, associations, and foundations that publish or support historical and social scientific research relating to insurance.

8.     My work in the insurance field has not been purely academic.  I also serve as a consultant and expert in many contexts.  For example, I was retained to write a major report for the Investment Dealers Association of Canada analyzing the economics of a new form of insurance for securities fraud losses proposed for Canada; together with the law firm of Dewey and LeBoeuf, I prepared a White Paper on the modernization of insurance regulation in the United States for submission to the Federal Insurance Office in the U.S. Department of the Treasury; I prepared a major report that supported the New York Insurance Department in a legal challenge to its approval of the restructuring of MBIA Insurance Company during the Financial Crisis; I have provided Congressional

---

[2] See, e.g., Tom Baker and Peter Siegelman, Tontines for the Invincibles: Enticing Low Risks into the Health Insurance Pool with an Idea from Insurance History and Behavioral Economics, 2010 *Wisconsin Law Review* 79 (2010) (referring to the Armstrong Investigation).

briefings and legislative testimony on the liability insurance market; I have been engaged formally and informally in a strategic consulting capacity by established and start up insurance enterprises; and I have been retained as a testifying expert on insurance by a wide range of entities engaged in court and arbitral proceedings, including insurance companies, commercial insurance brokers, policyholders, the Internal Revenue Service, the Federal Deposit Insurance Corporation, and shareholders and consumers in class actions. I have been qualified as an expert on insurance in every trial or hearing in which I have appeared: in Bermuda, California, Connecticut, the District of Columbia, England, Ireland, New York, and Texas.

9.      My opinions in this matter are based on this research and experience, together with the case-specific materials provided to me by counsel and additional materials that I gathered for this project described in Exhibit 1 hereto or otherwise cited herein. A copy of my c.v., which lists my published writings in the field of insurance, appears as Exhibit 2 to this report. My review of the materials from this case is continuing. I reserve the right to modify or expand my opinions based on additional information.

### III. The Historical Record on the Anti-Hoarding Laws

10.      This case is a class action seeking to require MassMutual to return excess surplus – the entire amount exceeding the safety fund limit– to its participating policyholders as dividends. I have conducted extensive historical research into three of the main provisions of Massachusetts General Laws at issue in this case: M.G.L. Chapter 175 §§ 140, 141, and 149. Section 140 requires Massachusetts domestic life insurance companies to ascertain and distribute their divisible surplus attributable to participating policyholders on an annual basis, including all amounts exceeding the "contingency reserve" limit defined by § 141.[3] Sections 149 and 140 require life insurance companies

---

[3] Section 140 provides, in relevant part:

> Except as provided in this section, every domestic life company heretofore or hereafter organized, anything in its charter or its certificate of incorporation or special act to the contrary notwithstanding, shall provide in every participating policy of life or endowment insurance hereafter issued that the proportion of the divisible surplus of the company contributed by said policy shall be ascertained

to include terms in their participating policies that give their participating policyholders contractual rights to the annual ascertainment and distribution of dividends under §140. Plaintiff's standard whole life insurance policy contains the requisite language.

11.     In this report I refer to §141 as the "Safety Fund Law."[1] The Safety Fund Law includes a statutory formula setting a cap on the amount of surplus that domestic life insurance companies may retain as a safety fund (or "contingency reserve"), and therefore not include in the required annual dividend distributions to policyholders. The safety fund provides a margin over the required reserves necessary to prevent the risk of insurer insolvency. The proper application of that statutory formula is at issue in this matter.

12.     The Massachusetts Legislature first enacted the predecessor to the Safety Fund Law and dividend distribution requirements in forward-thinking legislation proposed by Massachusetts Insurance Commissioner John Tarbox in 1887.  Thirteen

---

and distributed annually, and not otherwise, … Every such company shall on December thirty-first of each year or as soon thereafter as practicable, after providing from the funds attributable to its participating business for the reserve required by sections nine and eleven and all other liabilities attributable to such business, including dividends declared upon the capital stock, if any, and such sum as may be held on account of existing deferred dividend policies, and providing also for a contingency reserve not in excess of the limit prescribed in the following section, apportion its remaining funds attributable to such business upon the contribution to surplus plan, as dividends, to all other policies entitled to share therein.

[1] Section 141 provides, in relevant part:

Any domestic life company may from its surplus funds or profits attributable to its participating business accumulate and hold, or hold if already accumulated, as a safety fund, an amount not in excess of twelve per cent of its reserve for such business or one hundred thousand dollars, whichever is greater, and, in addition thereto, any surplus that may have been contributed by the holders of the guaranty stock of the company, or which has been accumulated for the retirement of said guaranty stock and the margin of the market value of its securities over their book value, provided that in cases where the existing surplus or safety fund, exclusive of all accumulations held on account of existing deferred dividend policies, exceeds the limit above designated, the company shall be entitled to retain said surplus or safety fund, but shall not be entitled to add thereto so long as it exceeds said limit, and provided that for cause shown, the commissioner may at any time and from time to time permit any company to accumulate and maintain a safety fund in excess of the limit above mentioned, for such period as the commissioner may prescribe in any one permission, by filing in his office his reasons therefor and causing the same to be published in his next annual report.

….

years later, in response to complaints from Massachusetts-based life insurance companies about the negative impact of these provisions on their ability to compete, the Massachusetts Legislature temporarily, and to its later regret, repealed these distributive and anti-hoarding protections in 1900. Then, in 1907 – in the wake of the most significant financial scandal in the history of the U.S. life insurance business arising from the practices of the Equitable Life Assurance Company ("the Equitable") and the subsequent Armstrong Investigation of 1905 (which found life insurers were hoarding surplus to the detriment of their participating policyholders and the public good) – the Massachusetts Legislature restored the safety fund cap with the enactment of §141 and strengthened the dividend distribution requirement.[5]

13.     Of note, the Armstrong Investigation and the legislative response enacting § 141 vindicated, in one important respect, the 19th Century business methods of Connecticut Mutual Life Insurance Company, the company from which Ms. Bacchi purchased her policies and that subsequently merged with MassMutual. In an effort that journalists later called the "Thirty Years War," Connecticut Mutual's President, Jacob Greene, fought against what are termed "deferred dividend" insurance policies – policies that paid dividends only after many years (during which time surplus was accumulated) and then only to the reduced number of policyholders still holding policies at that time. Insurance companies used these deferred dividend policies to accumulate the enormous surpluses that were the source of the abuses leading to the Armstrong Investigation.[6] While the Armstrong Investigation took place under the auspices of the New York

---

[5] See, e.g., Buist Anderson, The Armstrong Investigation in Retrospect, 1952 Proceedings of the Association of Life Insurance Counsel 237-276 (reporting that the investigation revealed "misfeasance and malfeasance of many important life insurance officials," including wasteful and extravagant practices, close connections between the insurers and large New York banks, self-dealing by officers of the life insurance companies, "unsavory lobbying or other questionable purposes," high salaries and commissions paid to relatives of company officials "not in keeping with the value of the services rendered," huge sums for lobbying that were not accounted for, and "officers [who] had no hesitancy with using [the companies'] control [over investments in stocks] for personal advantage") (note that Buist Anderson was at the time the General Counsel of Connecticut Mutual Life Insurance Co.). Similar contemporary accounts can be found in Burton Jesse Hendrick, The Story of Life Insurance (1907).

[6] Burton Jesse Hendrick, The Story of Life Insurance, at 191 to 293 (1907).

Legislature, its impact was national, with Massachusetts's own Louis Brandeis playing a significant role in his capacity as counsel for policyholders of the Equitable.[7]

14.     My opinions in this expert report focus on the history and legislative intent of the Safety Fund Law and the manner in which certain aggressive and manipulative accounting practices of MassMutual conflict with this legislative intent and with historical practices in the application of the Safety Fund Law. Plaintiff's other experts address the reasons why MassMutual's safety fund practices: (i) are inconsistent with statutory accounting and similar accounting principles and practices (Larry Johnson); and (2) improperly include certain derivatives in the calculation of the MVM component of the safety fund that are not properly characterized as "securities" within the meaning of § 141 (James Lovely).

## A. Deferred Dividends and the Growth of Life Insurance

15.     Life insurance companies first became a significant economic force in the U.S. in the mid 19th Century. By the end of that century, life insurance companies were the largest financial institutions in the U.S.[8] Historians agree that the invention and marketing of deferred dividend insurance policies, and the resulting hoarding of surplus, were primary engines of that growth and the source of the abuses uncovered by the Armstrong Investigation.[9]

16.     A life insurance dividend is a feature of participating life insurance policies. Participating (or "par") policies are those eligible to share in the profits, or surplus, of the insurer, as dividends, once the dividends are declared or otherwise required to be paid by the Safety Fund Law (§141), the distribution statute (§140) and the policies issued by the insurer. As with ordinary corporations, a dividend is a distribution to the owners of the company of profits that the company does not need to operate its

---

[7] See Louis Brandeis, Life Insurance: The Abuses and The Remedies, An Address to the Commercial Club of Boston October 26, 1905.

[8] Mark Roe, Foundations of Corporate Finance: The 1906 Pacification of the Insurance Industry, 93 Colum L Rev 639 (1993).

[9] See, e.g., Morton Keller, The Life Insurance Enterprise, 1885-1910: A Study in the Limits of Corporate Power (1963); J. Owen Stalson, Marketing Life Insurance, Its History in America (1942). See also Buist Anderson, The Armstrong Investigation in Retrospect, 1952 Proceedings of the Association of Life Insurance Counsel 237-276.

business. In an ordinary corporation the owners are shareholders and, thus, dividends are paid to shareholders. Mutual insurance companies do not have shareholders. Instead, they have par policyholders, who are both the customers and the owners of the company. As such, par policyholders have the rights to any and all dividends declared by their mutual life insurance company or as otherwise required by §§ 140 and 141, operating in tandem.

17.     The fact that policyholders own the rights to dividends gave mutual life insurance companies certain marketing advantages during the 19th Century growth period of the life insurance industry.[10] As a result, some stock insurance companies began conducting life insurance "on a mutual basis," meaning that they sold "participating" policies that provided rights and benefits that were similar to those sold by a mutual company. Like the Massachusetts legislation at issue, I use the term "participating policies" to refer to policies that are eligible to receive participating dividends, without distinguishing between policies sold by mutual and stock companies. MassMutual is, of course, a mutual life insurance company, which means that it is owned by its participating policyholders and members and that it is supposed to conduct its business exclusively for the benefit of those policyholders and members.[11]

18.     In the insurance industry, dividends are paid out of what is known as "surplus," which represents the companies' retained profits as measured by the amount by which the value of the assets of an insurance company exceed its liabilities. One of the benefits touted by life insurers selling participating policies was the ability to tell the applicants that the real price of the insurance would be less than the premiums charged

---

[10] Cf. Henry Hannsmann, The Organization of Insurance Companies: Mutual vs. Stock, J. L. Econ. & Org. (1985) (explaining other advantages of mutual life insurance companies).

[11] See https://massmutual.com/about-us/our-history-and-purpose:

MassMutual is a mutual company. That means we don't have shareholders. Instead, our members and participating policyowners are often described as sharing in our ownership. … As a mutual company, we operate for the benefit of our members and participating policyowners. We manage the company with a focus on their long-term interests and are not subject to the expectations of Wall Street analysts or stockholders. Throughout our history, this focus on the long-term has helped us provide financial and retirement security to millions of people. And while they're not guaranteed, we've consistently paid dividends to eligible participating policyowners since the 1860s.

because the insurer would collect more in premiums than was strictly necessary in order to build in a margin of safety, but that it would return those excess premiums to the policyholder in the form of a dividend.

19.     Life insurance actuaries and salesmen realized as early as the mid 19th Century that offering deferred dividends – those that would accumulate and be paid to the policyholder only at the end of a lengthy period of time – could make life insurance appear even more attractive to potential applicants. My co-author, Peter Siegelman, and I wrote about deferred dividend policies, also called tontine policies, in an article explaining how some of the same ideas could be used to sell health insurance to young, healthy people:

> Tontine life insurance emerged in the United States in the mid-nineteenth century and became a resoundingly successful alternative to traditional life insurance.  A tontine life-insurance policy paid a deferred dividend to policyholders who timely paid their life insurance premiums for a specified period: ten, fifteen, or twenty years, depending on the policy that the applicant chose.  People who died earlier would receive the stated death benefit, but they would not receive any share of the dividends.  With this arrangement, a tontine life-insurance policy paid a cash benefit to customers who otherwise might think that they had lost their bet with the insurance company. …

> A company that deferred the dividends and then distributed them only to policyholders who had faithfully paid their premiums for twenty years would accomplish three very useful things.

> First, the company would make its life-insurance policy more attractive to men (and it was mostly men buying life insurance) who liked a little spice packaged with an otherwise dull purchase.  Second, the company would give its agents an excellent answer to the prospect who objected that he was healthy and did not need life insurance.  "No problem," the agent could say, "our deferred dividends mean that you can back your own life, and you cannot lose. Either you die and your heirs emerge as the winner on your behalf, or you survive and we give you a cash payment at the end of twenty years—and, by the by, no need to let your wife or your creditors know about that little bonus."  Third, the company would gain "one of the best solutions to the problem of healthier lives lapsing at a higher rate than unhealthy ones—since 'backing one's life' required the continued payment of premiums." …

Tontine life insurance quickly swept the life-insurance field, and the mutual life-insurance companies selling tontine policies became the largest financial institutions of the day. At the same time, however, the millions of dollars that the companies accumulated during the deferral of the dividend proved too tempting to some of the managers of the leading firms. The result was a scandal and investigation in 1905 that rocked the life-insurance industry more profoundly than anything since. One key result was the prohibition of tontine life insurance—not because there was anything wrong with such insurance in theory, but rather because tontines allowed the life companies to amass enormous reserves that led executives to public extravagance and gave them too much influence over the companies whose shares they purchased as investments for the reserves. [12]

20.      These deferred dividend, or tontine, insurance policies were controversial from the start. The controversy included concerns about the failure to annually distribute excess premiums (which generated retained profits) to policyholders and the resulting hoarding of surplus. These concerns resulted in the enactment of the Safety Fund Law in Massachusetts in 1887 and its restoration in 1907 and, thus, are directly relevant to the current dispute.

21.      Life insurance traditionalists, like Connecticut Mutual's President Jacob Greene and Massachusetts' first insurance commissioner Elizur Wright bitterly opposed deferred dividend policies. Jacob Greene objected on the grounds that the deferred dividend inappropriately mixed insurance and gambling and deprived policyholders who died or did not renew their policies of their rights to the surplus created by their premiums.[13] Elizur Wright raised these same two criticisms even earlier than Greene,[14] but he was best known for a third criticism that, today, we would call distributional.

---

[12] Tom Baker and Peter Siegelman, Tontines for the Invincibles: Enticing Low Risks into the Health Insurance Pool with an Idea from Insurance History and Behavioral Economics, 2010 *Wisconsin Law Review* 79 (2010) (footnotes deleted).

[13] Connecticut Mutual Life Insurance, Papers Relating to Tontine Insurance at 5-7 (collected writings of Jacob Greene on tontine insurance).

[14] See, e.g., Report of Hearing on the Commissioner's Report before the Joint Committee on Insurance (1887) at 70 (M010064-101 at 099), quoting Elizur Wright as follows:

This surplus belongs to the insured from whose premiums it has accrued. It if should not be divided, but continue accumulating till those who were the first contributors to it have dropped away by death or by the lapse or surrender of policies, a wrong will be done which, though not so frightful as bankruptcy, may be as extensive in its transfer of property from the hands of its owners to those of strangers.

