# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS (BOSTON)

| | | |
|---|---|---|
| KAREN L. BACCHI, Individually and on Behalf of all Persons Similarly Situated, | ) ) ) | Civil Action No. 12-cv-11280-DJC |
| Plaintiff, | ) ) ) | |
| v. | ) ) | |
| MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, | ) ) ) | |
| Defendant. | ) ) ) | |

### DECLARATION OF JASON B. ADKINS IN SUPPORT OF PLAINTIFF'S MOTION FOR APPROVAL OF ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND CLASS REPRESENTATIVE INCENTIVE AWARD

Jason B. Adkins (BBO# 558560)
John P. Zavez (BBO# 555721)
**ADKINS, KELSTON & ZAVEZ, P.C.**
90 Canal Street
Boston, MA  02114
Telephone: (617) 367-1040

*Attorneys for Plaintiff/Class Representative*
*Karen L. Bacchi*

DATED: June 19, 2017

# **Table of Contents**

I.  Introduction ...................................................................................................................1

II. The Fee and Expense Applications .........................................................................5

III. Factors in Support of the Fee Award ......................................................................6

    A. The Results Achieved and Benefit Obtained for the Class .............................................6

    B. The Time and Effort Expended by Class Counsel ........................................................7

    C. The Magnitude, Complexity and Uniqueness of the Litigation ....................................13

    D. The Need for Competent Counsel in Such High Risk, Contingent Cases ...................15

IV. Conclusion ..................................................................................................................16

I, Jason B. Adkins, declare:

1.      I am a duly licensed attorney admitted to the Massachusetts bar and a member of the law firm of Adkins, Kelston & Zavez, P.C., Plaintiff's co-lead Class Counsel in this class action along with Bonnett, Fairbourn, Friedman & Balint, P.C. and Chavez & Gertler LLP (collectively, "Class Counsel").  I submit this declaration in support of Plaintiff's application for the Court's approval of an award of attorneys' fees and reimbursement of litigation expenses to Class Counsel and of an incentive award to Plaintiff as the sole Class Representative.  I am familiar with the proceedings described below and, if called upon, could competently testify that the following facts are true and correct.

## I.      INTRODUCTION

2.      Class Counsel have diligently prosecuted this complex and protracted case – involving the application of Massachusetts' "Safety Fund" law to the participating insurance policies issued by Defendant Massachusetts Mutual Life Insurance Company ("MassMutual") – since July 2012.  After over a year of research and investigation, Plaintiff filed this action in July 2012 contending that the Massachusetts "Safety Fund" law, M.G.L. c. 175, §§ 140 & 141, establishes a statutory percentage limit on the maximum amount of surplus a Massachusetts-domiciled life insurance company may withhold from its participating policyholders and that MassMutual exceeded the Safety Fund limit in each year during the Class Period (January 1, 2001 to December 31, 2016) (the "Action").  The Parties had significantly divergent interpretations of the Safety Fund law and of the significance and interpretation of MassMutual's financial reporting and accounting practices, which differences were manifested in highly contested discovery disputes and dispositive motions.  The litigation was hard fought for nearly

five years,[1] At every stage of the litigation, defense counsel vigorously raised procedural and substantive issues through extensive motion practice, including highly contentious motions such as Defendant's motion to dismiss, various discovery motions and summary judgment. Nevertheless, Class Counsel obtained a settlement providing for meaningful benefits for all members of the Settlement Class, including a common fund of $37.5 million.

3.      As I describe below, Class Counsel achieved settlement only after:

(a)      conducting an extensive pre-filing investigation of the facts underlying the original complaint;

(b)      generating a complaint setting out the facts learned from that investigation and the legal theories and claims raised by those facts;

(c)      defeating a motion to dismiss the complaint;

(d)      taking and producing discovery in a comprehensive and contentious discovery program from both sides involving multiple sets of interrogatories (25 interrogatories by Plaintiff) and document requests (43 by Plaintiff), the production of more than 145,000 pages of documents (which included voluminous sets of complex data-filled MassMutual electronic spreadsheets) and over 26,000 pages of documents from subpoenaed third parties, extensive motion practice related to discovery, and the depositions of ten fact witnesses, including three Rule 30(b)(6) witnesses (resulting in 2,964 pages of transcripts and 175 exhibits (totaling 2,568 pages) of complex financial records, accounting standards and spreadsheets);

(e)      deciphering, analyzing and testing esoteric spreadsheet data produced by MassMutual as the back-up for its Safety Fund calculations;

---

[1] *See Declaration of Jason B. Adkins In Support of Plaintiff's Motion for Preliminary Approval* [ECF 238] ("Adkins Preliminary Approval Decl.").

(f)       preparing and arguing several motions related to discovery, motions to amend the

discovery schedule, a motion to preclude documents withheld under claim of privilege, and two

motions to compel;

(g)       generating expert reports and rebuttal reports for five (5) experts (totaling 359

pages) and responding to the expert reports of MassMutual's six (6) experts (total of 509 pages),

all of which encompassed complex issues of insurance, finance and accounting, and required 43

exhibits (totaling 1,550 pages) during the depositions of seven (7) of the experts and the prepared

expert witness testimony for trial; and

(h)       briefing and arguing summary judgment (pending at the time of settlement).

4.       It is, therefore, fair to say that the parties had a solid grasp on the strengths and

weaknesses of the respective claims and defenses by the time mediation and related settlement

negotiations began on December 5, 2016.  Overseen by Professor Eric D. Green, from

Resolutions, LLC, in Boston, Massachusetts, the mediation proceedings were unquestionably

adversarial.  Although the parties eventually agreed in principle to a settlement of all class claims

against MassMutual, the formal Stipulated Settlement Agreement ("Stipulation") required

additional heavy negotiations and drafting disputes, particularly with respect to the nature and

terms of the Class Notice.