Wright observed that, because the policyholders who would lapse would be more likely to be those in difficult economic straits, deferred dividend policies "make the richer part of the company richer by making the poorer part poorer."[15]

22.    A later Massachusetts insurance commissioner, John Tarbox, added to these criticisms a fourth that proved the most prescient of all: the surplus accumulated by deferring the dividends would create too great a temptation for the managers of the mutual insurance companies. Invoking the then-recently deceased Elizur Wright as an inspiration, Tarbox, convinced the Massachusetts legislature in 1887 to enact anti-hoarding legislation that required insurers to distribute dividends at least once every five years and that set a cap on the amount of surplus that insurers could retain, which he called a "safety fund," explicitly to avoid "a perpetual temptation to wastefulness, speculation and corruption."[16]

23.    The safety fund component of Commissioner Tarbox's anti-hoarding statute was substantively nearly identical to the Safety Fund Law at issue in this matter.[17]

---

[15] Elizur Wright, Politics and Mysteries of Life Insurance at 205-07 (1873). See also Connecticut Mutual, supra note 9, at 6-7 (describing deferred dividend polices as "changing life insurance from a beneficent plan for so distributing death losses that each family is certainly protected from their financial effect, into a device for winning profits, on a gambler's chance, out of a loss of protection by the most needy").

[16] Report of the Insurance Commissioner on the Resolve to Revise and Codify the Insurance Laws of the Commonwealth of Massachusetts (1887) at *xx* (M010052-63 at 62):

> The conclusion is that the accumulation by a mutual life company, by exactions from its policy-holders, of a fund incapable of ultimate distribution to the persons whose contributions create it, in excess of the amount which the law, the principles of the system and the history of every well-ordered institution of life insurance in the country avouch as sufficient to assure the full accomplishment of its contracts is not justified by any prudent reason, and is an injustice to the insured public the law should redress. Such a surplus serves no legitimate use, and is a perpetual temptation to wastefulness, speculation and corruption in the management of the corporation.

[17] The 1887 statute provided as follows, in relevant part:

> Every such domestic life insurance company shall annually, or once in every two, three, four or five years, as it shall determine, and as may be conditioned in its policies, make distribution of all surplus it may have accumulated since the last dividend of surplus. The distribution shall be upon what is known as the contribution plan, and each member upon whose policy no premium is overdue or unpaid shall be entitled to the amount contributed by his policy to such surplus. ...*provided* that, besides the aggregate market value margin in excess of par of all bonds held by a company, and not included in its reserve, any such

As Tarbox's report and his testimony to the Massachusetts legislature make clear, the primary purpose of the safety fund was to protect policyholders from hoarding:

> I agree entirely with Mr. Wright in the opinion that a life company, well established and with sound investments and a safe basis of reserve needs no surplus for its safety, and that for it to accumulate such a surplus from dividends to which its policy holders are in equity entitled is an injustice. ...  But the bill concedes to the corporations the power to withhold from their policy holders and accumulate a surplus equal to ten per cent of their reserves .... If in your judgment the limit is too narrow, enlarge it to such limit as you approve of as safe. But fix it somewhere. **Do not leave these corporations with unlimited power to hoard from the public**; and let the law so provide that whatever beyond its proper needs the corporation keeps from its policy holder shall some time inure to his benefit.[18] (Emphasis added)

24.     In 1900 Commissioner Tarbox's efforts to protect policyholders from insurer hoarding of surplus were temporarily interrupted through the efforts of insurance companies complaining that the safety fund placed them at a competitive disadvantage. The Massachusetts Legislature – to its later regret – eliminated the mandatory distribution requirement and repealed the safety fund limit, reportedly to allow Massachusetts' insurance companies to compete with New York companies and others in the sale of deferred dividend insurance.[19]

### B. Hoarded Surplus and the Armstrong Investigation

25.     In 1905 the New York legislature's Armstrong Investigation revealed to a shocked, but rapt public that Commissioner John Tarbox's concerns about hoarding had, if anything, been understated. Led by Charles Evan Hughes, the Investigation uncovered "wastefulness, speculation, and corruption" at the largest New York based mutual life

---

company may accumulate from its surplus and hold as a safety fund an amount not larger than ten per cent of its required legal reserve.

Chapter 214, Section 75, Acts of 1887.  The substantive difference relates solely to the clause regarding the market value margin.  The 1887 statute limited that component of the safety fund to bonds while the 1907 statute expanded it to include securities.

[18] Id at 72-73 (M010100).

[19] See Chapter 363, Section 2, Acts of 1900.  The 1907 Massachusetts Legislature Joint Special Committee on insurance explained the reason for the repeal in the report that is quoted in paragraph 29, infra.

insurance companies in fascinating abundance,[20] with the hoarded surplus widely recognized as "the basis of corruption."[21] The corruption, speculation, and wastefulness included payoffs to political leaders, using insurance funds to control railroads and other industries, extravagant buildings and salaries, and enormous sums spent on marketing and agent commissions. As a result, the dividends actually paid to policyholders proved to be much smaller than the companies and their agents had promised. Indeed, today's actuarial training materials report, "whatever the tontine plan may have taken from the poorer policyholders, not much of it got to the richer ones unless they were among those in a position to benefit from the extravagant spending that the buildup of tontine funds led to in some companies."[22]

26.     The Armstrong Investigation captivated the public, transforming Hughes into a highly regarded public figure and laying the foundation for his successful campaign for the Governor's mansion that same year.[23] By modern standards, the Armstrong Investigation and the legislative response were remarkably swift. The investigation itself took less than six months; the Committee issued its final report, including recommended legislation, in early 1906; and New York, Massachusetts, and other states enacted corrective legislation over the next 18 months. The corrective

---

[20] See generally 7 Joint Committee of the Sen. and Assembly of the State of New York to Investigate and Examine into the Business and Affairs of Life Insurance Companies Doing Business in the State of New York, Exhibits, Report and Index (1906).

[21] See Burton Jesse Hendrick, The Story of Life Insurance (1907), which collects in book form a series of articles about the scandal and investigation that first appeared in McClure's Magazine. Chapter 1 is titled "The Surplus the Basis of Corruption." See also letter from Louis Brandeis, counsel for Policy Holders' Protective Committee, to Trustees of Stock, Equitable Life Assurance Society, July 22, 1905, Letters of Louis D. Brandeis: Volume I, 1870-1907: Urban Reformer:

The issuance of policies on which dividends are deferred for long periods …
tends to extravagant an inefficient management because it removes the protection
which flows from publicity and annual accounting. … It vests also in the
management the control of huge funds not required as an insurance reserve, with
the temptations incident thereto.

[22] Society of Actuaries, Fundamentals of Actuarial Practice Module 1: Actuarius to Actuary at 8, available at https://www.soa.org/Files/Edu/edu-2012-c2-1.pdf. See also Buist Anderson, at 242 ("in essentially all the cases the distributions were much less than had been projected").

[23] Hughes ran successfully for New York Governor in 1906. He was appointed to the U.S. Supreme Court for the first time in 1908. He resigned from the Court to serve as the Republican candidate for President in 1916. He returned to the Court as Chief Justice in 1930, serving in that position until 1941.

legislation addressed many topics, including two that lie at the core of this case: the annual dividend requirement and the safety fund.

### C. The Revived Massachusetts Anti-Hoarding Legislation of 1907

27.     Shortly after the publication of the Armstrong Investigation report, the Governor of Massachusetts appointed a commission, headed by former Governor John L. Bates, to consider the recommendations of the Armstrong Committee and other governmental bodies that had recommended significant reform of life insurance laws.[24] The Massachusetts commission recommended, among other changes, that the Massachusetts Legislature restore and strengthen the anti-hoarding protections that it had repealed in 1900.  Specifically, the commission recommended that Commissioner Tarbox's safety fund limit be restored and that the mandatory distribution of dividends be restored in strengthened form such that distributions would now be required every year (rather than every five years as required by the 1887 statute).[25]  In addition, the commission recommended that insurance companies be required to put in their insurance policies a provision granting the policyholders rights to the annual distribution of dividends.

28.     The commission prepared a report that provides useful insight into the purposes of the annual distribution requirement and the safety fund.  The discussion of dividends began by emphasizing that surplus comes from and belongs to the policyholders:

> The scheme of mutual life insurance requires that each member pay as premium more than a conservative estimate would require for the insurance and the expenses, so that the company may be on the safe side. From these overpayments and the income thereon a surplus results which

---

[24] See, e.g., Report and Recommendations of the Insurance Convention, U.S. Senate Document No. 333 at 10 (April 17, 1906) (listing 12 recommended reforms, including the prohibition of deferred dividends).

[25] Report of the Commission to Recodify the Insurance Laws, Massachusetts House Document No. 1375 at 38-39 (June 1906).

> naturally would belong to the policy holders who contributed it, in sums proportioned to the contributions of each policy.[26]

The report explained that restoring and strengthening the dividend distribution requirement

> will not injuriously affect the Massachusetts companies; it will, however, prevent them from following the example of some foreign companies which have raised inordinate surpluses at the expense of policy holders, and then used them to provide funds for speculation, and to furnish a pretext for excessive salaries to the officers who accumulated them.[27]

In explaining the need for such anti-hoarding laws, the report made observations about deferred dividends that are equally applicable to manipulation of the safety fund law:

> The phrase "deferred dividend" in itself is a misnomer, and conveys a false impression. In the first place, the dividend, so called, is not a dividend. It in no way represents earnings on a premium. It is merely a return of that portion of the premium which constitutes an overcharge for insurance. In the second place, the dividend, so called, is not strictly deferred. The word "deferred" denotes that the event deferred will ultimately take place. The dividend deferred, however, may never take place; it may never be realized. … The members who die or lapse their premiums receive no share of the accumulation. The deferred dividend policy not only defers dividends – and defers them possibly forever for the individual policy holder – but also works a forfeiture in the case of lapse, and in many companies in the case of death as well.[28]

The report went on to explain how hoarding surplus resulted in a loss to all the policyholders, even those who did not die or lapse, because the companies used the surplus for purposes that did not serve policyholders:

---

[26] Id. at 32.

[27] Id. at 34.

[28] Id. at 35-36.  This statement echoes Commissioner Tarbox's quote from Elizur Wright:
> This surplus belongs to the insured from whose premiums it has accrued. It if should not be divided, but continue accumulating till those who were the first contributors to it have dropped away by death or by the lapse or surrender of policies, a wrong will be done which, though not so frightful as bankruptcy, may be as extensive in its transfer of property from the hands of its owners to those of strangers.

Report of Hearing on the Commissioner's Report before the Joint Committee on Insurance (1887) at 70 (M001064-101 at 099).

A large portion of the accumulation on deferred-dividend policies, which should have been passed on to the persistent survivors has, in the larger companies at least, been used to purchase the popularity of the system. … Under the conditions and systems of accounting that have prevailed, the deferred-dividend fund has been materially depleted, to the prejudice of the persistent survivors. The deferred-dividend premiums pass into what has been called a "blind pool," forming part of the general surplus, but not kept distinct and separate, and for which the company has been accountable practically to no one. The result has been that the "blind pool" has been drained to cover extravagance and mismanagement and to meet various contingencies. These facts show the falsity of the argument that the system creates stability and safety by increasing the surplus. The large blind surplus has been an evil in itself.[29]

29.     The commission presented its report to a Joint Special Committee of the Massachusetts Legislature, which held hearings on the commission's proposal. After the hearing, the Joint Special Committee prepared a report that openly acknowledged that the Legislature had made a serious mistake when it repealed the anti-hoarding laws in 1900 and that specifically identified the negative consequences of hoarding surplus as the reason for restoring the prior laws in strengthened form:

> Prior to the year 1900 the statutes of this Commonwealth required that every domestic life insurance company issuing participating policies should make distribution of its surplus annual, or every two, three, four, or five years, as each company shall determine; and that each insurer [sic i.e. policyholder] should be entitled to the amount contributed to the surplus by his policy.

> The less restrictive laws of other States permitted the writing of alluring but deceptive forms of insurance, forbidden in Massachusetts, of which the tontine and the unlimited deferred dividend are types; and the zeal of agents, inspired by large commissions made these forms of insurance appear so attractive that the growth of the business became phenomenal, rising in recent years to more than four-fifths of all the insurance written. In the strenuous competition prevailing, this greater freedom of foreign companies seemed to place the Massachusetts companies at a disadvantage; and they secured an amendment to the law (chapter 363, section 2, Acts of 1900), which provided that domestic life insurance companies "may from time to time make to policy holders not in arrears distribution of surplus not inconsistent with the terms of their

---

[29] Id. at 38.

policies." It is doubtful if the Legislature which passed this amendment realized that it was permitting changes which made possible the manifold forms of corruption which have elsewhere been brought to light, constituting offences that have shocked the moral sense of the nation, and brought the beneficent principle of life insurance into grave peril and disrepute. …

The wisdom of those who framed the insurance laws of this Commonwealth, requiring from mutual companies regular and frequent accounting and distribution of surplus to policy holders, has been justified by recent disclosure of corruption elsewhere which the vast accumulation of unapportioned dividends made possible; and not only has corruption followed, but this immense sum, aggregating many millions, for which no security is exacted and no accounting required before the expiration of the long terms of the contract, has been so drawn upon and reduced to meet the grossly excessive expenses incident to exploiting this form of insurance that the persistent survivors have been defrauded of a large part of the accumulations due and promised them.[30]

As this reference to the misguided repeal of the Commissioner Tarbox's protective provisions makes clear, the Legislature intended that the anti-hoarding purpose and provisions of the restored Safety Fund Law would trump industry concerns over its impact on insurers' competitiveness. The Joint Special Committee report also emphasized the fairness of annual dividends:

But, even if the moral peril were removed and the distributions honestly made, no form of insurance should be permitted offering the inducement of a share in profits accruing from the lapsing of policies through misfortune of the holders ….

The present law provides that "distribution to policy holders shall be made upon contribution to surplus plan." To the law mind this is best explained by the statement that the policy holders shall receive in dividends an amount proportioned to the profit he has been to the company.[31]

---

[30] Report of the Joint Special Committee on Insurance Appointed to Revise and Amend the Insurance Laws of the Commonwealth of Massachusetts at 36-37, January 1907 (House Document No. 1085).
[31] Id. at 37-38.

30.     In explaining the formula for the calculation of the safety fund, the 1907 Joint Special Committee's report incorporated by reference Commissioner Tarbox's report from 1887:

> *Contingency Reserve or Safety Fund.* -- It would be manifestly unsafe to compel a company to distribute its surplus down to a point just short of the required legal reserve.  Regard for the solvency of the company demands that there be a sufficient undistributed surplus to afford protection from possible shrinkage in the company's assets.  The New York Law provides a graduated scale, the amount of the contingency reserve decreasing as the legal reserve increases.  For the reasons stated in the report of the Commission to Recodify the Insurance Laws, the law of Massachusetts, enacted in 1887 (Statutes of 1887, chapter 214, section 75, repealed by Statutes of 1900, chapter 363, section 2) is preferable, and we recommend accordingly that a company be allowed to accumulate and maintain a contingency reserve or safety fund of not more than 10 per cent. of the reserve, not counting as surplus the excess of market value over par of all the bonds held by the company; provided, however, that, in case said 10 per cent. of the reserve is less than $100,000, a company shall be allowed to maintain a contingency reserve of not more than $100,000.[32]

31.     The Legislature enacted the proposed legislation with some modifications (e.g., increasing the safety fund margin of safety from 10% of reserves to 12% of reserves).  The ascertainment and distribution of dividends requirements were codified in §§ 140 and 149 of Chapter 175 of the Massachusetts General Laws.  The Safety Fund Law was codified in § 141 of Chapter 175.

32.     I note that the solvency considerations inherent in the Safety Fund Law as referenced above are addressed in Section V.A. below.