5.       The Settlement Agreement reached through mediation provides for a common

fund of $37.5 million. Stipulation at §§ II & X.  In addition, MassMutual has agreed to pay all

costs of class notice and settlement administration, an expense reasonably estimated at over $3

million (at $1 per 2.71 million Class Members, considering mailed notice plus additional

administration costs) which would otherwise be borne by the Settlement Class. *Id.* at §§VIII(E)

& X(B)(2). Finally, MassMutual agreed to mandatory injunctive relief, requiring it to continue

3

for at least ten years to provide voluntary annual Safety Fund calculations to the Massachusetts Division of Insurance. *Id.* at § X(B)(1).

6.      Plaintiff's Class Counsel litigated this action on a wholly contingent basis, thereby shouldering the entire economic risk of an unfavorable result.  The intense effort sustained for more than four years, as described in detail below, was an expensive proposition both in terms of time committed and expenses incurred.  Plaintiff's Class Counsel have devoted over 12,840 hours of attorney, law clerk and paralegal time, the equivalent of $7,165,025.50 in time, and $1,533,575.85 in out-of-pocket expenses (including $1,344,439.69 in expert witness costs) to date – all with no assurance that a Class would ever be certified, that Plaintiffs would prevail on the merits or that they would be able to recover a judgment in their favor. Consequently, a fee and expense award to Class Counsel is both appropriate and warranted. Furthermore, the "benchmark" 25% fee requested pursuant to the percentage of fund method is fair to both the Class Counsel and the Settlement Class, and warrants approval as squarely within the range of fees customarily awarded in actions such as this, particularly given the benefits conferred on the Class, the risks undertaken on the Class's behalf, and the nature, quality and extent of legal services provided by Class Counsel.

7.      Plaintiff/Class Representative Bacchi has reviewed both the proposed Settlement and Class Counsel's fee request, and fully supports the requested fee award, emphasizing the skill and commitment of Class Counsel and their willingness to take on a case for which the legal landscape is so uncertain.

8.      For a detailed review of the allegations, legal theories and procedural history of this matter, please see Adkins Preliminary Approval Decl. at ¶¶ 3-9.

## II.     THE FEE AND EXPENSE APPLICATIONS

9.     The Class Notice informed Settlement Class Members that Class Counsel would seek approval a fee of up to $9,375,000 plus litigation expenses out of the common fund $37.5 million, subject to the Court's approval at the fairness hearing.  The Class Notice also advised that Class Counsel would seek a Court-approved incentive award of $3,000 for Class Representative Bacchi, to compensate her for the time and effort she expended as the sole named Plaintiff in this case.  Plaintiff Bacchi is particularly deserving because she willingly expended considerable time assisting Class Counsel in preparing and litigating this case, including, without limitation, obtaining and reviewing documents and lengthy briefs, and making herself available for her deposition and to respond to MassMutual's numerous document requests and interrogatories. These fees, expenses and awards are reasonable to compensate both Class Counsel and the Class Representative for more than four years of substantial effort performed on a contingent basis for the approximately 2.71 million Settlement Class Members.  As described above, Class Counsel were tenacious in their dedication to the interests of their clients, and in their investment of the necessary time and resources to bring this matter to a successful conclusion, to the exclusion of pursuing other matters.

10.     Each firm representing Plaintiff has submitted a Declaration setting forth the time it has devoted and the expenses it has incurred in the prosecution of this Action.  In addition to my declaration, *please see* the Declaration of Andrew S. Friedman ("Friedman Decl.") and the Declaration of Mark A. Chavez ("Chavez Decl."), which are attached as Exhibits 2 and 3 to *Plaintiff's Memorandum In Support of Plaintiff's Motion For Approval For Attorneys' Fees, Reimbursement of Litigation Expenses, and Class Representative Award* ("Plaintiff's Fee and Expense Mem.").

11.     As described in their accompanying respective declarations, Plaintiff and the putative class were represented by some of the most experienced and capable class action law firms in the field:  Adkins, Kelston & Zavez, P.C. in Boston, Massachusetts; Bonnett, Fairbourn, Friedman & Balint, P.C. in Phoenix, Arizona; and Chavez & Gertler LLP in Mill Valley, California. Class Counsel have substantial experience prosecuting large-scale class actions, including, without limitation, insurance and complex litigation. *See* attached Exhibit A; Friedman Decl., Exhibit C; Chavez Decl., Exhibit C.  My firm has particularized expertise in litigating class claims against another Massachusetts life insurance company under Massachusetts' Safety Fund law.  *See, e.g., Goldstein v. Savings Bank Life Ins. Co*., 2004 WL 5783465 (Mass. Super. 2004); *Goldstein v. Savings Bank Life Ins. Co*., 21 Mass.L.Rptr. 204, 2006 WL 1720153 (Mass. Super. 2006); and *Goldstein v. Savings Bank Life Ins. Co*., Civ. Act. No. 98-2330-BLS1 (Mass. Super. Sept. 26, 2008). MassMutual was ably represented by high caliber counsel at Skadden, Arps, Slate, Meagher & Flom LLP, who have substantial experience litigating insurance-related class action cases.