## IV. The Structural Reason for the Safety Fund Law – Insurers' Lack of Accountability to their Par Policyholders – Persists and is Evident in MassMutual

33.     As Elizur Wright, John Tarbox, Charles Evan Hughes, and Louis Brandeis would surely have predicted, the annual distribution requirement and the safety fund's limit on retained surplus have checked but not eliminated the natural inclination of large mutual life insurance companies to hoard surplus.  This inclination is attributable to a

---

[32] Id. at 39.

structural conflict of interest between the management of a mutual life insurance company and its members. As Commissioner Tarbox observed in his closing statement to the Massachusetts Legislature in 1887:

> Acquisitiveness is the ruling trait of the corporate spirit. To grasp all it can, and keep all it gets, is its native instinct and disposition. The more it has, the more it covets. So intent is it on its object that it is liable, even when it possesses good men, to neglect and overlook justice to the individual, and to magnify the corporation at his expense. I am aware that the corporation spirit, which makes a distinction between the body corporate and its individual members, has no proper abiding place in the affairs of mutual life insurance; but it is there none the less. Love of power and of emolument is well-nigh universal. The men who manage the concerns of our insurance institutions – excellent gentlemen, though, I esteem them to be as a rule – have it in like degree with other men. And power and emolument both dwell in the control of great corporations with great expenditures to make and great funds to administer. I do not rail at corporations. I recognize their usefulness and the great worth of our insurance corporations. But they have charge over vast funds in trust, over which their proper constituents, the owners, have no opportunity to exercise any efficient control as to management, and, therefore, I would would apply to their natural faults the corrective justice of watchful legal restraints.[33] (Emphasis added)

The management of a mutual life insurance company may benefit from hoarded surplus not only in the patently illegitimate ways revealed in the Armstrong Investigation, but also in the security that comes from having so much surplus that even very serious business misadventures or extravagant compensation do not threaten management's tenure. Policyholders lose as a result of the waste and lack of accountability that excess surplus makes possible, and, even if a company is prudent and well-managed, those who die or lapse during the accumulation of excess surplus lose their share of that surplus. As Supreme Court Justice Brandeis stated in his opinion in the Lederer case:

> In a mutual company, whatever the field of its operation, the premium exacted is necessarily greater than the expected cost of the insurance, as the redundancy in the premium furnishes the guaranty fund out of which extraordinary losses may be met, while in a stock company they may be

---

[33] Report of Hearing on the Commissioner's Report before the Joint Committee on Insurance (1887) M010064-101 at 092.

met from the capital stock subscribed. It is of the essence of mutual insurance that the excess in the premium over the actual cost as later ascertained shall be returned to the policy holder.[34]

When life insurance companies hoard surplus, participating policyholders may lose a substantial portion or all of this "essence of mutuality."

34.    As a general matter, life insurance regulation is predicated on the proposition that even sophisticated policyholders are vulnerable in the life insurance purchasing process, because of the policyholders' insufficient knowledge or access to information, as well as cognitive, emotional and other behavioral factors that place them at a disadvantage, relative to insurance companies and agents. That vulnerability continues beyond the purchasing process because, having purchased a permanent life insurance policy, par policyholders are, to a substantial extent, locked in. Indeed, life insurance policies are consciously designed to promote policyholder lock-in in order to protect life insurance pools from adverse selection.[35] From an economic perspective, this lock-in can be a good thing, provided that there are mechanisms that prevent the insurance company from taking advantage of the locked-in policyholders, whether by hoarding surplus or otherwise, which as a practical matter is impossible to uncover from publicly available information.

35.    Unfortunately, however, there is no practical mechanism within the ordinary corporate governance procedures of a mutual company for even highly motivated and educated policyholders to prevent insurers from hoarding surplus. Although mutual life insurance par policyholders and members are the ultimate owners of a mutual life insurance company, they do not exercise the same degree of control over the

---

[34] Penn Mut Life Ins. Co. v. Lederer, 252 U.S. 523, 525 (1920).

[35] See, e.g., Tom Baker, Containing the Promise of Insurance: Adverse Selection and Risk Classification, 9 Conn. Ins. L. J. 371 (2003). Adverse selection is the tendency for insurance pools to contain a disproportionate share of high risk people. Without the "lock in" provisions, healthy people would drop their insurance policies periodically and replace those policies with new ones based on their health status, while people who were less healthy would have to stick with the old policies, with the result that the risk level of life insurance pools would gradually increase. The mandate and subsidy provisions of the Affordable Care Act are the most recent high profile example of a legislative effort to prevent adverse selection.

22

company as shareholders.[36] Indeed, as Professor Henry Hansmann reports, "management in many mutual insurance companies is commonly self-appointing and free of any supervision or control by members whatsoever."[37]

36.     MassMutual appears to be no exception in this regard. As reported by the Boston Globe in June 2015, MassMutual has limited internal accountability to its owners.[38] For example, the Globe reported:

> Massachusetts Mutual Life Insurance Co. frequently brags that it doesn't react to the whims of Wall Street, it answers to the millions of policyholders who own the giant insurer. But when a handful of those owners showed up for MassMutual's annual meeting this spring, they were treated more like security risks. ... Once they got to the meeting, the annual business of the Fortune 100 company, with more than $250 billion in assets, was concluded in 15 minutes. ...

> Policyholders, despite their status as owners, have no meaningful oversight of how mutual companies spend their money – whether to lower rates, pay dividends, or fund executive salaries and perks – and few avenues to challenge such decisions. ...

> MassMutual policyholders might have asked about the eight-figure compensation package doled out to chief executive Roger Crandall, the two airplanes and two helicopters the company maintains, or the $34.5 million the company spent last year ferrying executives to New York, Europe, and the Carribbean.[39]

37.     An additional example illustrating the lack of effective internal methods for protecting policyholder interests, not included in the Boston Globe article, is illustrated by a lawsuit seeking the right of inspection of MassMutual's books and records. A Superior Court held recently that, unlike stockholders of a stock company, the

---

[36] See, e.g., David Mayers, Anil Shivdasani, and Clifford Smith, Board Composition and Corporate Control: Evidence from the Insurance Industry, 70 J. Business 30, 36 (1970) ("ownership rights are limited through the company charter, policy provisions and regulation in ways that are not imposed by stockholders of common-stock firms").

[37] Henry Hannsmann, The Organization of Insurance Companies: Mutual vs. Stock, 1 J. L. Econ. & Org. 125, 128 (1985).

[38] See, e.g., Deirdre Fernandes and Todd Wallack, A Rich Financial Realm Run Almost Without Oversight, The Boston Globe, June 17, 2015.

[39] Id.

policyholder members of a mutual life insurer have no such inspection rights under common law.[40]

38.    As a result of the conflict of interest between management and policyholders and the lack of effective policyholder control, the history of the mutual life insurance industry provides too many examples of management wasting policyholder funds.  The exorbitant salaries, lavish offices, extravagant parties, political corruption, and over-the-top marketing expenses revealed by the Armstrong Investigation are historically notable and well documented examples, but MassMutual has not been immune from allegations of wasting policyholder funds.[41]  Indeed MassMutual itself cited the wasting of policyholder funds in firing its CEO, Robert O'Connell, in 2005.[42] In an echo of the Armstrong Investigation, which was launched as a result of revelations made during an internal struggle for control of an insurance company,[43] O'Connell's supporters reported that the firing was a "palace coup," suggesting that O'Connell's

---

[40] See *Rule v. Massachusetts Mutual Life Ins. Co*, No. 2014-01811-BLS2at pp. 14-16 (J. Roach, Sup. Ct.) (unpublished decision).

[41] See, e.g., Deirdre Fernandes and Todd Wallack, A Rich Financial Realm Run Almost Without Oversight, The Boston Globe, June 17, 2015 (describing lavish salaries paid to senior executives and a fleet of planes and helicopters available for their use).

[42] See Andrew Caffrey, Insurer Details Why It Fired CEO; MassMutual Alleges 'Pattern of Abuse," The Boston Globe, June 22, 2005:

> MassMutual Financial Group's termination letter to ousted chief executive Robert J. O'Connell said he had "engaged in a systematic and pervasive pattern of willful abuse of authority" that included "taking or diverting policyholders monies or assets for personal use" and resulted in a "financial loss" to the Springfield-based firm and its owners.

See also Andrew Caffrey, US Targets MassMutual, Ex-Chief; Insurer Seeking to Block Release of Internal Inquiry, The Boston Globe, August 9, 2005 ("MassMutual has said that O'Connell made improper trades to inflate the value of a supplemental compensation account; wangled a special deal on a luxury condo the company is building in Marco Island, Fla; interfered with an investigation of his son who worked at the company's Oppenheimer mutual funds unit; and used intimidation to subvert internal MassMutual controls to conceal his wrongdoing"); Sasha Talcott, Larger than Life in a Small City; For Ousted MassMutual CEO Robert J. O'Connell, All Power was Personal.  Politically Connected and Professionally Savvy, He Wielded Enormous Influence in Struggling Springfield – And He Wasn't Afraid to Use It, The Boston Globe, July 24, 2005 (reporting that "O'Connell's largesse … was also about power, both personal and political," and reporting about his "use of perks" and "of corporate suites and aircraft").

[43] See Buist Anderson, The Armstrong Investigation in Retrospect, 1952 Proceedings of the Association of Life Insurance Counsel 243 (describing "the immediate cause of the Armstrong Investigation" as "the fight for the control of the Equitable Life Assurance Society of the United States").

alleged extravagance and self-dealing would never have been revealed to policyholders if it weren't for his internal enemies.[44] Consistent with that position, a panel of arbitrators later determined that the firing was unjustified, among other reasons because "O'Connell's arrangements were approved by MassMutual," and awarded him $50 million in damages, at least in part paid out of the policyholders' surplus.[45]

39.  The annual dividend distribution statute and the safety fund statute were meant to operate in tandem to establish bright-line rules protecting policyholders. Yet, the underlying conflict of interest between policyholders and management means that an insurer has a strong incentive to manipulate the calculation of the safety fund to increase the amount of funds that are within management's control. Hence, the need, in Commissioner John Tarbox's words, for "watchful legal restraints."

## V. Inconsistencies Between MassMutual's Safety Fund Computations and Historical Practice

40.  MassMutual's safety fund calculations conflict with the historical purpose of the safety fund and distribution statutes – which is intended to prevent hoarding and require distribution of all surplus to policyholders except for the modest margin over reserves necessary to prevent the risk of insurer insolvency – in at least the following respects:[46]

---

[44] See Sasha Talcott, Larger than Life in a Small City; For Ousted MassMutual CEO Robert J. O'Connell, All Power was Personal. Politically Connected and Professionally Savvy, He Wielded Enormous Influence in Struggling Springfield – And He Wasn't Afraid to Use It, The Boston Globe, July 24, 2005 (reporting that, "O'Connell's lawyers, however, called the firing a 'palace coup,' and supporters have floated the idea that the board fired him in a dispute over taking the company public").

[45] See Ross Kerber, Arbiter: MassMutual Unjustly Fired Chief; Lawyers Put Value of Award at $50M; Firm Fires Back with a Suit, The Boston Globe, October 21, 2006 ("An arbitration panel upheld claims by former MassMutual Financial Group chief executive Robert O'Connell that he was unjustly fired last year and awarded him termination benefits that his lawyers put at $50 million").

[46]  As noted at the outset, my opinions address the history and legislative intent of the anti-hoarding provisions in the Massachusetts insurance laws, particularly the Safety Fund Law, and the manner in which certain of MassMutual's practices conflict with the legislative intent and the historical application of these statutes. Plaintiff's other experts address the reasons why MassMutual's safety fund practices: (i) are inconsistent with statutory accounting and similar accounting principles and practices (Larry Johnson); and (2) improperly include certain

- MassMutual includes in the "reserves" it uses as the base for calculation of the 12% safety fund limit, liabilities that are not properly classified as legal reserves under governing statutory insurance accounting rules or the operative Massachusetts statutes defining policy reserves, contrary to the legislative history and intent (as recognized by a prior Massachusetts court ruling directly on point);

- MassMutual also includes in the "reserves" the liabilities that it posts as reserves for its Separate Accounts, which do not qualify for inclusion in the safety fund's "contingency reserve," because these liabilities are held separate from the Company's surplus and reserves and do not pose any solvency or other contingency risk to the company or its participating policyholders;

- MassMutual inflates its claimed safety fund limit by including enormous sums attributable to non-securities in "the margin of the market value of its securities over their book value" (MVM); and

- MassMutual inflates the MVM component by only including some of its assets (those with unrealized gains) while excluding assets with market values that are below book value, contrary to historical practice and the operative language and legislative purpose of § 141.

41.    Through these manipulative and aggressive accounting practices, among others, MassMutual has artificially inflated its claimed safety fund in a manner that completely undercuts the intended purpose of the Safety Fund Law. As Plaintiff's statutory accounting expert, Larry Johnson, has shown, despite its substantial financial strength and surplus, MassMutual claims it was entitled to withhold from dividend distributions to its policyholders a total safety fund amount, as of 2014, of $19.5 billion. The amount is essentially double its participating surplus of $10 billion and nearly 1 ½ times its entire reported statutory surplus.[47]

---

derivatives in the MVM calculation that are not properly characterized as "securities" within the meaning of § 141 (James Lovely).

[47] See Expert Report of R. Larry Johnson (Dec. 15, 2015) ("Johnson Report) at ¶ 60 (chart showing MassMutual's claimed safety fund limit and participating surplus).

42.     This means that MassMutual is attempting to use the Safety Fund Law to accomplish precisely what the law was enacted to prevent – to hoard enormous amounts of surplus that should be distributed as dividends to its participating policyholders. Indeed, according to MassMutual's calculations, it claims  the discretion under the Safety Fund Law to stop paying *any* dividends to its par policyholders for many years, despite holding its very substantial surplus.[48]  In effect, MassMutual is attempting to reclaim through aggressive accounting techniques the discretion over the timing and amount of its dividends that the Massachusetts Legislature took away with the enactment of §§ 140 and 141.

### A.  The Anti-Hoarding and Solvency-Protection Purposes of the Safety Fund

43.     The historical materials that I have reviewed demonstrate that the purpose of the Safety Fund Law was primarily to protect policyholders from hoarded surplus by requiring life insurance companies to make distributions to policyholders and secondarily to provide a modest margin of safety protecting the solvency of the companies from inadequate reserves..  These purposes are apparent in (1) the 1887 Report of the Insurance Commissioner on the Resolve to Revise and Codify the Insurance Laws of the Commonwealth, (2) the transcript of the hearing on the 1887 Report before the Joint Special Committee on Insurance of the Massachusetts Legislature, (3) the Annual Report of Massachusetts Insurance Commissioner as of January 1887, (4) the 1906 Report of the Commission to Recodify the Insurance Laws, and (5) the 1907 Report of the Joint Insurance Committee.  I have previously discussed much of the historical record regarding the primary, anti-hoarding and distributive purpose.  Accordingly, in this section I focus mainly on the historical record regarding the secondary, solvency-protection purpose.

---

[48] See Johnson Report at ¶ 62 (noting 2014 statutory surplus could grow from $14.2 billion to $23.8 billion before MassMutual would have to distribute any surplus in the form of dividends). In addition to the participating surplus of $10 billion, MassMutual holds another $4.2 billion in non-par surplus.  See Massachusetts Mutual 2014 Safety Fund Calculation (M093805-806 at 806) (reporting non-par surplus of $2.5 billion and surplus notes of $1.7 billion).

44.   The 1887 Report of the Insurance Commissioner on the Resolve to Revise and Codify the Insurance Laws of the Commonwealth explains many of the sections of the proposed legislation. In explaining Section 75, which contains the provisions regarding the distribution of surplus, the report states:

> By section 75 of the bill provision is made to fix the amount that mutual life companies may withhold from their policyholders, and for the distribution of surplus accumulations. …
>
> To this subject I particularly invite the attention of the Legislature, as it involves the responsibility of the companies, the truth of the pretentions upon which the system of life insurance asks the public confidence, and the rights of every policy-holder in these corporations. Indeed, it puts on trial the foundations of the system and the equities of its administration, both which the Legislature, in behalf of the public, may usefully investigate.
>
> The law now in force obliges each life company to hold funds, above its other liabilities, equal to the net value, or "reserve," of its outstanding policies.  These funds, as all other funds of a mutual life company, are created from the premiums paid by the policy-holders. Holding such a reserve, the law, as also the assumption of life insurance "science," pronounce the company to be solvent, i.e. able to perform its obligations.  If the conclusion of the law be true, and a company with that reserve is solvent and safe and able to carry out its contracts, why should it be allowed to accumulate other funds it has no legitimate use for by over-taxation of its policy-holders?  But here the law halts. …
>
> Should the Legislature enact the section (75) into law, the mutual policy-holder will pay for his insurance, his share of the losses and expenses, his share of the legal reserve, and, in addition, his share of safety fund equal in amount to ten per cent of the entire reserve, and liable to be used, if needed, to repair the reserve. ….[49]

As this excerpt from the report makes clear, the company's policy reserves serve as the primary protector of solvency, and the safety fund is to be available as a backstop "to be used, if needed, to repair the reserve."