## III.    FACTORS IN SUPPORT OF THE FEE AWARD

### A.    The Results Achieved and Benefit Obtained for the Class

12.     In spite of determined and well-funded opposition, Class Counsel achieved a Settlement that provides a total benefit to Class Members in excess of the $37.5 million common fund, as discussed in Paragraph 5.  Class Counsel is of the unanimous opinion that this is an excellent result, particularly in light of Defendant's pending summary judgment motion and other defenses to be presented at trial that could have substantially reduced or eliminated MassMutual's liability to the Class.

13.    Notably, none of the $37.5 million common fund will under any circumstance revert to MassMutual. MassMutual has also agreed to pay all costs associated with the provision of class notice and settlement administration.  Stipulation at § X(B)(2).  MassMutual will pay these costs in addition to the $37.5 million common fund amount, thus adding to the value of the settlement.  *Id.* (last sentence of § X(B)(2)).

14.    The common fund will be distributed in an extremely cost-effective manner. Settlement Class Members with in-force policies will automatically receive Paid-Up Additions, increasing the face amount of their life insurance policies, with no need to file any claim form. Stipulation, at § X(A)(2). Members of the Settlement Class who are former participating policyholders will receive cash payments, also without the need for any claim form. *Id.*  As a result, Settlement Class Members will receive their respective *pro rata* shares of the net common fund determined with reference to the total annual dividends they received during the Settlement Class Period. *Id.* at § X(A)(1).

**B.    The Time and Effort Expended by Class Counsel**

15.    It is no understatement to say that Class Counsel devoted exceptional time, effort and resources to the prosecution of the class claims resolved by the proposed Settlement.

16.    Plaintiff Bacchi filed this action in July 2012 contending that the Massachusetts "Safety Fund" law, M.G.L. c. 175, §§ 140 & 141, sets a statutory percentage limit on the maximum amount of surplus a Massachusetts-domiciled life insurance company may withhold from its participating policyholders and that MassMutual exceeded the Safety Fund limit in each year during the Class Period (January 1, 2001 to December 31, 2016).  The Parties had significantly divergent interpretations of the Safety Fund law and of the significance and interpretation of MassMutual's financial reporting and accounting practices, which differences

7

were manifest in highly contested discovery disputes and dispositive motions.   The litigation

was hard-fought for more than four years, including highly contentious motions such as

Defendant's motion to dismiss, various discovery motions and summary judgment.

17.     Extensive fact discovery in this case began in 2013 and concluded on October 15,

2015.  In response to Plaintiff's discovery requests, MassMutual produced (and Class Counsel

reviewed) over 145,000 pages of documents including voluminous complex spreadsheet data.

The spreadsheets covering many years, product lines and financial data required extensive time

and involvement by Class Counsel and experts and consultants to decipher, analyze and test with

regards to Plaintiff's claims and MassMutual's defenses.

18.     Class Counsel furthermore served subpoenas on accounting firms that served as

MassMutual's auditors and business consultants during the class period, which accounting firms

produced an additional 26,309 pages of documents for review.  Class Counsel also responded to

MassMutual's thorough document requests and interrogatories.  Class Counsel also filed public

records requests in multiple states seeking relevant information, including source information

that separately identified the financials for MassMutual's participating versus its non-

participating business, which distinction is highly material to the safety fund calculation (which

only applies to participating business).

19.     In addition, before entering into settlement negotiations, the Parties commissioned

numerous initial and rebuttal expert disclosure reports.  All told, Plaintiff served disclosures for

five (5) experts and MassMutual served disclosures for six (6) experts. The Parties then

completed depositions of the primary respective experts.

20.     Numerous disputes arose during the discovery process, necessitating substantial

work on the part of Class Counsel, including extensive discovery-related correspondence and

lengthy deficiency letters, multiple meet and confer sessions to negotiate disputed discovery issues and motions to compel the production of improperly withheld documents. Class Counsel also drafted, filed and litigated several discovery motions. These include, among others, motions to amend the discovery schedule, a motion to preclude documents withheld under claim of privilege, and two lengthy (sequential) motions to compel the production of documents and interrogatory responses.  In addition, MassMutual withheld thousands of pages of documents under claim of privilege, requiring Class Counsel to review and challenge the extensive privilege log to obtain favorable decisions (resulting in the production of additional documents).

21.     Moreover, because MassMutual produced only minimal amounts of archival material relating to the history and adoption of M.G.L. c. 175, §§ 140 and 141 and historic accounting practices and annual statements, Class Counsel performed substantial and wide-reaching research in public, university, legislative and specialized libraries and in other public archives to locate information regarding the meaning of the various contested terms in Sections 140 and 141 (and the predecessor statutes dating back to 1887) and interpretation of statutory accounting terms at the time the Safety Fund law was adopted and readopted in 1907.

22.     Class Counsel also deposed ten (10) MassMutual fact witnesses, including accountants, actuaries and MassMutual's in-house lobbyist and attorney.  The depositions of these fact witnesses involved complex issues of statutory accounting, financial reporting, reserves and investments.  Class Counsel served several 30(b)(6) deposition notices on MassMutual and conducted three (3) Rule 30(b)(6) depositions. These depositions produced 987 pages of transcripts and required 59 exhibits (totaling 788 pages) of internal safety fund calculations, meeting minutes, insurance product analyses, financial and accounting records, annual statements and their supplements, the noted multipage spreadsheets containing data for

9

fifteen or more years of MassMutual's operations, and evolving accounting standards to name a few areas of inquiry.  Class Counsel of course also defended Plaintiff's deposition.

23.     Plaintiff Bacchi assisted Class Counsel before and during all the foregoing discovery processes: Plaintiff requested and obtained critical documents regarding the MassMutual policies at issue in this case; she aided Class Counsel's investigation and ability to prepare a detailed complaint; and she expended considerable time assisting Class Counsel in preparing and litigating this case by reviewing documents and briefs, making herself available for her deposition, and responding to MassMutual's numerous document requests and interrogatories.  She did all this willingly and in the spirit of advancing the interests of all similarly situated MassMutual policyholders.