---

[49] Report of the Insurance Commissioner on the Resolve to Revise and Codify the Insurance Laws of the Commonwealth, House Document No. 20 at pp. *xvii-xxi* (M010060-M010062) (1887).

45.   The transcript of the joint committee's hearing on the report provides further evidence that the secondary purpose of the safety fund is to serve as a *modest* solvency backstop. Mr. A.D. Foster testified on behalf of the New England Mutual Life Insurance Co. to complain about the margin of safety that the safety fund would give life insurance companies:

> As to this provision for a safety fund of ten per cent of the required legal reserves, it seems to me that is altogether too small to cover, as he [Tarbox] says, "any deficiency in the reserve caused by depreciation of assets or losses and expenses."[50]

Foster's complaint accepts the objective of solvency protection and, apparently, even the wisdom of setting some limit on the retention of surplus.  He simply wished the margin of safety to be less modest.   By contrast, Jacob Greene, the President of the Connecticut Mutual Life Insurance Co., objected to any limit for any purpose:

> Section 5 of the preliminary draft, which is section 75 of page 41 of the report, undertakes in general terms to limit the surplus which a company may hold to ten per cent of its reserve, and to require that it shall at stated periods divide all of its surplus above a given amount.  It seems to me that is wholly unnecessary. The tendency, taking one thing with another, will be for companies to divide as much, to make as large dividends to their policyholders as is consistent with safety, and **I think that can all be left where the charters of the company leave it, in the discretion of those who are responsible for the management of a company's affairs, and responsible for the integrity of its contracts, for the final result**.  And it is looking a great ways into the future to determine now just what function a surplus may be called upon to fulfill in the affairs of the company, and to say that any amount of surplus is absolutely and unconditionally sufficient for all the contingencies of the future.  It seems to me such legislation is entirely uncalled for, and would be intrinsically unwise.[51] (Emphasis supplied)

Jacob Greene refused to accept that the purpose of a safety fund should be limited to solvency protection: "it is looking a great ways into the future to determine just what function a surplus may be called upon to fulfil in the affairs of the company."  Instead, what Greene proposed for mutual life insurance companies was complete discretion to

---

[50] Report on Hearing at p. 40 (M010084).
[51] Report on Hearing at p. 9 (M010068).

29

retain surplus in any amount and for any purpose. Needless to say, Greene's proposal was not accepted.

46.    Commissioner Tarbox responded to the testimony of the insurance industry representatives on the final day of the hearings. Before addressing their specific objections, he observed that there were two common themes:

> These corporation managers have brought here once more the old familiar arguments which they opposed to all insurance legislation in the past. It is in two parts. *First.* That the unskilled persons who compose our legislature cannot understand life insurance, and therefore are incompetent to legislate about it. *Second.* That the management of these institutions, and the rights of their policy holders, can be left to the control, judgment and sense of justice of the men temporarily in charge, more safely than to the protection of positive and permanent law. This argument is as old as the earliest attempt at public supervision of insurance.[52]

With regard to the specific objections about the safety fund, Commissioner Tarbox testified as follows:

> The next and final topic which I had prepared myself to discuss is section 75, and that covers the question whether a limit shall be put upon the power of the corporation to retain from its policy-holders a surplus over its reserve, and also, whether the law shall prescribe and protect the rights of the policy-holder in that portion of surplus which the company is permitted to retain. …. We now propose that the law shall oblige the corporation at the same stated periods as before to divide to its policy-holders all the surplus it accumulates above a certain amount, which it is allowed to retain for the benefit of the common safety; …

> I agree entirely with Mr. Wright in the opinion that a life company, well established and with sound investments and a safe basis of reserve, needs no surplus for its safety, and that for it to accumulate such a surplus from dividends to which its policy holders are in equity entitled is an injustice. …    But the bill concedes to the corporations the power to withhold from their policy holders and accumulate a surplus equal to ten per cent of their reserves, provided that the policy holders from whom this surplus is withheld shall have their rights in the share they contribute to it preserved ….

---

[52] Report on Hearing at pp. 58-59 (M010093).

> But the corporations are not content with that concession. They object to any limit upon their power. They profess to doubt if the surplus allowed is sufficient for safety.... Gentlemen, the matter rests with your judgment and that of your associates in the Legislature. I have performed my part in the deliberation as well as I am able, and certainly without prejudice. If in your judgment the limit is too narrow, enlarge it to such limit as you approve as safe. But fix it somewhere. **Do not leave these corporations with unlimited power to hoard from the public ....**[53] (Emphasis added)

As Commissioner Tarbox's testimony makes clear, the primary purpose of the safety fund is protecting policyholders from the hoarding of surplus by requiring its distribution. The secondary purpose is to provide a modest margin of safety to protect the solvency of the company. Hence, the name he invented, "safety fund." As Commissioner Tarbox and the Legislature would certainly have understood, the size of that safety fund would in many cases be much smaller than the management of a financially strong mutual life insurance companies would choose if left to their discretion.[54] Indeed, limiting that discretion was necessary to achieve the primary, anti-hoarding and distributive purpose of the Safety Fund Law.

---

[53] Report on Hearing at pp. 69, 72-73 (M010098-100).

[54] See also the testimony of Commissioner Tarbox, as quoted earlier in paragraph 33:

> Acquisitiveness is the ruling trait of the corporate spirit. To grasp all it can, and keep all it gets, is its native instinct and disposition. The more it has, the more it covets. So intent is it on its object that it is liable, even when it possesses good men, to neglect and overlook justice to the individual, and to magnify the corporation at his expense. I am aware that the corporation spirit, which makes a distinction between the body corporate and its individual members, has no proper abiding place in the affairs of mutual life insurance; but it is there none the less. Love of power and of emolument is well-nigh universal. The men who manage the concerns of our insurance institutions – excellent gentlemen, though, I esteem them to be as a rule – have it in like degree with other men. And power and emolument both dwell in the control of great corporations with great expenditures to make and great funds to administer. I do not rail at corporations. I recognize their usefulness and the great worth of our insurance corporations. But they have charge over vast funds in trust, over which their proper constituents, the owners, have no opportunity to exercise any efficient control as to management, and, therefore, I would apply to their natural faults the corrective justice of watchful legal restraints.

31

47.    Commissioner Tarbox submitted the Thirty Second Annual Report of Insurance Commissioner in April 1887, little more than a month before he died.[55] This Annual Report represents Commissioner Tarbox's last word on the legislation that he wrote and shepherded through the legislative process:[56] "as the questions involved possess a permanent interest, apart from as well as connected with their immediate consideration by the Legislature, I incorporate here some remarks of mine addressed to the committee in explanation of and in reply to objections to several of the sections as originally drawn by me."[57]  By including his remarks in the Annual Report, Commissioner Tarbox ensured that these remarks would be preserved in the records of the Department of Insurance.  The excerpts in the Annual Report include Commissioner Tarbox's testimony quoted in my report, indicating the importance that Commissioner Tarbox gave to the safety fund aspects of the legislation.

48.    Twenty years later – after the repeal of Commissioner Tarbox's anti-hoarding laws and after the revelations of the Armstrong Investigation – the Massachusetts Commission to Recodify the Insurance Laws reaffirmed in its report that the primary purpose for restoring the safety fund was the same anti-hoarding and distributive purpose that motivated Commissioner Tarbox:

> The scheme of mutual life insurance requires that each member pay as premium more than a conservative estimate would require for the insurance and expenses, so that the company may be on the safe side. From these overpayments and the income thereon a surplus results which naturally would belong to the policy holders who contributed to it, in sums proportioned to the contributions of each policy.
>
> Obviously there are several ways of returning these overpayments.

---

[55] See Hard Work Killed Him: A Faithful Public Servant of Massachusetts, The New York Times, May 29, 1887. Commissioner Tarbox died in May 1887, just a few days after the legislation – described in this obituary as his "last great work" – went into effect.

[56] Commissioner Tarbox had, earlier in his career, been a member of the Massachusetts House and Senate, as well as a Representative in Congress and, thus, was well acquainted with the legislative process.  See Id.

[57] Thirty Second Annual Report of the Insurance Commissioner of the Commonwealth of Massachusetts, Part II: Life, Casualty and Guarantee Insurance at p. xxii, Public Document No. 9 (1887).

(a) The directors may distribute each year or at other arbitrary periods *all* of the surplus, leaving the company at the date of distribution just solvent.  No one would advocate such a method, because the slightest shrinkage in investment values would impair the company.

(b) *Contingency Reserve or Safety Fund* – The directors may invest a part of the surplus, and apportion or distribute the balance annually, or at other arbitrary periods.  The invested part is held back for the security of the company. …

We deem it wise that the contingency reserve be limited by law to a maximum uniform percentage of the reserve liability, and that the percentage be large enough to allow a margin for safety in times of panic, as well as reasonable elasticity for the purpose of making dividends steady.  The law of Massachusetts, enacted after deliberation in 1887 (citation omitted) fixed this percentage at 10 per cent, besides the aggregate market value in excess of par of all bonds held.

We believe that this provision of the repealed law was a wise one. …

Such law will not injuriously affect the Massachusetts companies; it will, however, prevent them from following the example of some foreign companies which have raised in ordinate surpluses at the expense of policy holders, and then used the to provide funds for speculation, and to furnish a pretext for excessive salaries of the officers who accumulated them.[58]

Note that the 1906 Commission's report identified two secondary purposes of the safety fund:  a margin of safety against insolvency in "times of [financial] panic," when asset values fall precipitously, and "reasonable elasticity for the purpose of making dividends steady."  The first – solvency protection – is the secondary purpose reflected in the records of the 1887 legislation.  The second – dividend smoothing – nowhere appears in the records of the 1887 legislation.

49.     Significantly, and in contrast to Commissioner Tarbox's report and proposed legislation, the Massachusetts Legislature did not adopt the 1906 Commission report and proposed legislation without amendment.  Among other significant changes, the legislative committee significantly reorganized and revised the discussion of the

---

[58] Report of the Commission to Recodify the Insurance Laws at 33-34, House Document No. 1375 (June 1906).

distribution of dividends and the safety fund.  In particular, the committee deleted any reference to a dividend smoothing and focused, instead, on the solvency margin of safety. Moreover, rather than relying exclusively on the 1906 Commission report, the committee's report also relied on Commissioner Tarbox's Report from 1887, which I have discussed extensively above to "afford protection from possible shrinkage in the company's assets."[59]  The MVM was directly relevant to this purpose.

50.      I now turn to MassMutual's safety fund calculation based on the foregoing and my analysis of the legislative history and purpose of the Safety Fund Law.

### B. Including Liabilities that are not Reserves in the Safety Fund Calculation is Contrary to the Historical Record

51.      In addition to its "legal reserve," MassMutual also includes in its safety fund calculation all of its other liabilities listed in its annual statement, contrary to the Safety Fund Law and historical practice. According to Mr. Johnson, for 2014 MassMutual has inflated its claimed safety fund limit by $1.7 billion.[60]  As such, this is a manipulative and aggressive calculation.

52.      From the very beginning, as Commissioner Tarbox's report and the testimony from the hearing on his report make clear, Massachusetts lawmakers were well aware that insurance companies had liabilities that were not legal reserves.  They meant the safety fund calculation to be made only on the basis of the company's legal reserves and not on the basis of the company's other liabilities.  For example, Mr. Tarbox's report stated:

> The law now in force obliges each life company to hold funds, *above its other liabilities*, equal to the **net value, or "reserve,"** of its outstanding policies.[61] (Emphasis added)

---

[59] Report of the Joint Special Committee on Insurance Appointed to Revise and Amend the Insurance Laws of the Commonwealth of Massachusetts at 39, January 1907 (House Document No. 1085).

[60] See Johnson Report at ¶ 94. The $1.7 billion represents the amount related to "other liabilities," excluding amounts attributable to separate accounts which are discussed later herein.

[61] Report of the Insurance Commissioner on the Resolve to Revise and Codify the Insurance Laws of the Commonwealth, House Document No. 20 at *xvii* (M010060) (1887).

53.     Indeed, Commissioner Tarbox's 1887 legislation also contained a provision regarding the calculation of this "net value" that expressly distinguished this legal reserve of a life insurer from "all its other liabilities":

> He [the Commissioner] shall each year compute the net value on the thirty-first day of December of the preceding year of all outstanding policies of life insurance in companies authorized to make insurance on lives in this Commonwealth upon the basis of the "Combined Experience" or "Actuaries' Table" rate of mortality with interest at four per cent, per annum, and the aggregate net value, so ascertained, of the policies of any such company shall be deemed its liability on account of its policy obligations, other than accrued claims, to provide for which it shall hold funds in secure investments of an amount equal to such net value **above all its other liabilities.**[62] (Emphasis added.)

That these reserves were the "required legal reserves" can also be seen in the complaint about the safety fund lodged by Mr. A.D. Foster on behalf of the New England Mutual Life Insurance Co. at the 1887 hearing on the legislation, that "ten per cent of the *required legal reserves* … is altogether too small" a margin of safety.[63]

54.     In restoring the Safety Fund Law in 1907, the legislative committee report similarly made clear that the "reserves" to be considered in the safety fund computation are the "legal reserve":

> It would be manifestly unsafe to compel a company to distribute its surplus down to a point just short of **the required legal reserve**.  Regard for the solvency of the company demands that there be a sufficient undistributed surplus to afford protection from possible shrinkage in the company's assets.  The New York Law provides a graduated scale, the amount of the contingency reserve decreasing as the **legal reserve** increases.  For the reasons stated in the report of the Commission to Recodify the Insurance Laws, the law of Massachusetts, enacted in 1887 (Statutes of 1887, chapter 214, section 75, repealed by Statutes of 1900, chapter 363, section 2) is preferable, and we recommend accordingly that a company be allowed to accumulate and maintain a contingency reserve

---

[62] Ch. 214, Section 11, Acts of 1887.
[63] Report on Hearing at p. 40 (M010084).

or safety fund of not more than 10 per cent. **of the reserve,** ...[64]
(Emphasis added)

55.     The reserve statute is now M.G.L. c. 175, § 9, which is captioned "Computation of reserve liability or net value of life company with respect to policies or contracts" and has been in place in various forms since first being adopted in 1858. As in 1887, the 1907 statute similarly distinguished between the reserves, or net value, and all other liabilities.[65]  The statute still does, in § 9(9).

56.     The intent to distinguish reserves from all other liabilities can also be seen in the restored and strengthened dividend distribution provision, subsequently codified in § 140 of Chapter 175.  § 140 states:

> Every such company shall ... after providing from the funds attributable to its participating business for the reserve required by sections nine and eleven and all other liabilities attributable to such business, including dividends declared upon the capital stock, if any, and such sum as may be held on account of existing deferred dividend policies, and providing also for a contingency reserve not in excess of the limit prescribed in the following section, apportion its remaining funds attributable to such business upon the contribution to surplus plan, as dividends, to all other policies entitled to share therein.

Like Commissioner Tarbox's 1887 report and the 1887 Act, § 140 distinguishes between "reserves" and "all other liabilities."  "Reserves" are defined in § 9(9) to include

> all liabilities of the company for the fulfillment of future unaccrued claims of policyholders, contract holders and beneficiaries arising from any kind of policy or contract which the company is authorized to write. To provide for such reserve liability, which shall be computed in accordance with the requirements of this section, the company shall hold funds in an amount equal thereto above **all its other liabilities**.  (Emphasis added.)

---

[64] Report of the Joint Special Committee on Insurance Appointed to Revise and Amend the Insurance Laws of the Commonwealth of Massachusetts at 39, January 1907 (House Document No. 1085).