24.     After completing fact and expert discovery, the parties briefed and argued MassMutual's motion for summary judgment, which extensive briefing included Plaintiff's sur-reply. Before commencing settlement negotiations the Parties completed briefing and presented oral argument on MassMutual's motion for summary judgment.  Subject to the Court's ruling on MassMutual's summary judgment motion, the trial in this Action was set to commence on February 6, 2017. [ECF 178].

25.     During the pendency of summary judgment, and after fact and expert discovery was completed, the Parties engaged in arms'-length negotiations and a mediation through their counsel, all of whom are experienced in complex insurance and class action litigation.  The Parties conducted a mediation on December 5, 2016 before Professor Eric D. Green, from Resolutions, LLC, in Boston, Massachusetts.   Between December 2016 and March 2017, the Parties' counsel exchanged numerous drafts of the Stipulation, including details on settlement administration and a proposed Class Notice. On March 13, 2017, the Parties executed and filed

the Stipulation [ECF 235] and Plaintiff moved for preliminary approval of the Settlement

Agreement [ECF 236].

26.     Thus, this case was settled only after the Parties had engaged in several years of

extensive litigation, had briefed and argued numerous substantive motions, waged intense

discovery battles, took extensive discovery, and performed substantial work retaining experts,

and overseeing the preparation of expert reports and rebuttals of MassMutual's experts.  The

work of Plaintiff's experts was critical to Class Counsel's analysis of the highly complex issues

and in prosecuting this case.

27.     The $9,375,000 in attorneys' fees sought by Class Counsel constitutes 25% of the

$37.5 million common fund created for the benefit of the Class, which is squarely within the

range of percentages awarded in comparable class action settlements.  *See* Plaintiff's Fee and

Expense Mem., at 7-8 (and authorities cited therein).  And, as shown below, the reasonableness

of such a "benchmark" percentage award is confirmed by a "lodestar" cross-check.

28.     My firm's time in this case, which excludes time spent drafting the fee application

and related pleadings, totaled 7,509.8 hours with a lodestar of $4,091,340, as follows:

| Attorney | Hours | Hourly Rate | Lodestar |
|---|---|---|---|
| Jason Adkins | 1,915 | $750 | $1,436,250 |
| John Zavez | 1,378 | $750 | $1,033,500 |
| Brendan Bridgeland | 3,081 | $400 | $1,232,400 |
| Jeff Thorn | 670 | $450 | $301,500 |
| Noah Rosmarin | 29.8 | $450 | $13,410 |
| Mimi Brown | 12 | $360 | $4,320 |
| Law Clerk | 424 | $165 | $69,960 |
| **Total** | **7,509.8** | **--** | **$4,091,340** |

*See* Exhibit B (setting forth the time report of Adkins, Kelston & Zavez, P.C.).

29. The information in this declaration regarding my firm's time and expenses is documented and reflected in time and expense printouts and supporting documentation prepared and/or maintained by my firm in the ordinary course of business. I am the attorney who oversaw and/or conducted the day-to-day activities in the litigation and I reviewed these printouts (and backup documentation where necessary or appropriate) in connection with the preparation of this declaration. The purpose of this review was to confirm both the accuracy of the entries on the printouts as well as the necessity for, and reasonableness of, the time and expenses committed to the litigation. I exercised billing judgment to ensure: (a) that the reported lodestar does not include mark-up on contract lawyers, and (b) that billing judgment has been exercised to eliminate duplicative, inconsequential or *de minimus* time. As a result of this review, I believe that the time reflected in my firm's lodestar calculation and the expenses for which payment is sought as set forth in this declaration are reasonable in amount and were necessary for the effective and efficient prosecution and resolution of the litigation. In addition, I believe that the expenses are all of a type that would normally be charged to a fee-paying client in the private legal marketplace.

30. The lodestar for Bonnett, Fairbourn, Friedman & Balint, P.C. and Chavez & Gertler LLP is similarly set forth in the concomitantly filed Friedman Decl. and the Chavez Decl. Cumulatively, Class Counsel expended over 12,840 hours of attorney, law clerk and paralegal time, with a resulting lodestar of over $7,165,025.50. *See* Adkins Decl., Exhibit B (7,509.8 hours totaling a lodestar of $4,091,340); Friedman Decl., Exhibit A (4,677.2 hours totaling lodestar of $2,562,121.00); Chavez Decl., Exhibit A (653.6 hours totaling a lodestar of $511,564.50). Relative to the requested fee of $9,375,000, Class Counsel's combined lodestar of

12

$7,165,025.50 represents a multiplier of 1.31 ($9,375,000 / $7,165,025.50) -- a multiplier well-within that routinely accepted in this and other Circuits. Plaintiff's Fee and Expense Mem., at 18.

31.     Class Counsel's aggregate hours are reasonable for a complex class case like this Action. Moreover, the requested fee is not based solely on time and effort already expended; rather, it is also meant to compensate Class Counsel for time that will be spent administering the settlement in the future.

32.     Class Counsel incurred litigation expenses totaling $1,533,575.85, as set forth in detail in the attached Exhibit C, which consolidates the information from the Friedman Decl. and Chavez Decl. These expenses are reasonable because all are directly related to the case, were key to ensuring that the case would ultimately be trial ready, and were necessary to settle this case. Class Counsel's expenses – especially experts retained by Plaintiff – were critical, incidental and necessary to the representation of the Class. They include expert fees, filing fees, postage, transportation, working meals, printing, electronic research, consultant fees, and Plaintiff's share of the mediator's fees. Because Class Counsel had no assurance whatsoever of recovering these expenses, we had every incentive to economize where possible.