[65] See Chapter 576, Section 11(5), Acts of 1907 a p. 845 ("the aggregate net value so ascertained of all the policies of any such company shall be deemed its reserve liability, to provide for which it shall hold funds in secure investments of an amount equal to such net value **above all its other liabilities**.") (Emphasis added.)

57.     Therefore, reserves equal those liabilities held to pay all future unaccrued policy claims, which are contingent on future events.  Expressly excluded from the definition of said reserves are "all its other liabilities," namely those that are already known and accrued. MassMutual's safety fund computation reflects the incorrect view that the term "reserve" has different meanings in different sections of the Massachusetts life insurance laws, including in the two core sections of the anti-hoarding laws that were enacted at the same time.  I can find no support in the historical record for the proposition that the word "reserves" means one thing in § 141 and something different in § 140 or § 9.  Indeed, the historical records that I reviewed are to the contrary.  Thus, I completely agree with Judge Gants' statutory analysis and the court's description of "the spirit behind these statutes" – specifically, the spirit behind the requirement that the safety fund be computed on the basis of the legal reserve and not on the basis of all liabilities:

> "This unique provision [the Safety Fund Law] was inserted in the law because Mr. Brandeis ... believed that the piling up of enormous surplus by life insurance companies was entirely unnecessary after adequate insurance reserves had been provided for." [citation omitted] .... If the Safety Fund established in § 141 were defined as twelve percent of all liabilities rather than twelve percent of insurance reserves, it would so increase the size of the Safety Fund for life insurance companies as to leave little or nothing for policyholders to receive in dividends.  This Court has no doubt that, if Justice Brandeis were alive today and learned of this proposed corruption of the statute he inspired, he would roar in protest.[66]

---

[66] Goldstein v. Savings Bank Life Insurance Co. of Massachusetts, C.A. 98-2330-BLS1 (September 26, 2008) (Gants, J).

Judge Gants' description comes from a case that presented the identical question of statutory interpretation presented in this case, in which Judge Gants held that that the safety fund computation is to be made on the basis of the legal reserves, not on the basis of all liabilities, as MassMutual contends.[67] To the names of those who would "roar in protest" in response to MassMutual's "corruption of the statute," I would add Commissioner John Tarbox and the members of the 1887 and 1907 Joint Insurance Committees of the Massachusetts legislature.

### C. Including Separate Accounts in the Safety Fund Calculation Conflicts with Historical Practice and Purpose

58.    When calculating the "reserves" that it uses as the base for calculating the safety fund, MassMutual includes not only the reserves in its General Account – which is what the insurer's primary financials are called and the the only kind of account that life insurance companies had when the Safety Fund Law was enacted – but also the reserves and other liabilities from its Separate Accounts. Separate Accounts are accounts that are linked to annuities and other contracts that are similar in important respects to mutual funds.[68] The benefits paid under the Separate Account contracts are linked to specific assets chosen at the direction of the holder. These assets can be invested in riskier investments than is possible by life insurers in their General Account precisely because the Separate Account holder bears the investment risk associated with those assets, not the insurer.[69]

59.    Indeed, the fundamental feature of Separate Accounts is, as that name suggests, their legal separation from the life insurance company's General Account. Accordingly, the Separate Account reserves do not pose any solvency risk to MassMutual for which a "contingency reserve" needs to exist. There is nothing in the legislative history that would suggest that the liabilities of the Separate Accounts (which did not

---

[67] Id.

[68] See, e.g. Virginia P. Puder, The Revolution Within the U.S. Life Insurance Industry, 26 Financial Analysts J. 50 (1970); George E. Johnson, The Separate Account: A New Phenomenon in Life Insurance, 2 Forum 248 (1968).

[69] George E. Johnson, The Separate Account: A New Phenomenon in Life Insurance, 2 Forum 248, 254 (1968).

exist at the time of the enactment of the Safety Fund Law), would be included in the safety fund calculation. MassMutual's legal reserves are unrelated to the Separate Account holders, and MassMutual's surplus or safety fund does not cover any contingencies that may arise in the reserves or liabilities contained in the Separate Accounts.[70]

60.    In short, there is no solvency risk in the Separate Accounts for which a "contingency reserve" in the General Account would be required. Nor is there any benefit to the Separate Account holders from a **larger** safety fund, which is the result of including the substantial Separate Account reserves and liabilities in the safety fund.

### D. MassMutual's Treatment of the MVM Component of the Safety Fund Conflicts with Historical Purpose and Practice

61.    The Safety Fund Law contains a clause regarding "the margin of the market value of its [the company's] securities over their book value" that MassMutual has applied in a manner that would eliminate, for all practical purposes, the statutory limit on the accumulation of surplus. This topic is the most technical of all of the topics I address in this report, but it also is one of the most important.

62.    The harsh irony in MassMutual's manipulation of the MVM calculation lies in the fact that the special solvency risk that led to the inclusion of the MVM in the safety fund formula is now addressed by other solvency mechanisms and reserved funds that did not exist when the Safety Fund Statute was enacted. Thus, the need for the MVM

---

[70] The only way that Separate Accounts can affect the amount of surplus in the General Account is if the life insurance company guarantees the performance of the separate account investments, for example by guaranteeing a minimum return. If MassMutual makes such a guarantee, that guarantee will be an obligation of the General Account and, as such, that obligation must be reflected in a reserve that is posted in MassMutual's General Account (and not in the Separate Accounts). That reserve functions to set aside a share of MassMutual's General Account assets, reducing surplus, to protect against the solvency risk of the guarantees. As reported in MassMutual's 2014 Annual Statement, the magnitude of the risk that such guarantees pose to MassMutual's General Account is very small in relation to surplus. MassMutual's total surplus for 2014 is $14.2 billion. See 2014 Massachusetts Mutual Annual Statement (M092741-M093668) at p. 3, line 37 (p. M092743). The face value of the guarantees to the Separate Accounts at $391 million, which is the total amount that the General Account would be obligated to pay the Separate Accounts in the "worst case" situation. See 2014 Massachusetts Mutual Annual Statement (M092741-M093668) at p. 19.53, Note 34(a)(3) (p. M09816).

margin of safety has diminished. Yet, MassMutual nonetheless has taken aggressive efforts to expand the calculation of the MVM as if the MVM should be larger. It does so to the point that, today, MassMutual calculates the value of the MVM alone to be larger than its entire participating surplus in 2014.[71] As noted above, MassMutual is attempting to inflate its claimed safety fund limit to a level that is **double** its participating surplus, a result that would give MassMutual the discretion under current conditions to stop paying any dividends to its par policyholders for years, despite its very substantial surplus[72] and despite the Massachusetts Legislature's rebuff of Jacob Greene's demand for this kind of discretion in 1887 and again in 1907.

63.     The historical record demonstrates that the Massachusetts Legislature included the MVM clause in the safety fund statute to address a specific concern: the impact of declines in the market value of bonds (and, later, stocks) on the solvency of a life insurance company at a time when companies included these securities at market value in their statement of assets (and thereby included unrealized gains in surplus) and did not include in their statement of liabilities (i.e. remove from surplus) an amount that reflected their exposure to these declines.[73] Beginning in 1951, however, insurance law

---

[71] See Johnson Report at ¶ 60 (table showing MassMutual's safety fund limit of $19.5 billion and participating surplus of $10 billion in 2014).

[72] See Id. at ¶ 60, ¶ 62 (noting 2014 statutory surplus could grow from $14.2 billion to $23.8 billion before MassMutual would have to distribute any surplus in the form of dividends); see also ¶ 52 (showing strong risk based capital ratio of 993%); id. at ¶ 198 (after complying with safety fund limit MassMutual would still have a risk based capital ratio of 827.5%, more than four times the level triggering regulatory oversight).

[73] See Harold G. Fraine, Valuation of Securities Holdings of Life Insurance Companies at 2-4 (1962) (noting that the decline in market value of securities in the panic of 1907 "posed an immediate question of solvency for many companies" and that insurance commissioners responded by allowing companies to report the value of their securities at a value that exceeded the then current market price) and at 10-11 (reporting the first discussion of a securities reserve in 1948). Note that the price of a bond on the secondary market depends on two main factors: the creditworthiness of the entity that issued the bond (the stronger the financial condition of the issuer, the lower the price), and the difference between the interest rate promised in the bond and the interest rates currently prevailing in the market at the time of the secondary market sale. If the currently prevailing interest rates are higher than the rate promised in the bond, the bond is less attractive and, thus, the price of the bond will tend to be lower. If the currently prevailing interest rate is lower than that promised in the bond, the bond is more attractive and, thus, the price of the bond will tend to be higher.

required life insurance companies include a special reserve designed to absorb declines in market values of stock and credit losses on bonds (that are no longer carried at market).[74]

64.    Today, MassMutual and other life insurance companies are legally required to lower their surplus by holding a special reserve that reflects these short term changes, called the Asset Valuation Reserve ("AVR"). MassMutual must also test the adequacy of its reserves in ways that were not contemplated (i.e., Cash Flow Testing) let alone possible when the Safety Fund Law was enacted. Those tests show that its reserves are robust, as Mr. Johnson discusses in his report.[75] In addition, as noted by Mr. Lovely, MassMutual has a sophisticated and highly effective Asset Liability Management ("ALM") program through which it hedges its assets and liabilities to reduce or eliminate the risks associated with those assets and liabilities.[76] Thus, the historic solvency protection purpose of the MVM has been augmented and/or largely supplanted by these modern statutory accounting protections and asset management tools.  Therefore, the MVM component should be read narrowly, consistent with the historical purposes of the safety fund, and not expanded as MassMutual seeks to do.

65.    Yet, despite these reductions in surplus due to the development of the AVR and its other solvency tools, MassMutual has become more aggressive in its calculation of the MVM in the safety fund, in at least three important respects: (1) calculating the MVM on a gross rather than net basis, inflating the size of the MVM by counting only those securities with market values in excess of book value and excluding securities with market values that are less than book value; (2) including certain derivatives in the safety fund MVM calculation, despite the fact that such derivatives are not securities;[77] and (3) including the shares in its wholly owned subsidiaries even though

---

[74] See National Association of Insurance Commissioners, Proceedings Mid-Winter Meeting (1951) (reporting adoption of a security valuation reserve).  Compare Annual Statement for the Year 1951 of the Massachusetts Mutual Life Insurance Company (including a mandatory securities valuation reserve (MSVR) and no line item for MVM) with Annual Statement for the Year 1950 of the Massachusetts Mutual Life Insurance Company (including the MVM line item for stocks and bonds and not including a MSVR).

[75] See Johnson Report at ¶¶ 95-99.

[76] See Expert Report of James W. Lovely (Dec. 15, 2015) ("Lovely Report") at ¶¶ 32-35, 95-99.

[77] See Lovely Report at ¶¶ 8, 18.

(like bonds, which MassMutual now excludes from the MVM component of the safety fund) those shares are not carried at market value in surplus.

### 1. The historical record shows that MVM is supposed to be calculated on a net basis

66.    Until 1951 life insurance company financial statements filed in Massachusetts included a line item that corresponded to the MVM for stocks and bonds.[78] From at least 1887 until 1907, the financial statements included a line item for "Market value of stocks and bonds, over cost."[79]  From 1907 until 1950, the statement included a line item for "Market value of stocks and bonds over book."[80]  In each year that I have reviewed, that calculation was done on a net basis.  The annual statement reports the market value as the sum of the market values for all of the stocks and bonds listed in the annual statement.  It reports the book value (or cost value) as the sum of the book value (or cost value) of all of the same stocks and bonds.  The amount reported for the "Market value of stocks or bonds over book" (or cost) is simply the difference between the total market value and the total book value (or cost).[81]  This means that at the time of the

---

[78] See National Association of Insurance Commissioners, Proceedings Mid-Winter Meeting (1951) (reporting adoption of a security valuation reserve).  Compare Annual Statement for the Year 1951 of the Massachusetts Mutual Life Insurance Company (M074518-720 at 523) (including a mandatory securities valuation reserve (MSVR) and no line item for MVM) with Annual Statement for the Year 1950 of the Massachusetts Mutual Life Insurance Company (M074721-M074911 at 725) (including the MVM line item for stocks and bonds and not including a MSVR).

[79] See, e.g. Thirty Second Annual Report of the Insurance Commissioner of the Commonwealth of Massachusetts Part II, Life, Casualty & Guarantee Insurance, Detailed Statements at 15 (1887) (reporting Market value of stocks and bonds, over cost for Massachusetts Mutual Life Insurance Co.).

[80] See, e.g., Fifty-Second Annual Report of the Insurance Commissioner of the Commonwealth of Massachusetts, Part II, Life, Casualty & Guarantee Insurance, Detailed Statements at p 30 (1907) (reporting Market value of stocks and bonds over book for Massachusetts Mutual Life Insurance Co.).  At some point life insurance companies were given the option of choosing to use amortized value rather than market value for bonds.  See, e.g., Annual Statement for the Year 1950 of the Massachusetts Mutual Life Insurance Company at p. 4 line 23, M074518 et seq.

[81] See, e.g., Thirty Second Annual Report of the Insurance Commissioner of the Commonwealth of Massachusetts Part II, Life, Casualty & Guarantee Insurance, Detailed Statements at p. 20 (1887) (showing total cost and market value) and at 15 (listing the difference between those two sums as the "Market value of stocks and bonds over cost"); Fifty-Second Annual Report of the Insurance Commissioner of the Commonwealth of Massachusetts, Part II, Life, Casualty & Guarantee Insurance, Detailed Statements at 34 (1907) (showing total book value and market

enactment of the safety fund law in 1887, at the time of the restoration of the safety fund law in 1907, and as long as the annual statements included a line item for the MVM, the practice in Massachusetts was to compute the MVM on a net basis that takes into account all of the stocks and bonds of the company.[82]

67.     In spite of this clear historical record, and the language of the Safety Fund Law, which refers to "the margin of the market value of its [the company's] securities over their book value," where "its" is an inclusive not an exclusive term, MassMutual now calculates the MVM on a gross basis that includes only what it claims as "securities" for which the market value is greater than the book value and that excludes such "securities" for which the market value is less than the book value.  That approach inflates the MVM compared to the historical practice and, thus, conflicts with the primary anti-hoarding and distributive purpose of the Safety Fund Law.

## 2. The historical record shows that the MVM component of the safety fund is limited to securities

68.     Despite the fact that the safety fund law refers to "the margin of the market value of its [the company's] **securities** over their book value," MassMutual includes derivatives in its safety fund MVM calculations, even though derivatives are not "securities" under Massachusetts law.[83]  I understand that MassMutual's justification for this practice is that for derivatives, like securities, their book value can vary from their market value.

69.     The historical record makes clear, however, that the MVM component of the safety fund was never supposed to include all assets that presented a market over book value risk.  Indeed, when the legislature first enacted the safety fund law in 1887, the only assets that it authorized to be included in the MVM component of the safety fund

---

value) and p 30 (listing the difference between those two sums as the "Market value of stocks and bonds over book").

[82] Note that the 1887 safety fund law made provision only for the MVM for bonds, not also stocks.  The annual statements of the time listed bonds and stocks individually, making the computation of the "bond only" MVM a simple arithmetic exercise.

[83] See Lovely Report at ¶¶ 8, 18.

were bonds.[84] Yet, at that time there were two other important categories of assets that also could have market values that varied from their book values: stocks and real estate. Those two categories of assets were important enough that the insurance department required life insurance companies to list the MVM for those assets in their annual reports.[85] Thus, Commissioner Tarbox and, by extension the Legislature that enacted the safety fund law, intended that the MVM component of the safety fund would include only certain specified assets, not all assets that could have a market value that exceeded the book value.

70.     The legislative intent behind the restoration of the safety fund in 1907 was similar. As initially proposed by the Massachusetts recodification commission in 1906, the MVM component of the safety fund was to be limited to bonds, just like the original 1887 safety fund law. The Legislature expanded the MVM component to include "securities," not just bonds. As before, however, real estate was not included in the MVM component of the safety fund, notwithstanding the fact that insurance company financial reports continued to include a line item for "Market value of real estate over book value."[86] This demonstrates that the legislative intent was to include in the safety fund MVM calculation only "securities," not all assets that have a potential difference between market and book value.