### C.     The Magnitude, Complexity and Uniqueness of the Litigation

33.     It would be difficult to overstate the magnitude, complexity or uniqueness of this case.  With respect to magnitude, the Settlement Class consists of approximately 2.71 million members.  The case was indeed complex, involving rarely litigated statutory accounting rules with nuanced exceptions, in an environment where the law changed mid-litigation.  Most of the litigation revolved around Section 141 (M.G.L. c. 175 § 141), a statute governing MassMutual and less than a handful of other life insurers and judicially enforced only once before (by my firm).

34.     Prosecuting the action and conducting discovery accordingly required Class Counsel to master the complexities of statutory accounting principles (including the historic application of those governing principles dating back to the late 1800s when the predecessor to the Safety Fund law was first adopted by the Legislature), to obtain and review historic texts, legislative history, insurance commissioner reports, and annual statements (and various state supplements thereto) for purposes of statutory interpretation, and esoteric accounting, actuarial and financial information specifically related to MassMutual's annual statements and tax filings, among innumerable other areas concerning life insurance and the law.

35.     The dispositive legal question in this case – whether MassMutual's Safety Fund calculations exceeded the limitations provided by the Safety Fund law – implicated several substantive defenses raised by MassMutual. For example, MassMutual asserted that it has calculated its Safety Fund limit in accordance with the statutorily provided two-part formula and has complied with Section 141 at all times. Specifically, MassMutual contends that its Board of Directors, in the exercise of its business judgment, decides each year which part of MassMutual's earnings will be paid out as dividends to participating policyholders, and which part the Company will retain to ensure its ability to pay claims, to cover expenses, and to grow its business.  MassMutual emphasizes that each year it has reported its Safety Fund calculation to its chief regulator, the Massachusetts Division of Insurance, and that the insurance Commissioner never objected to them. Beyond this claimed "regulatory blessing," MassMutual argues that Section 141 was not incorporated into Plaintiff's par policy contract, and that she lacks a private right of action to otherwise enforce Section 141. MassMutual also argued that Plaintiff's theory that the Asset Valuation Reserve (AVR) was where the MVM was accounted

for under modern statutory accounting principles, was one of "implied repeal," against which there is a "strong presumption" under Massachusetts law.

36.     In addition, MassMutual argued that Plaintiff's interpretation of the Safety Fund law was contrary to the unambiguous text of Section 141, which must be enforced as enacted. MassMutual also argued that Plaintiff's complaint is time-barred, based on deposition testimony it claimed showed that its Safety Fund calculations were public records and that Plaintiff was aware of the facts giving rise to her claims by virtue of these public records filed more than 10 years before she filed suit.

37.     In short, there is nothing about this Action that could be characterized as "garden variety." The case was a decidedly unique one, raising complicated statutory accounting issues on behalf of approximately 2.71 million MassMutual policyholders.

**D.     The Need for Competent Counsel in Such High Risk, Contingent Cases**

38.     Class Counsel undertook this case on a wholly contingent basis with no assurance that they would ever be compensated for the enormous investment of time and resources required.  In doing so, we were obligated to ensure that sufficient resources were dedicated to the prosecution of this Action and that (our own) funds were available to compensate staff and pay the considerable out-of-pocket costs a case such as this entails.  We knew at the outset that there would likely be a lag of many years between the expenditure of time and money, and any recovery, and that the financial burden on contingent fee counsel (even if they ultimately prevail) is far greater than on attorneys paid on an ongoing basis.  In addition, this litigation presented significant risks that could have precluded any recovery at all, as in many hard-fought cases that have produced no compensation for contingent fee counsel.  If contingent-fee counsel are not adequately compensated out of the recoveries they obtain, ultimately there would be no firms of

the caliber of Class Counsel willing to venture the risk to obtain recoveries for consumers of the sort achieved here.

39.     Despite all the risks described above, Class Counsel undertook to prosecute the putative class claims against a resourceful and intrepid adversary in MassMutual. Class Counsel's skill, experience and persistence were directly responsible for the favorable settlement despite the tribulations of high stakes litigation, and therefore weigh in favor of a benchmark award of 25% of the common fund generated through their diligent effort.

## IV.     CONCLUSION

40.     For the reasons set forth above and in the accompanying briefs, Class Counsel's application for a Court-approved award of attorneys' fees to Class Counsel, reimbursed litigation expenses to Class Counsel, and an incentive award to Plaintiff, is well-taken, and should be granted.


I declare under penalty of perjury under the laws of the Commonwealth of Massachusetts that the foregoing is true and correct to the best of my knowledge and that this declaration was executed this 19th day of June, 2017 at Boston, Massachusetts.


s/ Jason B. Adkins
Jason B. Adkins

# EXHIBIT A

# ADKINS, KELSTON & ZAVEZ, P.C.
**90 Canal Street, Boston, MA  02114**
**(617) 367-1040**

## FIRM BIOGRAPHY

Adkins, Kelston & Zavez, P.C. specializes in class action matters, particularly involving corporate wrongdoing, policyholder protection and related insurance regulatory matters, demutualizations, improper corporate reorganizations, environmental pollution, and violations of consumer rights and interests.  Adkins, Kelston & Zavez, P.C. also has a broad range of experience in the areas of business and partnership disputes, intellectual property litigation, landlord-tenant matters, civil rights matters, environmental torts, business reorganizations and a wide variety of other transactions.