---

[84] The MVM provision in the original safety fund law stated:

> Provided, that besides the aggregate market value margin in excess of par of all of the bonds held by a company, and not included in its reserve, any such company may accumulate from its surplus and hold as a safety fund an amount not larger than ten per cent of its legal reserve.

Statutes of 1887, Chapter 214, Section 75. The statute specifically addressed the MVM of bonds, alone. Bonds were the primary asset of most life insurance companies at the time. Bonds were, and are, such important assets for life insurance companies because they produce a predictable stream of earnings.

[85] For example, the Annual Statement for Massachusetts Mutual Life Insurance Company reported in the Annual Report of the Insurance Commissioner for 1887 includes two MVM calculations: one for the company's real estate investments and a second for the company's stocks and bonds.

[86] See, e.g. 1907 Annual Statement of Massachusetts Mutual Life Insurance Company (M076153-M076353) at p. 4, Section IV, line 20 (M076158). M010122.

3. **The historical record and purpose of the safety fund statute shows that the MVM component of the safety fund does not include assets not carried in surplus at market value**

71.    Oddly, MassMutual also includes in the MVM component of its safety fund calculation an amount for its wholly owned subsidiaries despite the fact that these subsidiaries are carried at book value in its financial statements, not market value.[87] As a result, per se there is no market versus book value to include in the MVM. According to Mr. Johnson, MassMutual nonetheless included an amount representing what it claims is the difference between its cost basis and the reported book value.[88] Including this amount in the MVM component not only conflicts with the statutory language of market versus book value, it also conflicts with the historical purpose of the Safety Fund Law, because MassMutual uses the book value of these subsidiaries in computing surplus and, thus, the changes in the "market value" of the subsidiaries pose no risk to surplus.

72.    MassMutual itself recognizes this logic, as shown by its treatment of bonds in the MVM calculation. MassMutual does not include bonds in the calculation of the MVM component of the safety fund, despite the fact that bonds are securities.[89] This is because MassMutual uses the book value of its bonds in computing its surplus, not the market value, and as a result changes in the market value of the bonds are not included in surplus and do not pose the kind of risk to surplus that led to the MVM component of the safety fund.

## VI.   Conclusion

73.    For the foregoing reasons, it is my opinion that:

- The Massachusetts Safety Fund Law embodies a historically well-founded legislative judgment about the perils of allowing life insurers to hoard surplus;

- the historical record indicates a clear legislative and regulatory intent dating back to 1887 that surplus in a life insurance company belongs to its

---

[87] See Johnson Report at ¶¶ 134-137.
[88] Id. at ¶ 142.
[89] Id. at ¶¶ 111-112.

participating policyholders and should be determined and returned to them, and annually so starting in 1907; and

- Certain of the methods that MassMutual has used to calculate its safety fund conflict with the historical purpose of and practices regarding safety funds in Massachusetts.

Tom Baker

_____
Tom Baker

Dated: December 15, 2015

Exhibits:
1. Materials Considered
2. C.V.
3. List of prior testimony

## EXHIBIT 1 – MATERIALS CONSIDERED

**Legislative Materials**

Report of the Insurance Commissioner on the Resolve to Revise and Codify the Insurance Laws of the Commonwealth of Massachusetts, House Document No. 20 (1887)

Report of Hearing on the Commissioner's Report before the Joint Committee on Insurance (1887)

7 Joint Committee of the Sen. and Assembly of the State of New York to Investigate and Examine into the Business and Affairs of Life Insurance Companies Doing Business in the State of New York, Exhibits, Report and Index (1906)

Report and Recommendations of the Insurance Convention, U.S. Senate Document No. 333 (April 17, 1906)

Report No. 1085 of the Joint Special Committee on Insurance Appointed to Revise and Amend the Insurance Laws of the Commonwealth of Massachusetts (January 1907)

Report No. 1375 of the House Commission to Recodify the Insurance Laws to Massachusetts Governor Curtis Guild, Jr. (June 1906)

**Statutes & Cases**

Chapter 214, Section 75, Acts of 1887

Chapter 363, Section 2, Acts of 1900

Chapter 576, Section 11(5), Acts of 1907

Chapter 576, Section 77, Acts of 1907

M.G.L., Ch. 175, § 9

M.G.L., Ch. 175, § 11

M.G.L., Ch. 175, § 140

M.G.L., Ch. 175, § 141

M.G.L., Ch. 175, § 149

Penn Mut Life Ins. Co. v. Lederer, 252 U.S. 523, 525 (1920)

*Goldstein v. Savings Bank Life Ins. Co. of Mass.*, No. 98-2330-BLS2, 2004 WL 5783464 (J. Bostford) (Mass. Super. 2004) (unpublished decision).

*Goldstein v. Savings Bank Life Ins. Co. of Mass.*, No. 98-2330-BLS2, 21 Mass. L. Rptr. 204, 2006 WL 1720153 (J. Gants) (Mass. Super. 2006) (unpublished decision)

Goldstein v. Savings Bank Life Insurance Co. of Massachusetts, C.A. 98-2330-BLSI (J. Gants) (Mass. Super. Sept. 26, 2008) (unpublished decision)

*Rule v. Massachusetts Mutual Life Ins. Co*, No. 2014-01811-BLS2 (J. Roach) (Mass. Super. 2015) (unpublished decision)

## Other Documents

Class Action Complaint and Jury Trial Demand, Karen L. Bacchi, individually and on behalf of all persons similarly situated, Plaintiff, U.S. District Court for the District of Massachusetts (Boston), Civil Action No. 12-11280-GAO.

Expert Report of James W. Lovely

Expert Report of R. Larry Johnson

Thirty Second Annual Report of the Insurance Commissioner of the Commonwealth of Massachusetts, Part II: Life, Casualty and Guarantee Insurance (1887)

Fifty-Second Annual Report of the Insurance Commissioner of the Commonwealth of Massachusetts, Part II, Life, Casualty & Guarantee Insurance, Detailed Statements (1907)

1907 Massachusetts Mutual Annual Statement

1950 Massachusetts Mutual Annual Statement

1951 Massachusetts Mutual Annual Statement

2014 Massachusetts Mutual Annual Statement

1896 Massachusetts Mutual Annual Report

1899 Massachusetts Mutual Annual Report

1907 Massachusetts Mutual Annual Report

Buist Anderson, The Armstrong Investigation in Retrospect, 1952 Proceedings of the Association of Life Insurance Counsel (1952)

The Policy of Plaintiff Karen L. Bacchi (Policy No. 3,181,626)

Tom Baker, On the Genealogy of Moral Hazard, 75 *Texas Law Review* 237 (1996)

Tom Baker, Containing the Promise of Insurance: Adverse Selection and Risk Classification, in 9 *Conn. Ins. L. J.* 371 (2003)

Tom Baker and Peter Siegelman, Tontines for the Invincibles: Enticing Low Risks into the Health Insurance Pool with an Idea from Insurance History and Behavioral Economics, 2010 *Wisconsin Law Review* 79 (2010)

Steve Bailey, A Matter of Trust, The Boston Globe, June 22, 2005

Steve Bailey and Andrew Caffrey, Fired Chief Allegedly Abuse Position; But Allies Say He Was Ousted for Opposing Taking Insurer Public, The Boston Globe, June 10, 2005

Louis Brandeis, Life Insurance: The Abuses and The Remedies, An Address to the Commercial Club of Boston October 26, 1905

Letter from Louis Brandeis, counsel for Policy Holders' Protective Committee, to Trustees of Stock, Equitable Life Assurance Society, July 22, 1905 (Letters of Louis D. Brandeis: Volume I, 1870-1907: Urban Reformer)

Andrew Caffrey, Insurer Details Why It Fired CEO; MassMutual Alleges 'Pattern of Abuse," The Boston Globe, June 22, 2005

Andrew Caffrey, US Targets MassMutual, Ex-Chief; Insurer Seeking to Block Release of Internal Inquiry, The Boston Globe, August 9, 2005

Andrew Caffrey, AG Opens New MassMutual Probe; Reilly to Focus on 'Serious Allegations' in Fired CEO's Case, The Boston Globe, June 15, 2005

Deirdre Fernandes and Todd Wallack, A Rich Financial Realm Run Almost Without Oversight, The Boston Globe, June 17, 2015

Harold G. Fraine, Valuation of Securities Holdings of Life Insurance Companies (1962)

Connecticut Mutual Life Insurance, Papers Relating to Tontine Insurance (collected writings of Jacob Greene)

Henry Hannsmann, The Organization of Insurance Companies: Mutual vs. Stock, J. L. Econ. & Org. (1985)

Hard Work Killed Him: A Faithful Public Servant of Massachusetts, The New York Times, May 29, 1887.

Burton Jesse Hendrick, The Story of Life Insurance (1907)

George E. Johnson, The Separate Account: A New Phenomenon in Life Insurance, 2 Forum 248 (1968)

Morton Keller, The Life Insurance Enterprise, 1885-1910: A Study in the Limits of Corporate Power (1963)

Ross Kerber, Arbiter: MassMutual Unjustly Fired Chief; Lawyers Put Value of Award at $50M; Firm Fires Back with a Suit, The Boston Globe, October 21, 2006

Massachusetts Mutual 2014 Safety Fund Calculation (M093805-M093806)

David Mayers, Anil Shivdasani, and Clifford Smith, Board Composition and Corporate Control: Evidence from the Insurance Industry, 70 J. Business 30, 36 (1970)

National Association of Insurance Commissioners, Proceedings Mid-Winter Meeting (1951)

Douglass North, The Large Life Insurance Companies Before 1906 (Ph.D. diss., U.C. Berkeley 1952)

Douglass North, Entrepreneurial Policy and Internal Organization in the Large Life Insurance Companies at the Time of the Armstrong Investigation of Life Insurance, Explorations in Entrepreneurial History 139-161

Virginia P. Puder, The Revolution Within the U.S. Life Insurance Industry, 26 Financial Analysts J. 50 (1970)

Mark Roe, Foundations of Corporate Finance: The 1906 Pacification of the Insurance Industry, 93 Colum L Rev 639 (1993)

J. Owen Stalson, Marketing Life Insurance, Its History in America (1942)

Society of Actuaries, Fundamentals of Actuarial Practice Module 1: Actuarius to Actuary, available at https://www.soa.org/Files/Edu/edu-2012-c2-1.pdf

Sasha Talcott, Larger than Life in a Small City; For Ousted MassMutual CEO Robert J. O'Connell, All Power was Personal.  Politically Connected and Professionally Savvy, He Wielded Enormous Influence in Struggling Springfield – And He Wasn't Afraid to Use It, The Boston Globe, July 24, 2005

Sasha Talcott and Andrew Caffrey, MassMutual Chief Vows 'High Ethical Standards'; Letter to Employees Follows Departures of Several Executives, The Boston Globe, June 8, 2005

Sasha Talcott and Andrew Caffrey, Praise Preceded CEO's Firing, The Boston Globe, June 23, 2005

Sasha Talcott, Ex-MassMutual Chief Faces Tax Probe; AG Scrutinizing His Personal Use of Corporate Aircraft, The Boston Globe, May 18, 2006

Elizur Wright, Politics and Mysteries of Life Insurance (1873)

https://massmutual.com/about-us/our-history-and-purpose (2015)

## EXHIBIT 2 – Curriculum Vitae

### Tom Baker

University of Pennsylvania Law School                    Home office:
3501 Sansom St.                                          355 Trevor Lane
Philadelphia, PA 19104                                   Bala Cynwyd PA
215-746-2185                                             610-667-1648

## ACADEMIC APPOINTMENTS

University of Pennsylvania. Professor of Law 2008-2009. William Maul Measey Professor of
Law and Health Sciences 2009-present. Secondary appointment, Wharton School:
Business Economics and Public Policy Department (formerly Insurance and Risk
Management), 2008-present; Healthcare Management Department, 2014-present.

Service:  Leonard Davis Institute for Health Economics (executive committee, co-chair
HIX research group,) 2011-present. Steering Committee, Wharton/Penn Risk and
Insurance Program 2011-present. Law school deputy dean, 2010-12. Law school
representative, Faculty Senate Executive Committee 2009-11. Chair, University Council
Committee on Personnel Benefits 2012-14. Faculty Liaison to the Trustee Committee on
Facilities and Campus Planning 2014-present. Chair, Law Building Committee 2009-10.
Chair, Law Tenure & Promotion Committee 2013-14. Chair, Law Appointments
Committee, 2014-15. Chair, Gruss Committee 2008-.

Teaching: Insurance Law and Policy, Insurance Insolvency, Health Insurance Market
Regulation, Risk Management, Torts, Public Policy Seminar, Liability and Insurance.

University of Connecticut School of Law. 1997–2008. Connecticut Mutual Professor of Law and
Director, Insurance Law Center.  Service: Chair, Appointments (multiple terms),
Educational Policy, and Petitions Committees. Teaching:  Principles of Insurance,
Liability Insurance, Insurance Regulation, Torts, Contracts.

Vanderbilt University Law School.  Spring 2008.  Visiting Professor teaching short course on
liability insurance and the litigation process.

Columbia Law School.  Fall 2006. Joseph F. Cunningham Visiting Professor of Commercial and
Insurance Law teaching torts, and liability and insurance seminar.

The Hebrew University of Jerusalem. 1996-97. 2001-02. Summers 2003-06, 2009.  Visiting
Professor & Fulbright Visiting Professor, Faculty of Law. Visiting Scholar, Center for the
Study of Rationality.  Teaching: U.S. Contract Law; Insurance; Con-Torts.

Yale Law School.  Fall semester 2002. Visiting Lecturer (taught Insurance Law and Policy).

University of Miami School of Law. 1992-97. Associate Professor.  Teaching:  Insurance Law
and Policy, Contracts, Health Law, Environmental Law.

## EDUCATION

Harvard Law School, J.D., Magna Cum Laude, 1986. Harvard Law Review.  Felix Frankfurter
Scholarship.

Harvard College, B.A., Magna Cum Laude in Sociology, 1982. Phi Beta Kappa. John Harvard
   Scholarship. Honors thesis (Computers and Political Campaigns) published by the
   Harvard Program on Information Policy.

## PUBLICATIONS

Books:

*Ensuring Corporate Misconduct: How Liability Insurance Undermines Shareholder Litigation*
   (University of Chicago Press 2010) (with Sean Griffith). Reviewed in: D and O Diary
   blog (2010) (Kevin LaCroix); 124 Harv. L. Rev. 2131 (2011) (recent publications); 14 U.
   Penn. J. Bus. L. 927 (2012) (Miriam Baer). Review essay symposium in 38 Law and
   Social Inquiry 474 (2013 (essays by Carol Heimer and Jodi Short; introduction by
   Donald Langevoort).

*The Medical Malpractice Myth* (University of Chicago Press 2005) (paperback 2007).
   Reviewed in: 16 Law and Politics Book Review 253 (2006) (Barbara A. Noah); 42(2)
   Trial Magazine 70 (February 2006) (Kathleen L. Nastri); 25 Health Affairs 289 (2006)
   (Peter J. Hammer); 295 JAMA 1709 (2006) (Edward A. Dauer); 354 NEJM 15 (2006)
   (Martin E. Gordan); 152 Cong. Rec. S4122 (2006) (Senator Harry Reid); 27 J. Legal
   Med. 243 (2006) (Mary Coombs); 236 New York Law J. (October 2006) (Martin
   Bienstock), 85 Texas Law Rev. 1465 (2007) (Anthony Sebok); 25 Medizinrecht 348
   (2007) (Gerald Mäsch); 41 Law & Society Rev. 737 (2007) (Sarah Jain).

*Insurance Law and Policy: Cases, Materials and Problems* (Aspen Publishing 2003; second
   edition 2008; third edition, with Kyle Logue, 2013) (adopted at 41 U.S. law schools).