## REPRESENTATIVE CASES

In *Weldon v. Blue Cross Blue Shield of Florida, Inc.*, we represented a policyholder in challenging the adequacy of the insurer's proxy statement concerning its proposed reorganization from a mutual health insurer into a mutual holding company and a failure to distribute dividends, which matter was amicably resolved in 2015.

In *In Re Harleysville Mutual*, we were part of a team of law firms that litigated and then negotiated a class-wide settlement in 2012 of $26 million in damages on behalf of Harleysville Mutual policyholders who alleged unfairness in the merger between Harleysville and Nationwide Mutual Insurance Company.

In *Gintis et al. v. Bouchard Transportation Co. Inc. et al.*, we represented in Massachusetts federal court a class of hundreds of property owners on a 90 mile stretch of the Buzzards Bay coastline whose waterfront property was polluted by an oil spill on April 27, 2003.  After extensive litigation, including a successful appeal of the district court's initial denial of class certification, we settled the matter in 2010 for $11.45 million.

In *Goldstein v. Savings Bank Life Ins. Co.*, we certified a contested class of 400,000 policyholders and successfully settled the matter in 2010 for a recovery valued at $21.5 million.  We litigated this complex action for over twelve years in Massachusetts state court to obtain the recovery for an alleged underpayment of dividends.

In *Rieff v. Evans et al.*, we represented a class of 300,000 members in which we succeeded in getting the Iowa Supreme Court to recognize the tort of de facto demutualization, certified the class and, after an extensive motion practice, settled the case on a nationwide class basis for $128.5 million (plus $110 million in forced dividends).

In *Crandall v. Alderfer*, we represented plaintiffs in a class action filed in federal court in Philadelphia that alleged that the defendant directors and Old Guard Mutual Insurance

Company had converted from a mutual insurance company without adequately compensating the class.  After extensive motion practice and discovery, and certification of the class, the case settled on behalf of the class for approximately $7 million.

In *In re New England Life Insurance Company Sales Practices Litigation,* in which the company was charged with deceptive sales practices, we assisted in litigating the case which settled on a class-wide basis for a value in excess of $100 million.  In a similar class action brought against Franklin Life Insurance Company, alleging the Company engaged in deceptive sales practices, AKZ assisted in litigating the case which settled on a class-wide basis for a value of $50 million.

In *Micromuse, Inc. v. The Estate of Christopher Dawes*, USDC CV 12333 (D. Mass. 2002) we represented the defendant (the estate of a recently deceased high tech entrepreneur), where plaintiff claimed hundreds of millions of dollars in damages for breach of a joint venture agreement.  After extensive discovery, our client prevailed on summary judgment, and final judgment entered for the estate, with costs, on March 2, 2004.

In *495Harrison LLC v. J&B, Inc.*, Suffolk Sup. Ct. C.A. No. 04-1849, we represented a plaintiff developer, and successfully established a new mechanics' lien law in Massachusetts discharging an encumbrance that was interfering with the project's completion.

In *Silverman v. Liberty Mutual Insurance Company*, we represented policyholders who alleged the insurer filed misleading proxies concerning its mutual holding company conversion which, as structured, would harm the policyholders' interests.  Through settlement, the company agreed to substantive changes in how it operated and paid $850,000 in costs.

In *Mitchell v. City of Boston, et al*, AKZ represented a plaintiff in a civil rights action against the City of Boston and two of its police officers when plaintiff was exonerated after spending over seven years in prison (we were the first to overturn a Massachusetts conviction through DNA evidence).  AKZ obtained $950,000 for the client.

In *Commonwealth v. Hardwood*, AKZ represented a criminal defendant against charges of larceny and workers' compensation fraud.  On the eve of trial, the Massachusetts Superior Court granted our motion to suppress the Commonwealth's key witness.  The Commonwealth took an interlocutory appeal and the SJC affirmed the trial judge's decision.   As a result, the Commonwealth dropped all charges.

In *Commonwealth v. Cassino*, a heavily publicized criminal matter in which our client was charged with vehicular homicide, AKZ won a full acquittal after a jury trial.

## ATTORNEYS

### Jason B. Adkins

Jason Adkins graduated from the University of Michigan in 1982, and Harvard Law School in 1991. He is admitted to the Massachusetts bar, and federal courts (District of Massachusetts, U.S. Court of Appeals for the First Circuit; U.S Court of Appeals for the District of Columbia; U.S. Supreme Court).  He has also been admitted pro hac vice in numerous state courts.

Jason Adkins is a founder and director of Adkins, Kelston & Zavez, P.C.  Previously, Jason was founder and executive director of the Center for Insurance Research from 1991 to 1997. The Center is a leading non-profit organization that conducts research and advocates on behalf of insurance policyholders nationwide.  He has written, published and testified widely on insurance and related regulatory matters.

Mr. Adkins specializes in evaluating and prosecuting complex litigation and all aspects of major consumer class action litigation around the country. He has also represented state and national candidates for political office and political parties in election-related litigation, and represented clients before the U.S. Federal Election Commission, U.S. Federal Trade Commission, the Mass. Board of Medicine, Mass. Department of Environmental Protection, numerous state insurance departments, other governmental agencies, and before professional associations.

### David L. Kelston

David Kelston graduated from Columbia College in 1967, the Kennedy School of Government, Harvard, M.P.A., in 1982, and Harvard Law School (magna cum laude) in 1982, where he served as articles editor for the Harvard Law Review. David is admitted to the Massachusetts bar, and federal courts (District of Massachusetts and U.S Court of Appeals for the First Circuit).