*Embracing Risk: The Changing Culture of Insurance and Responsibility*, (University of Chicago
   Press 2002) (contributing editor, with Jonathan Simon). Reviewed in: 21 Health Affairs
   294 (2002) (William M. Sage); 28 Law & Social Inquiry 295 (2003) (Brian J. Glenn); 33
   Journal of Interdisciplinary History 602-604 (2003) (Timothy Alborn); 29 Canadian J. of
   Sociology 469 (2004) (Norma Nielson & Stephanie Bertels); 72 J. Risk & Insurance 182
   (2005) (Anne Kleffner, Norma Nielson & Stephanie Bertels).

Articles:

Liability Insurer Data as a Window on Lawyers' Professional Liability, *U.C. Irvine L. Rev.*
   (forthcoming 2015) (with Rick Swedloff)

Everything's Bigger in Texas except the Medmal Settlements, *Conn. Ins. L. J.* (forthcoming
   2015) (with Eric Helland and Jonathan Klick)

Putting the Health Back in Health Insurance, 71 *Medical Care Research and Review* 337 (2014)
   (with Pavel Atanasov)

Can Consumers Make Affordable Care Affordable?  The value of choice architecture (2013)
   (with Eric Johnson, Ran Hassin, Allison Bajger, Galen Treuer), 8(12) *PLOS ONE* e81521
   http://dx.plos.org/10.1371/journal.pone.0081521

"You Want Insurance with That?" Using Behavioral Economics to Protect Consumers from Add-On Insurance Products, *20 Conn. Ins. L. J.* 1 (2013) (with Peter Siegelman) (relied on by the U.K. Financial Conduct Authority in General Insurance Add-Ons Market Study, MS 14/1)

Regulation by Liability Insurance: From Auto to Lawyers Professional Liability, 60 *UCLA L. Rev.* 1412 (2013) (with Rick Swedloff)

Predicting Securities Fraud Settlements and Amounts: A Hierarchical Bayesian Model of Federal Securities Class Action Lawsuits, 9 *J. Empirical Legal Studies* 482 (2012) (with Blakely McShane, Oliver Watson, Sean Griffith)

Health Insurance, Risk, and Responsibility after the Affordable Care Act, 159 *University of Pennsylvania Law Review* 1577 (2011)

The Shifting Terrain of Risk and Uncertainty on the Liability Insurance Field, 60 *DePaul Law Review* 521 (2011) (updated version in 1 *Journal of Financial Perspectives* 29 (2013))

Insurance in Sociolegal Research, 6 *Annual Review of Law and Social Science* 433 (2010)

Liability Risks for After Hours Use of Public School Property to Reduce Obesity: A 50 State Survey, 80 *Journal of School Health* 508 (2010) (with Hania Masud)

Tontines for the Invincibles: Enticing Low Risks into the Health Insurance Pool with an Idea from Insurance History and Behavioral Economics, 2010 *Wisconsin Law Review* 79 (2010) (with Peter Siegelman)

Allowing Patients to Waive the Right to Sue for Malpractice: A Response to Thaler and Sunstein 104 *Northwestern University Law Review* 233 (2010) (with Timothy Lytton)

How the Merits Matter: D&O Insurance and Settlements in Securities Class Actions, 157 *University of Pennsylvania Law Review* 755 (2009) (with Sean Griffith) (selected by the Corporate Practice Commentator as one of the top 10 corporate and securities articles of 2009) (reprinted in Matera & Sbarbaro, eds., Saggi di Diritto Commerciale Interno e Comparativo, 2012).

The Effects of Tort Reform on Medical Malpractice Insurers' Ultimate Losses, 76 *Journal of Risk and Insurance* 197 (2009) (with Patricia Born and Kip Viscusi)

Liability Insurance, Moral Luck, and Auto Accidents, 9 *Theoretical Inquiries in Law* 165 (2008).

The Missing Monitor in Corporate Governance: The Directors' and Officers' Liability Insurer, 95 *Georgetown Law Journal* 1795 (2007) (with Sean Griffith) (selected by the Corporate Practice Commentator as one of the top 10 corporate and securities articles of 2007; reprinted in Economics of Corporate Law, edited by Claire A. Hill and Brett McDonnell).

Predicting Corporate Governance Risk: Evidence from the Directors' and Officers' Insurance Market 74 *Chicago Law Review* 487 (2007) (with Sean Griffith).

Offer of Judgment Rules and Civil Litigation: An Empirical Study of Automobile Insurance Litigation in the East, 59 *Vanderbilt Law Review* 155 (2006) (with Albert Yoon).

Reconsidering the Harvard Medical Practice Study Conclusions about the Validity of Medical Malpractice Claims, 33 *Journal of Law, Medicine & Ethics* 501 (2005).

Medical Malpractice and the Insurance Underwriting Cycle, 54 *DePaul Law Review* 393 (2005). Reprinted in K. Naga Sri Valli (ed), *Medical Malpractice Insurance: An Overview* 195 (Abacus Press, India: 2007).

The Virtues of Uncertainty in Law: An Experimental Approach, 89 *Iowa Law Review* 443 (2004) (with Alon Harel and Tamar Kugler).

Insuring Liability Risks, 29 *Geneva Papers on Risk and Insurance* 87 (2004) (Geneva Lecture).

Real Torts: Using Barry Werth's *Damages* in the Law School Classroom, 2 *Nevada Law Journal* 386 (2002).

Liability and Insurance After September 11th: Embracing Risk Meets the Precautionary Principle, 27 *Geneva Papers on Risk and Insurance* 342 (2002).

Blood Money, New Money and the Moral Economy of Tort Law in Action, 35 *Law & Society Review* 275 (2001).

Insuring Morality, 29 *Economy and Society* 559 (2000).

Transforming Punishment into Compensation: In the Shadow of Punitive Damages, 1998 *Wisconsin Law Review* 101 (1998).

Reconsidering Insurance for Punitive Damages, 1998 *Wisconsin Law Review* 211 (1998).

Liability Insurance Conflicts and Defense Lawyers: From Triangles to Tetrahedrons, 4 *Connecticut Insurance Law Journal* 101 (1998).

On the Genealogy of Moral Hazard, 75 *Texas Law Review* 237 (1996). Reprinted in *Law and Economics of Insurance*, D. Schwarcz, ed).

Whose Safety Net? Home Insurance and Inequality, 21 *Law and Social Inquiry* 229 (1996) (with Karen McElrath).

Constructing the Insurance Relationship: Sales Stories, Claims Stories and Insurance Contract Damages, 72 *Tex. L. Rev.* 1395 (1994). Reprinted in *Insurance Law Anthology*.

The Application of Per Occurrence Limits from Successive Policies, 3 *Environmental Claims. Journal* 411 (1991) (with Eva Orlebeke).

Book Chapters:

Mandatory Rules and Default Rules in Insurance Contracts, in *Law and Economics of Insurance*, D. Schwarcz & P. Siegelman, eds., (2015) (with Kyle Logue)

Behavioral Economics and Insurance Law:  The Importance of Equilibrium Analysis, in *Handbook of Behavioral Economics and Law*, Eyal Zamir and Doron Teichman, eds., (2014) (with Peter Siegelman)

The Law and Economics of Liability Insurance: A Theoretical and Empirical Review, in *Handbook on the Economics of Torts*, Jennifer Arlen, ed., (2013); reprinted in *Law and Economics of Insurance*, D. Schwarcz, ed., (2015) (with Peter Siegelman).

Transparency through Insurance: Mandates Dominate Discretion, in *Confidentiality, Transparency, and the U.S. Civil Justice System*, Joseph Doherty, Robert T. Reville, and Laura Zakaras, eds., (2012)

Bonded Import Safety Warranties, in *Import Safety: Regulatory Governance in the Global Economy*, Cary Coglianese, Adam Finkel & David Zaring, eds. (University of Pennsylvania Press, 2009)

Government as Risk Manager, in *Principles of Regulation*, John Cisternino & David Moss, eds. (Tobin Project, 2009) (with David Moss)

Liability Insurance at the Tort-Crime Boundary, in *Fault Lines: Tort Law as Cultural Practice*, David M. Engel and Michael McCann, eds. (Stanford U. Press 2009)

Medical Malpractice Insurance Reform: "Enterprise Insurance" and Some Alternatives, in *Medical Malpractice and the U.S. Health Care System*, William M. Sage and Rogan Kersh, eds. (Cambridge U. Press 2006)

Insurance as Tort Regulation: Six Ways that Liability Insurance Shapes Tort Law, in *Liability in Tort and Liability Insurance*, Gerhard Wagner, ed. (European Centre for Tort and Insurance Law 2005). Also published in 12 *Conn. Ins. L. J.* 1 (2006).  Reprinted in M.N. Bhavani (ed.), *Tortious Liability Emerging Trends* (Abacus Press, India: 2008). Translated to Chinese and published in 2012(2) Renmin University Law Review 233 (translated by Li Weina).

Liability Insurance and the Regulation of Firearms, in *Suing the Firearms Industry*, Timothy Lytton, ed. (U. Michigan Press 2005) (with Thomas Farrish).

Containing the Promise of Insurance:  Adverse Selection and Risk Classification, in *Risk and Morality*, Richard Ericson and Aaron Doyle, eds. (U. Toronto Press 2003). Also published in 9 *Conn. Ins. L. J.* 371 (2003).

Risk, Insurance and the Social Construction of Responsibility, in *Embracing Risk*, Tom Baker and Jonathan Simon, eds (U. Chicago P. 2002).

Insurance Claims Discrimination, in *Insurance Redlining*, Gregory Squires, ed. (Urban Institute Press 1997) (with Karen McElrath).

Book reviews and other short pieces:

CA Wong, G Nirenburg, R Town, D Polsky, T Baker, Insurance Plan Presentation and Decision Support on HealthCare.Gov and State-Based Websites Created for the Affordable Care Act, Letter, Annals of Internal Medicine (2015)

CA Wong, DA Asch, CM Vinoya, CA Ford, T Baker, R Town, RM Merchant, Seeing Health Insurance and HealthCare.gov Through the Eyes of Young Adults, J. Adolescent Medicine (2015)

CA Wong, DA Asch, CM Vinoya, CA Ford, T Baker, R Town, RM Merchant, The Experience of Young Adults on HealthCare.gov: Suggestions for Improvement: A Case Report, Ann Intern Med. Published online 8 July 2014 doi:10.7326/L14-0287.

The Economics of Health Insurance, 9 *J. Am. Col. Radiol.* 866 (2012) (with Saurabh Jha)

The Patient Protection and Affordable Care Act and the Regulation of Health Insurance, 9 *J. Am. Col. Radiol.* 871 (2012) (with Saurabh Jha).

Review:  Edward Z. Zelinsky, The Ownership Society (Oxford U. P. 2008), 10 *Journal of Pension Economics and Finance* 153 (2010).

Review: Kenneth S. Abraham, The Liability Century: Insurance and Tort Law from the Progressive Era to 9/11 (Harvard U. P. 2008), 83 *Business History Review* 629 (2009).

International Association of Insurance Supervisors, in Christian Tietje and Alan Brouder, eds., *Handbook of Transnational Economic Governance Regimes* (2009) (with Eryn Mathews).

Embracing Risk, Sharing Responsibility, 56 *Drake L. Rev.* 561 (2008).

Qualitative and Quantitative Research on Tort Law Topics: A Comment on Helland & Klick and Kritzer, 1 *Journal of Tort Law* Issue 3, Article 4 (2007).

Review: Richard Ericson and Aaron Doyle, Uncertain Business: Risk, Insurance and the Limits of Knowledge (U. Toronto P. 2004), 32 *Journal of Law & Society* 643 (2005).

Meet Your New Insured: Successors' Rights to Insurance Assets in Corporate Transactions, 14 No.5 *Coverage* 1 (September/October 2004) (with John Buchanan and Mariana Horton).

Insurance and the Law, 11 *International Encyclopedia of the Social and Behavioral Sciences* 7587-91 (2002).

Manuscripts in Circulation:

The Organization of Lawyers Liability Insurance Companies: Mutual and Stock (with Rick Swedloff) (2015) (selected for presentation to the Insurance Law Section at the 2016 annual meeting of the American Association of Law Schools)

Insurers as Bumblebees in the Garden of Law Firm Norms (with Rick Swedloff) (2015)

Reports and popular press:

Window Shopping on Healthcare.gov and the State-Based Marketplaces in the Second Enrollment Period: More Consumer Support is Needed (December 17, 2014) (with Gabbie Nirenburg, Adrienne Beatty, and Janet Weiner).  Available at www.rwjf.org/en/research-publications/find-rwjf-research/2014/12/window-shopping-on-healthcare-gov-and-the-state-based-marketplac.html

Modernizing Insurance Regulation in the United States (October 17, 2011) (with L. Charles Landgraf and John S. Pruitt).  Available at http://www.fsround.org/fsr/pdfs/cluff/CluffFundInsuranceModernizationStudy.pdf.

Extraordinary Remedy, Extraordinary Case, *The New York Times* (June 10, 1010)
http://roomfordebate.blogs.nytimes.com/2010/06/10/can-the-u-s-punish-bps-shareholders/

Tontines for the Young Invincibles, 32(4) *Regulation Magazine* 20 (Winter 2009-2010) (with Peter Siegelman)

Liability = Responsibility, *The New York Times* (July 12, 2009)
http://www.nytimes.com/2009/07/12/opinion/12baker.html

A Time for Tontines, *The New York Times* (March 9, 2009) (with Peter Siegelman)
http://www.nytimes.com/2009/03/09/opinion/09baker.html

Liability Risks for Recreational Use of Public School Facilities: A 50 State Survey (January 2009) (a report for the National Policy and Legal Analysis Network to Prevent Childhood Obesity). Available at http://changelabsolutions.org/publications/liability-schools-50-states

*Jackpot Justice* and the American Tort System: Thinking Beyond Junk Science (May 2008) (with Herbert Kritzer and Neil Vidmar). Available at http://ssrn.com/abstract=1152306.

Securities Misinformation Insurance (October 2006) (a report to the Task Force to Modernize Securities Legislation in Canada). Available at http://ssrn.com/abstract=1010106.

Research on Medical Malpractice: Implications for Tort Reform in Connecticut (January 2003) (a report to the Connecticut General Assembly)

Medical Mistakes, Not Lawsuits are the Problem, *The Hartford Courant* (January 26, 2003) (syndicated and published in multiple outlets nationally).

The Blood Money Myth, *Legal Affairs* (September-October 2002).

Congress Should OK Terrorism-Insurance Bill, *Newsday* (September 17, 2002) (with Peter Siegelman).

Privacy of Medical Records Worth the Cost, *The Hartford Courant*, (February 18, 2001).

Managed Care Companies Can Benefit From Liability, *The Hartford Courant*, (November 12, 1998).

## AMERICAN LAW INSTITUTE

Reporter, Principles of Liability Insurance Law Project (2010-14), Restatement of the Law, Liability Insurance (2014-).
- Principles of the Law of Liability Insurance:
  - Preliminary Draft No.1 distributed February 2011.
  - Preliminary Draft No. 2 distributed October 2011.
  - Council Draft No. 1 distributed January 2012.
  - Preliminary Draft No. 3 distributed February 2012.
  - Preliminary Draft No. 4 distributed March 2012.
  - Discussion Draft No. 1 distributed April 2012.
  - Preliminary Draft No. 5 distributed August 2012.
  - Council Draft No. 2 distributed September 2012.
  - Council Draft No. 3 distributed January 2013.
  - Tentative Draft No. 1 distributed April 2013.
  - Chapter 1 approved by Council (January 2013) and Annual Meeting (May 2013).
  - Council Draft No. 4 distributed September 2013.
  - Preliminary Draft No. 6 distributed March 2014.
  - Tentative Draft No. 2 distributed April 2014.
  - Chapter 2 approved by Council (October 2013) and Annual Meeting (May 2014).
  - Preliminary Draft No. 7 August 2014.
- Restatement of the Law, Liability Insurance:
  - Preliminary Draft No. 1, distributed February 2015.

- o Discussion Draft No. 1, distributed April 2015.
- o Council Draft No. 1, distributed September 2015 (approved October 2015).
- o Preliminary Draft No. 2, distributed September 2015.