David Kelston is a founder of Adkins, Kelston & Zavez, P.C.  He is an experienced trial and appellate litigator who, after clerking for the Federal District Judge Robert Keeton following law school, was an associate and then partner at prominent Boston law firms until the formation of this law firm in 1997. Mr. Kelston is the author of various articles concerning trial practice and related matters, and has served as a member and on the board of directors of numerous law-related groups.

Mr. Kelston has litigated cases that resulted in significant impact involving: class actions, constitutional first amendment rights; business cases concerning investors' property interests; intellectual property disputes; and criminal cases establishing evidentiary rules for informant testimony and automobile searches by police.

**John Peter Zavez**

John Peter Zavez graduated from Harvard College in 1981, served on active duty in the US Army from 1981-85, and graduated from Harvard Law School in 1989. He has been a member of the Massachusetts bar since 1989, and federal courts (District of Massachusetts, U.S. Court of Appeals for the First Circuit; U.S Court of Appeals for the Seventh Circuit; U.S. Supreme Court).

Mr. Zavez is a founder and director of Adkins, Kelston & Zavez, P.C. His previous legal experience includes clerking for a Federal District Judge William G. Young, and working 8 years for two prominent Boston law firms. Mr. Zavez has been involved in every aspect of approximately 30 nationwide consumer and shareholder class action lawsuits, from investigating and filing complaints to negotiating settlements.

Outside of work, Mr. Zavez is the father of three girls, a Colonel in the US Army Reserve, and a "middle of the pack" endurance athlete who has completed the Boston Marathon each of the last 18 years.

**Noah R. Rosmarin**

Noah Rosmarin is a graduate of the University of Tampa, B.A. in 1992, and Southern New England School of Law, where he received his J.D. in 1995. While in law school, Noah served as an officer of the International Law Society (1993-1995), was a member of the Environmental Law Society (1994-1995) and was Outstanding Oralist on the Phillip C. Jessup International Law Moot Court Team.  Mr. Rosmarin is admitted to the Massachusetts bar, and federal courts (District of Massachusetts and U.S Court of Appeals for the 1st Circuit).

A native of Boston, Mr. Rosmarin was selected as one of Massachusetts' five outstanding young lawyers in 1997 for his participation in high-profile civil rights litigation. He was most recently commended for his successful effort, through the use of DNA evidence, in freeing a Massachusetts citizen who had been wrongly imprisoned for almost a decade. Noah joined the firm at its inception in 1997 and is involved in all aspects of the firm's litigation practice.

**Brendan M. Bridgeland**

Brendan Bridgeland graduated from Johns Hopkins University in 1996, and the Boston University School of Law in 2000. He was admitted to the Massachusetts bar in 2001. While in law school, Brendan earned a Business and Financial Institutions Concentration with Honors.

Following his graduation, Brendan worked at the Center for Insurance Research in several capacities and served as the executive director of the organization from 2005-2009.  He still serves as a director of the organization. The Center is a leading non-profit

organization that conducts research and advocates on behalf of insurance policyholders nationwide.

Brendan specializes in evaluating and prosecuting complex consumer class action litigation, in insurance and environmental areas of law.  He has also represented clients before numerous state insurance departments and other governmental agencies.

### Jeffrey G. Thorn

Jeffrey Thorn graduated from Yale College in 1999 and Harvard Law School in 2006.  He served in the U.S. Peace Corps in Namangan, Uzbekistan from 1999 - 2001.  He is a member of the Massachusetts bar, the New York bar, and federal courts in the Southern and Eastern Districts of New York.

Before joining Adkins, Kelston & Zavez, P.C., in 2010, Jeff was an associate in the New York litigation group of Shearman & Sterling LLP.  He has worked on complex commercial litigation involving corporate law, contractual breaches, securities disputes, and tortious actions, as well as civil rights, consumer protection, and various class action litigation.  Jeff also holds a post-graduate research fellowship from Harvard Law School for the study of, among other topics, legal reform in post-Soviet Central Asia.

## FIRM AFFILIATIONS

Adkins, Kelston & Zavez, P.C. works closely with prominent firms around the country to identify and litigate complex matters, particularly those involving insurance.

# EXHIBIT B

**BACCHI v. MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY**

**Adkins, Kelston & Zavez, PC**

**<u>Time Report</u>**

| <u>Attorney</u> | <u>Hours</u> | <u>Hourly Rate</u> | <u>Lodestar</u> | |
|---|---|---|---|---|
| Jason Adkins | 1915 | $750 | $ | 1,436,250 |
| John Zavez | 1378 | $750 | $ | 1,033,500 |
| Brendan Bridgeland | 3081 | $400 | $ | 1,232,400 |
| Jeff Thorn | 670 | $450 | $ | 301,500 |
| Noah Rosmarin | 29.8 | $450 | $ | 13,410 |
| Mimi Brown | 12 | $360 | $ | 4,320 |
| Law Clerk | 424 | $165 | $ | 69,960 |
| Total | 7,509.8 | -- | $ | 4,091,340 |