CONFERENCES, WORKSHOPS, AND SYMPOSIA ORGANIZED

Third Annual Health Insurance Exchange Conference, Penn Law School (April 2015) (with Health Insurance Exchange Research Group and the Princeton Center for Health and Wellbeing; supported by the Robert Wood Johnson Foundation)

Toward HIX 2.0, Penn Law School (April 2014) (with Health Insurance Exchange Research Group and the Princeton Center for Health and Wellbeing; supported by the Alfred P. Sloan Foundation)

Health Insurance Exchanges, Penn Law School (April 2013) (with Health Insurance Exchange Research Group; supported by the Alfred P. Sloan Foundation and the Leonard Davis Institute for Health Economics).

Workshops on Behavioral and Institutional Research and Financial Services Regulatory Reform, Penn Law School (November 2009), Georgetown Law Center (June 2010), Cornell Law School (April 2011) (with Annelise Riles; supported by the Tobin Project).

Insurance, Innovation, and Intellectual Property, University of Connecticut School of Law (April 2008) (with Hillary Greene).

D&O Insurance: Shareholders' Friend or Foe? University of Connecticut School of Law (April 2007).

Catastrophic Risk Insurance: The Search for a Long Term Solution, Washington, D.C. (March 2006) (with Wiley, Rein & Fielding).

Asbestos: Anatomy of a Mass Tort, University of Connecticut School of Law (November 2005) (with Adam Scales).

The Role of Insurance in Preventing Medical Injury, University of Connecticut School of Law (April 2005).

Litigation Management in the Insurance Industry, University of Connecticut School of Law, (June 2004); co-sponsored by the Tort Trial and Insurance Practice Section of the American Bar Association.

A 21st Century Symposium on Josiah Royce's *War and Insurance,* University of Connecticut School of Law (September 2003); published in Volume 10:1 of the Connecticut Insurance Law Journal.

Vision 20/20: The Future of Tort and Insurance, New York University School of Law (August 2002) and University of Connecticut School of Law (March 2003); co-sponsored by the Tort and Insurance Practice Section of the American Bar Association, the University of Connecticut and the Geneva Association.

Liability and Insurance After September 11th, University of Connecticut School of Law (March 2002); co-sponsored by the Geneva Association; published in Volume 9:1 of the Connecticut Insurance Law Journal.

Social Security: Privatization and Reform, University of Connecticut School of Law (April 2001).

Intellectual Property and Insurance Law (January 2001); co-sponsored by the Insurance Law Section of the American Association of Law Schools; published in Volume 8:1 of the Connecticut Insurance Law Journal.

Richard Posner's Insurance Jurisprudence, University of Connecticut School of Law (September 2000); published in volume 7:1 of the Connecticut Insurance Law Journal.

Federalism, International Law and the Globalization of Financial Services, University of Connecticut School of Law (March 2000).

A Conference for Latin American Regulators: Insurance and Financial Services, University of Connecticut School of Law (October 1999).

Insurance, Risk and Responsibility: Toward a New Paradigm?, University of Connecticut School of Law (April 1999); published in Volume 6:1 of the Connecticut Insurance Law Journal.

Liability Insurance Conflicts and Professional Responsibility, University of Connecticut School of Law (September 1997); published in Volume 4:1 of the Connecticut Insurance Law Journal.

## PRESENTATIONS

Recent Academic:

The Organization of Lawyers' Liability Insurance Companies: Mutual and Stock, International Institute for the Sociology of Law Conference on Consumer Redress When Lawyers are Negligent, Onati (July 2015), Northwestern University Law School (November 2015).

Insurers as Bumblebees in the Garden of Law Firm Norms, University of North Carolina Law School (October 2015).

Smart Choice Sets: Reducing Choice Overload by Partitioning Health Insurance Recommendation Lists, Boulder Summer Conference on Consumer Financial Decision Making, U. Colorado, Boulder (May 2015).

Mapping the Lawyers' Malpractice Insurance Market, University of California, Irvine (September 2014).

Using Big Data and Predictive Analytics to Improve Health Insurance Choice, Insurance Law Center, University of Connecticut School of Law (April 2014).

Liability Insurance as Governance, American Association of Law Schools Annual Meeting, Insurance and Tort Law Sections (New York, January 2014).

The Impact of Insurance on Civil Justice, Private Law Consortium, Bar Ilan University Law School (June 2013).

Choice Architecture and Health Insurance Exchanges:  What We Know and Don't Know, and the Research Opportunities that Lie Ahead, Columbia Business School (May 2013). Conference on Beyond Nudges: Topics in Choice Architecture.

Lawyers Liability as Governance, UCLA Law School (January 2013), University of Texas Law School (January 2013), University of California, Irvine, Law School (March 2013), University of Connecticut Law School (April 2013), Law and Society Association Annual Meeting (June 2013).

Protecting Consumers from Add-On Insurance Products: New Lessons for Insurance Regulation from Behavioral Economics, U. Miami Law School (March 2012), Rutgers (Camden) Law School (April 2012), Law and Society Association Annual Meeting (June 2012), Columbia Law School Law and Economics Seminar (November 2012).

Incorporating Insights of Judgment and Decision Making and Behavioral Economics into the Design of the Health Exchanges, Harvard Law School (October 2011).

Law and Economics after the Behavioral Turn: Learning from Insurance, Penn Law School (September 2011).

Health Insurance Regulation and Healthy Behavior, Law and Society Annual Meeting (San Francisco May 2011), Green College (Vancouver September 2011).

Comment on Annelise Riles' *Collateral Knowledge*, book publication symposium, Cornell Law School (April 2011), Law and Society Association Annual Meeting (June 2012).

Insurance Add-Ons as Shrouded Attributes, AALS Annual Meeting, San Francisco (January 2011), Baron Lab Group, University of Pennsylvania Department of Psychology (October 2010).

D&O Insurance, Corporate Governance and Securities Litigation, Georgia State University, Insurance and Risk Management Department (October 2010).

Health Insurance, Risk and Responsibility after the Affordable Care Act, Penn Law Review Symposium (October 2010), Emory Law School (October 2010), Hawley Lecture, Iowa College of Law (August 2010).

Insurance in Sociolegal Research, Iowa College of Law (August 2010).

The Demography of Litigation: How We Know What We Know, AALS Mid Year Meeting Workshop on Civil Procedure, New York City (June 2010).

Selected Professional:

The Consumer Choice Paradigm in Healthcare, New Jersey Health Care Quality Institute (May 2015)

The American Law Institute's Restatement of the Law of Liability Insurance, ABA Section on Trial, Torts and Insurance Practice CLE Conference (February 20, 2015); Rutgers Law School Risk Center Conference (February 27, 2015)

The American Law Institute's Principles of the Law of Liability Insurance Project, ABA Section on Litigation 2014 Insurance Coverage Litigation CLE Seminar (March 7, 2014); Defense Research Institute Insurance Coverage and CLE Conference, New York, New York (December 2012); Law and Regulation Committee of the American Insurance Association (June 2011).

Behavioral Economics and Insurance Regulation, ACE Global Legal Conference (June 2014).

Why Insurance Law, 2013 Torts Trial and Insurance Law Section Awards Dinner, San Francisco CA (August 2013).

Health Insurance Exchanges Research Group, Penn Medicine Innovation Seminar (December 2012).

Healthcare Exchange Design, Center for Consumer Information and Insurance Oversight, State Grantee Meetings (May and September 2011).

How D&O Insurance Transforms Securities Litigation, Professional Liability Underwriting Society Annual Meeting, San Antonio (November 2010).

Negotiating the Changing Terrain of Risk and Uncertainty in Liability and Insurance, ACE Global Legal Conference (June 2010).

Directors and Officers Liability Insurance Issues, Pennsylvania Bar Association CLE, Philadelphia Session (April 2010).

Medical Malpractice and Health Reform, briefing to U.S. Senate staff (October 2009).

What D&O Insurance and Securities Litigation Can Teach the Insurance Industry About Insuring Financial Injuries, Munich Re Conference on Mass Litigation (June 2008).

D&O Insurance, Corporate Governance, and Securities Litigation, ABA Tort Trial and Insurance Practice Section Task Force on Corporate Governance (May 2007).

Principal speaker for AEI-Brookings Joint Center for Regulatory Studies, Judicial Education Program, Judicial Symposium on Insurance and Risk Allocation in America: Economics, Law and Regulation (September 2006) (led sessions on medical liability, insurance law, insurance regulation, life and property insurance, and the insurance industry approach to litigation).

Liability Insurance and Tort Law, Geneva Association Program on Civil Liability, Munich (October 2005).

What Drives U.S. Casualty Losses? Annual Meeting of the Reinsurance Association of America (April 2005).

Moderator, Outsider Perspectives, Annual Meeting of the Professional Liability Underwriting Society (November 2004)

Liability Loss Drivers and Reserving Cycles in the US Casualty Market, Munich Re Renewal Briefing (October 2004).

Liability and Liability Insurance: Forms and Functions.  Sino-American Insurance Seminar, Beijing and Nanjing, China (October 2004).

Terrorism, Liability and Insurance: An American Perspective, Annual Seminar of the Cour de Cassation (French Supreme Court for civil law) (April 2004).

Insurance Economics and Legal Systems, 30th General Assembly of the Geneva Association (June 2003).

## HONORS AND AWARDS

Appointed Connecticut Mutual Professor of Law, University of Connecticut (September 1997).

Elected to American Law Institute (October 2000).

Fulbright Professor, The Hebrew University (Fall 2001).

29th Annual Lecture of the Geneva Association (September 2003).

University of Connecticut Provost's Research Fellowship Leave (Spring 2005).

Appointed William Maul Measey Professor of Law and Health Sciences (July 2009).

Hawley Lecture at Iowa College of Law (August 2010).

McKay Award, Tort Trial and Insurance Practice Section, American Bar Assn. (August 2013).

A. Leo Levin Teaching Award for Excellence in an Introductory Course (May 2014).

## PROFESSIONAL ACTIVITIES AND SERVICE

American Association of Law Schools Sections on Insurance, Torts, and Contracts. Chair of Insurance Section 2002-03; Insurance Section Program Chair 2001-02.

American Bar Association, Trial Torts and Insurance Practice Section Emerging Issues Committee (2000-2002); Robert B. McKay Law Professor Award Committee (2000-03); faculty editor, Fidelity & Surety Digest (formerly Fidelity & Surety News) (1999-2006); Presenter at ABA events (1996, 2002, 2004, 2007, 2014); Recipient of Robert B. McKay Law Professor Award (2013).

American Law and Economics Association.  Member.

International Association for the Study of Insurance Economics (the Geneva Association). Scientific Committee (2003-13).

Journal of Financial Perspectives, Editorial Board (2012-)

Law and Society Association. Site Evaluation Committee (2001); Graduate Student Workshop Committee (2002-05, 2012-13; Chair 2004-05; Workshop Instructor 2002-05, 2007); Ad Hoc Insurance Committee (2004-05); nominated for Trustee (2006); Publications Committee (2006-08; Chair 2006-07); Summer Institute Committee (Chair 2007-08); Early Career Workshop Committee (2008-09, 2012-13; Co-chair 2008-09).

Law and Society Review, Editorial Board Member (2006-12)

New Appleman Advisory Board (2005-14)

New England Insurance and Society Study Group.  Founder and facilitator (1997-2010).

Peer reviewer:  American Journal of Health Economics; American Journal of Industrial Medicine; American Journal of Sociology; American Law and Economics Review; Austrian Science Fund, Humanities and Social Science Division; Behavioral Science & Policy; BioSocieties; Cambridge University Press; Economic and Social Research Council (UK); CHEST Journal; Economy and Society; Geneva Papers on Risk and Insurance; Harvard University Press; Health Affairs; Israel Science Foundation; International Journal of the Legal Profession; International Review of Law & Economics; Journal of Consumer

Culture; Journal of Empirical Legal Studies; Journal of Health Politics, Policy and Law; Judgment and Decision Making; Journal of Legal Studies; Journal of Law, Medicine & Ethics; Journal of Law & Society; Journal of Risk and Insurance; Law and History; Law and Policy Quarterly; Law and Social Inquiry; Law and Society Review; National Institutes of Health, Ethics/Genome Study Section; National Science Foundation; Oxford University Press; Polity; Princeton University Press; Regulation and Governance; Social Science and Medicine; Stanford Law Review; University of Chicago Press; University of Toronto Press; Yale Law Journal; Yale University Press.

Picwell, Inc., Co-Founder, Secretary, and General Counsel (2012-present).

Professional Liability Underwriting Society. Academic member (2004-present). Presenter in educational programs (2004-08, 2010).

Promotion and tenure reviewer (external): American Bar Foundation; Bar Ilan University; Cornell University; George Mason University; The Hebrew University of Jerusalem; Rutgers University (Camden); Stanford University; SUNY Potsdam; Syracuse University; Tel Aviv University; University of California, Berkeley; University of California, Hastings; University of California, Irvine; University of California, Los Angeles; University College of London; University of Connecticut; University of Hawaii; University of Houston; University of Illinois; University of Michigan; University of Minnesota; University of Missouri; University of Nevada, Las Vegas; University of the Pacific; Vanderbilt University.

Sloan and Russell Sage Foundations. Working group on Behavioral Economics and the Regulation of Retail Financial Markets (2008-2014).

Society for Empirical Legal Studies. Member.

The Tobin Project. Government and Markets Initiative.

## PRIOR PROFESSIONAL EXPERIENCE

Office of Independent Counsel – Iran/Contra. 1991-92
Associate counsel.

Covington & Burling, Washington, D.C. 1987-91.
Private law practice involving civil litigation and advice with a focus on complex insurance coverage litigation, housing law, and ERISA.

Neighborhood Legal Services Program, Washington, D.C. 1989.
Staff attorney on loan from Covington & Burling. Handled landlord-tenant, public benefits, and consumer debt cases.

United States Court of Appeal, First Circuit. 1986-87.
Law clerk to Hon. Juan R. Torruella, Circuit Judge. San Juan, Puerto Rico, chambers.

Palmer & Dodge, Boston, MA; Morrison & Foerster, San Francisco, CA; Fish & Richardson, Boston, MA. Summers 1984-86. Summer law clerk.

ADMITTED TO PRACTICE: District of Columbia (Bar No. 414160) (inactive), Commonwealth of Massachusetts (Bar No. 549810) (inactive), Commonwealth of Pennsylvania (Bar No. 308011).

**EXHIBIT 3 - Prior Testimony of Tom Baker, December 2011 through December 2015**

1. ABN Amro Bank et al v. Dinallo et al., Index No.: 601846/09 (Sup. Ct. NY) (deposition 2012).

2. RT Vanderbilt v. The Hartford et al, NO. X02-UWYCV-07-5007875 (Conn. Sup. Ct.) (deposition 2012).

3. Ford Motor Company v. National Indemnity Company, U.S. D.C., Civ. Act. No. 3:12cv839 (E.D. Virginia) (deposition 2013).

4. Confidential insurance arbitration (deposition and hearing 2013).

5. JP Morgan Chase & Co v. Indian Harbor Ins. Co., Index No.: 603766/08 (Sup. Ct. NY) (deposition 2013).

6. Confidential insurance arbitrations (hearings 2014).

7. Confidential Reinsurance Arbitration (hearing 2014).

8. Massachusetts Mutual Life Insurance Company, et al. v. Certain Underwriters at Lloyd's of London et al, C.A. No. 4791-VCL (Del. Chancery) (Deposition 2014).

9. Ashland v. National Indemnity Co., No. 12-CI-4638 (Ky. Cir. Ct.) (Deposition 2014).

10. Lion Oil Company v. National Union Fire Ins. Co. et al, CA 1:13-cv-01071-SOH (W.D. Ark) (deposition 2015).

11. Confidential insurance arbitration (deposition 2015).

12. Doan & Endres v. State Farm General Insurance Co., No. 1-08-CV-129264 (Sup. Ct. CA) (Declaration 2012; Trial 2015).

13. J.P. Morgan Securities et al v. Vigilant Insurance Company et al., Index No.: 600979/09 (Sup. Ct. NY) (Deposition 2015).