# EXHIBIT C

**BACCHI v. MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY**

**<u>Summary of Case Expenses: All Plaintiff's Counsel</u>**

| | AKZ | BFFB | C&G |
|---|---|---|---|
| Conference Calls: | $    1,063.62 | $      398.90 | -- |
| Records: (Court Transcripts, etc.) | -- | $      582.90 | $      23.50 |
| Contributions to Litigation Fund: | $ 311,675.35 | $  566,682.46 | $ 538,348.34 |
| Copying (Internal): | $    1,036.46 | $   18,472.60 | $        2.65 |
|            (External): | -- | $    1,288.70 | -- |
| Electronic Research (Westlaw): | $    4,693.93 | $   25,290.31 | $    1,462.69 |
| Reference Materials (for Experts): | -- | $      291.94 | -- |
| Filing & Service Fees: | $    1,075.50 | -- | $      25.00 |
| Postage: | $      281.21 | -- | $        0.49 |
| Travel: | $    9,009.52 | $   45,452.99 | $    2,280.23 |
| Miscellaneous: (Hand deliveries/Express mail) | $      538.73 | $    3,534.29 | $      63.54 |
| **Firm Total:** | **$ 329,374.32** | **$  661,995.09** | **$ 542,206.44** |
| **GRAND TOTAL :** | | | **$1,533,575.85** |

| LITIGATION COMMON EXPENSE FUND | | |
|---|---|---|

| Litigation Fund Contributions | |
|---|---|
| **Firm** | **Amount** |
| Adkins, Kelston & Zavez | $311,675.35 |
| Bonnett, Fairbourn, Friedman & Balint | $566,682.46 |
| Chavez & Gertler | $538,348.34 |
| **TOTAL** | **$1,416,706.15** |

| Payments | | |
|---|---|---|

| **Payee** | **EXPERTS** | **Amount** |
|---|---|---|
| | **Description** | |
| Actuarial Resources Corporation (Robert Crompton) | Rebuttal Expert: compliance with Safety Fund Law | $114,497.09 |
| Consulting Expert #1 | Consulting Expert:  actuary, life insurance products | $2,400.00 |
| Cohen Strategic Consulting (Michael Cohen) | Rebuttal Expert:  insurance company ratings and compliance with Safety Fund | $46,777.32 |
| James W. Lovely | Expert:  interest rates and currency derivatives | $214,092.38 |
| Consulting Expert #2 | Consulting Expert:  actuary, life insurance products | $85,251.71 |
| Consulting Expert #3 | Consulting Expert: securities and financial analysis | $4,600.00 |
| Professor Tom Baker | Expert:  history and economics of insurance regulation | $25,000.00 |
| Veris Consulting, Inc. (R. Larry Johnson) | Expert: analysis of safety fund calculations for years 1999 through 2014 | $851,821.19 |
| | **TOTAL** | **$1,344,439.69** |

| **Payee** | **HEARING & DEPOSITION TRANSCRIPTS/VIDEOS** | **Amount** |
|---|---|---|
| | **Deponent/Hearing** | |
| Doris Wong Associates/National Video Reporters | Karen Bacchi (Plaintiff) - Transcript & Video | $1,428.31 |
| Catuogno Court Reporting | Matthew Bialecki (MM Expert) - Transcript | $1,247.65 |
| Catuogno Court Reporting | Delmer Borah (MM Employee) (Vol 1) - Transcript & Video | $3,617.80 |
| Catuogno Court Reporting | Delmer Borah (MM Employee) (Vol 2) - Transcript & Video | $2,129.40 |
| Catuogno Court Reporting | William Chrnelich (MM Expert) - Transcript | $2,293.00 |
| Doris Wong Associates | Michael Cohen (Plaintiff Expert) - Transcript | $522.05 |
| Doris Wong Associates | Robert Crompton (Plaintiff Expert) - Transcript | $522.05 |
| Catuogno Court Reporting | Carol Dube (MM Employee) (Transcript & Video) | $6,186.25 |
| Catuogno Court Reporting | David Echeverria (MM Employee) - Transcript & Video | $5,428.85 |
| Catuogno Court Reporting | Peter Ferris (MM Employee) - Transcript & Video | $2,638.25 |
| Veritext Legal Solutions | William Fisher (MM Employee) - Transcript & Video | $3,967.91 |
| Veritext Legal Solutions | Mary Gresham (MM Employee) (Vol 1) - Transcript & Video | $4,007.62 |
| Veritext Legal Solutions | Mary Gresham (MM Employee) (Vol 2) - Transcript & Video | $2,768.33 |
| Catuogno Court Reporting | Isadore Jermyn (MM Employee) - Transcript & Video | $6,952.50 |
| Doris Wong Associates | R. Larry Johnson (Plaintiff Expert) - Transcript | $764.00 |
| Catuogno Court Reporting | Kenneth Langevin (MM Employee) - Transcript & Video | $4,069.50 |
| Catuogno Court Reporting | Louis Lombardi (MM Expert) - Transcript | $2,503.10 |
| Catuogno Court Reporting | John Lopes (MM Employee) - Transcript & Video | $2,638.25 |
| Catuogno Court Reporting | Robert Reitano (MM Expert) - Transcript | $1,371.50 |
| Catuogno Court Reporting | Elizabeth Ward Chicares (MM Employee) - Transcript & Video | $6,106.25 |
| Copley Court Reporters | *Mass. Mutual Life v. Comm. Of Revenue* : Appellate Tax Board Hearings (April 2014) | $2,402.50 |
| Young Transcription Services | Status Conference Hearing 3/9/2016 (Judge Donald Cabell) | $66.00 |
| | **TOTAL** | **$63,631.07** |

| **Payee** | **MEDIATION** | **Amount** |
|---|---|---|
| Resolutions, LLC | Mediation (Professor Eric D. Green) 12/05/2016 | $8,250.00 |
| | **TOTAL** | **$8,250.00** |

| **Payee** | **BANKING** | **Amount** |
|---|---|---|
| Alliance Bank of Arizona | Bank Service Fees; Checks | $385.39 |
| | **TOTAL** | **$385.39** |

| | |
|---|---|
| **TOTAL EXPENSES PAID** | **$1,416,706.15** |